# EXHIBIT "A"

1          UNITED STATES BANKRUPTCY COURT

2              DISTRICT OF ARIZONA

3

4    In re:                        )
                                   ) Chapter 11 Proceedings
5    SUMMIT FAMILY RESTAURANTS,    )
     INC.,                         ) No. 2:21-bk-02477-BKM
6                                  )
                Debtor.            )
7                                  )
     _____)
8

9

10

11

12

13

14   VIDEOCONFERENCE RULE 2004 EXAMINATION OF ROBERT WHEATON

15                 Scottsdale, Arizona

16                   June 2, 2021

17

18

19

20

21

22

23
                              Prepared by:
24                            CINDY MAHONEY, RPR, RMR
                              Certified Court Reporter
25                            Certificate No. 50680

**Coash & Coash, Inc.**
     602-258-1440          www.coashandcoash.com

**Page 2**

```
 1                I N D E X
 2  WITNESS                                    PAGE
 3  ROBERT WHEATON
 4      Examination by Mr. Dawes               4
 5      Examination by Mr. Hawkins            91
 6
 7
 8                EXHIBITS MARKED
 9  EXHIBITS          DESCRIPTION             PAGE
10
11  Exhibit 1    Response to BSV Lamont JCRS LLC's    13
             Request for Documents Under
12           Bankruptcy Rule 2004
13  Exhibit 2    SBA documents, SU_000001-13          18
14  Exhibit 3    Summit Family Resturants Inc.        52
             Profit & Loss Projections (Cash
             Flow), SU001140
15
16  Exhibit 4    Voluntary Petition for               58
             Non-Individuals Filing for
17           Bankruptcy
18  Exhibit 5    Monthly Operating Report for Small   64
             Business Under Chapter 11
19  Exhibit 6    Shopping Center lease, JCRS          70
             Shopping Center
20
21  Exhibit 7    Letter to Summit Family Restaurants  82
             from John Deacon of Broad Street
             Realty, Inc., with enclosures
22
23
24                REQUEST
                Page 93   Line 17
25
```

**Page 3**

```
 1      THE VIDEOCONFERENCE RULE 2004 EXAMINATION OF
 2  ROBERT WHEATON commenced at 9:12 a.m. on June 2, 2021, at
 3  the law offices of Sacks Tierney, 4250 North Drinkwater
 4  Boulevard, 4th Floor, Scottsdale, Arizona, before Cindy
 5  Mahoney, RPR, RMR (via videoconference), Arizona Certified
 6  Court Reporter No. 50680.
 7
 8                   *    *    *
 9  APPEARANCES:
10  For the Debtor:
        SACKS TIERNEY P.A.
11      By: Sierra M. Minder, Esq.
            4250 North Drinkwater Boulevard
12          4th Floor
            Scottsdale, Arizona 85251
13          480-425-2600
            Sierra.minder@sackstierney.com
14
15  For BSV Lamont JCRS, LLC (via videoconference):
        FOX ROTHSCHILD LLP
16      By: Christopher J. Dawes, Esq.
            1225 17th Street
17          Suite 2200
            Denver, Colorado 80202
18          303-383-7604
            Cdawes@foxrothschild.com
19
20  For Save Casa Bonita (via videoconference):
        GUIDANT LAW FIRM
21      By: Lamar Hawkins, Esq.
            2390 East Camelback Road
22          Suite 318
            Phoenix, Arizona 85016
23          602-888-9229
            lamar@guidant.law
24
25  ALSO PRESENT:  Andrew Novick (via videoconference)
```

```
 1      ROBERT WHEATON,
 2  the witness herein, being first duly sworn,
 3  was examined and testified as follows:
 4
 5      EXAMINATION
 6  BY MR. DAWES:
 7  Q.  Good morning.
 8      Would you go ahead and state your name for
 9  the record, please.
10  A.  Robert Wheaton.
11  Q.  And, Mr. Wheaton, your title and capacity with the
12  debtor is what?
13  A.  CEO.
14  Q.  And for how long has that been the case?
15  A.  25 years.
16  Q.  So, Mr. Wheaton, my name is Chris Dawes.  We've
17  met at least over the phone at the 341 meeting a few weeks
18  ago.
19  A.  That's correct.
20  Q.  And so I represent the landlord.
21      I have some questions for you today that
22  you'll be answering under oath.  Do you understand that?
23  A.  Yes.
24  Q.  Have you previously given any deposition testimony
25  or, more specifically, a 2004 examination?
```

```
 1  A.  To answer your first question, yes.  In terms of a
 2  2004, no.
 3  Q.  And how many depositions have you provided?
 4  A.  More than 50, less than 100.
 5  Q.  And generally speaking, what were the types of
 6  matters -- of those 50 to 100 depositions, what was the
 7  general subject matter of those?
 8  A.  Other than saying that they were all business
 9  related, it would be difficult to classify any particular
10  one.
11  Q.  Okay.  That's fair.
12      When was the last time you gave a deposition?
13  A.  I actually can't recall, but it would be two or
14  three years ago at least.
15  Q.  Okay.  We had the 341 meeting a few weeks ago, and
16  I know you had some things in the works at the time in
17  terms of the debtor's plans.
18      Where have you been physically spending your
19  time since the 341 and today?
20  A.  The majority of time has been in Arizona.  I have
21  made two single-day trips to Denver since the 341.
22  Q.  And what was the purpose of those trips to Denver?
23  A.  To review agendas with the management team that is
24  there.  We -- one of the members of the management team is
25  our kitchen manager or kitchen director.  And we made some
```

1  joint vendor calls to some of the vendors that we have
2  historically used.
3     I also met with the -- some of the
4  maintenance people that we had some projects on, as well as
5  just meeting and thanking all the -- we have a pretty good
6  workforce working on the restaurant right now.  And just
7  offer encouragement, get -- keep the process going.
8  Q.  Okay.  And when you say you were meeting with the
9  management team, who comprises the management team for the
10  debtor?
11  A.  Well, at this point, the management team -- well,
12  I would be the senior most management team member.  And --
13  but in this particular case, I met with Jim Gronert, who,
14  again, would handle the kitchen and food-related side of
15  the house, and Dawn Masteas, as I mentioned in our 341, who
16  is handling the workforce and the cleanup and the
17  maintenance efforts.
18     Also, the -- the -- if you think of Casa
19  Bonita as having three business components, one is,
20  obviously, food.  Another is arcade, which is games.  And
21  then the third is gift shop.  She's spearheading the
22  opening of two of the three of those, which are the arcade
23  and gift shop.
24  Q.  So the management team is you, Mr. Gronert, and
25  Ms. Masteas?

1  A.  At this point, yes.
2  Q.  And are they both employees of the debtor?
3  A.  They are.
4  Q.  How many other employees does the debtor currently
5  employ today?
6  A.  18.
7  Q.  When were those employees hired?
8  A.  I don't know how many -- you asked this question
9  in the 341.  And I don't recall how many were on staff at
10  that point in time, and that was my response.  I would say
11  that all 20 have been added since I got involved in the
12  reopening and yesterday when we did our last payroll run,
13  which had 20 employees on it.
14  Q.  Who manages the payroll run?
15  A.  That's handled by an individual by the name of
16  Wendy Sawyer.  She is one of three Star Buffet employees,
17  Ron Dowdy being one and I am the other.
18  Q.  I think your testimony at the 341 was that there
19  were three employees at that time.  So do I you understand
20  correctly there have been 15 additional employees hired
21  since that time?
22  A.  Well, three -- 20 minus three would be 17.
23  Q.  Okay.  Are you -- I had -- you said that there
24  were three at the time?
25  A.  Right.

1  Q.  Okay.
2  A.  I said --
3  Q.  20 minus three is 17.  Okay.
4     So you hired 17 since the 341 meeting; is
5  that right?
6  A.  That's correct.  Other than I thought in my
7  testimony I said that I wasn't exactly sure, and I'd have
8  to check the payroll records to see whether it was three or
9  two or four.  But in general, we've gone from a small
10  amount to a larger amount.  And we could add additional
11  employees tomorrow.  We have a long list of applications.
12  We just don't have anything for them to do.
13  Q.  When you say you have a long list of applications,
14  how is it that the debtor is going about hiring folks?
15  A.  Well, actually, two different ways.  In our -- if
16  I can refer to the -- to the initial status conference
17  report, which was just submitted, I indicated in that
18  report that we have over 75 former employees who have
19  indicated that they will come back to work as soon as we --
20  it's clear the date we're going to open.  So that's one
21  source, just former employees that have been contacted that
22  we're highly confident will come to work when Casa Bonita
23  re-opens.
24     We then have established -- we have our
25  restaurant facility open.  And we have a gift shop open and

1  available.  We have our arcades, although we haven't --
2  ready to go.  We'll probably transition when I go to Denver
3  on Friday to have the arcade component of the business open
4  and active.
5     And the third thing is that we actually have
6  a table set up right in the front of the restaurant where
7  we are accepting applications.  And we have a large number,
8  but I don't know the exact number of applicants that are
9  non -- that are -- people who have applied but are not
10  former employees.
11  Q.  Okay.  You've indicated there are former employees
12  who have expressed interest in coming back; right?
13  A.  Yes.
14  Q.  You have a table to accept applications at the
15  front of the restaurant; is that right?
16  A.  Yes.
17  Q.  And what was the other methodology or approach of
18  hiring folks?  Or was that it?
19  A.  That was it.
20  Q.  Okay.  So there's no classifieds, no Monster.com?
21  There's none of that kind of stuff?
22  A.  Not yet, no.
23  Q.  Have we covered all of the efforts to hire
24  employees and bring them back on board?
25  A.  We have.

1  Q.  Okay.  All right.  Now, I think you just indicated
2  that you are open for business; is that true?
3  A.  Well, I think the -- I think a better, more
4  specific response is that we are open for gift shop sales.
5  We are planning to open this week for the arcade.  We are
6  doing promotional activities for those people who are
7  interested in coming by.
8      And promotional activities would be free
9  tours of the restaurant.  It would be passing out coupons
10  for discounted meals when we reopen.  So promotional
11  activities would be the third.  Plus, as I just mentioned,
12  accepting applications.
13  Q.  Okay.  So the -- when did the gift shop open --
14  reopen to the public?
15  A.  I -- Friday, a week ago.
16  Q.  May 28th?
17  A.  Yes.
18  Q.  What hours is it open now?
19  A.  Limited hours.  10:00 a.m. to 3:00 p.m.
20  Q.  And have there been revenues generated from the
21  gift shop since Friday?
22  A.  No.  There have been a number of giveaways, but we
23  haven't got our register system working at an acceptable
24  level yet.  So hopefully that will be by Friday.
25  Q.  So no sales; just giveaways?

1  A.  Giveaways.
2  Q.  And the arcade, as I understood you, the arcade is
3  not open at this juncture; correct?
4  A.  All the games have been -- there are three levels
5  of arcades at Casa Bonita, and two of the three levels of
6  arcades, all the games have been serviced, all the games
7  are functional, and all of the games will be available to
8  walk-in customers this weekend.
9  Q.  Okay.  So at this juncture, the arcade is not open
10  for business; correct?
11  A.  It is not open for business.
12  Q.  And the promotional activities that you mentioned,
13  how many tours have been provided in the year -- let's just
14  say this year of 2021?
15  A.  To be on the safe side, I would say less than one
16  dozen.
17  Q.  The restaurant and bar is not open for business;
18  correct?
19  A.  Correct.
20  Q.  In terms of revenues generated by the debtor, have
21  there been any since April of 2020?
22  A.  None.
23  Q.  And the employees that you brought on board, in
24  general terms -- I know you described a couple different
25  phases of your efforts to get it up and running.  One was

1  kind of taking inventory.  The other is kind of getting
2  equipment checked and making sure it's up and running.  Is
3  that a fair characterization?
4  A.  Yes.
5  Q.  And then so what's -- are you able to describe a
6  breakdown of kind of what -- how many employees are doing
7  which of those functions in general terms?
8  A.  I can.  There are approximately five individuals
9  who are on the payroll who are doing kitchen-related
10  activities.  That's everything from taking inventory to
11  discarding items whose -- products, food goods that --
12  whose used-by dates have been exceeded, testing, cleaning
13  the equipment.  They're performing kitchen-related,
14  inventory-related functions.
15      With respect to the other 15, they are doing
16  everything from -- we've completely -- a traditional thing
17  done every spring at Casa Bonita is to place a garden
18  around the fountain.  So I had a crew doing garden-related
19  work, and they continue to maintain the area around the
20  fountain.  I have another crew who is going doing nothing
21  but painting, touch-up painting in places that I feel could
22  warrant some touch-up painting.  And there's been a lot of
23  that.
24      We have -- since we have reopened so many
25  restaurants post COVID, there is a methodology that you go

1  through to make your restaurant ready for reopening.  And
2  the remainder of the crew have been working on that.  It's
3  a sanitizing procedure, cleaning procedure.  And a lot of
4  times -- it's a big restaurant.  A lot of time has been
5  spent on that.
6  Q.  Of the 20 employees that you mentioned, how many
7  -- are those all former employees?
8  A.  Every single one of them.
9  Q.  And the 75 that you have indicated have expressed
10  interest, how has that interest manifested itself?
11  A.  We have lists of all former employees.  And one of
12  the tasks that Dawn had and a couple of her assistants is
13  to contact all of the former employees and see who had an
14  interest in coming back to work.
15  Q.  So is there a list somewhere that keeps track of
16  who all those folks are?
17  A.  There is.
18  Q.  Okay.  Is that something you have?
19  A.  I have it, yes.  And she has it as well.
20  Q.  Okay.  Let me ask you to -- I'm going to share my
21  screen with you now.  I've moved into the Dropbox the
22  response that was filed last evening by the debtor.  So let
23  me start by sharing this screen here.
24      MR. DAWES: I will mark this Exhibit 1.
25      (The document was marked as Exhibit 1 for

1  identification.)
2    BY MR. DAWES:
3  Q.  Is that showing up on your end, Mr. Wheaton?
4  A.  It is.
5  Q.  So if we -- this was -- again, we received this
6  last evening.  I wanted to walk through a few of the
7  responses.
8    Before we get into the particulars, I'm going
9  -- I'll start with number 1?
10    But what was your involvement in preparing
11  the responses to this request?
12  A.  To this specific request or all requests in
13  general?
14  Q.  The responses to all of the requests that we see
15  in Exhibit 1.
16  A.  I either drafted a response or reviewed each and
17  every response.
18  Q.  Okay.  Other than counsel, did anyone else
19  facilitate or help prepare the responses for the debtor?
20  A.  Ron Dowdy.
21  Q.  Okay.  Anybody else?
22  A.  No.
23  Q.  I'd like to walk through a few of these.
24    And starting with number 1, this asks about
25  the documents evidencing the location of the debtor's

1  domicile, residence, principal place of business or
2  principal assets in the United States during 180
3  immediately preceding the petition date.  I think that was
4  mistyped there.  During 180 days.
5    Apparently there are no documents in the
6  debtor's possession that evidence such a location; is that
7  right?
8  A.  None other than what was provided in the 341 exam.
9  Q.  What was provided in the 341 exam?
10  A.  Well, in the 341 exam, there was documents that
11  provided evidence of our office, meaning the debtor's
12  office, in Scottsdale, Arizona.  There was documents that
13  provided evidence of my residency in Arizona for 30 years,
14  for example.
15  Q.  Okay.  And I will confess, I'm not privy to the
16  evidence you're referring to.
17    What is the evidence regarding the debtor's
18  office in Scottsdale, Arizona?
19  A.  I thought that was detailed in the 341 response.
20  It was also detailed -- I think just the 341.
21  Q.  Did you provide -- did the debtor provide
22  documents at the 341 examination?  I'm sorry.  I didn't
23  catch that.
24  A.  I was just thinking.  We provided testimony.  I
25  really can't answer whether we provided a specific series

1  of documents.
2  Q.  Okay.  In any event, as you sit here today under
3  oath, you're not aware of any documents responsive to
4  request number 1; is that correct?
5  A.  The response is accurate to the best of my
6  knowledge.
7  Q.  Okay.  There are -- number 2 asks about
8  documentation regarding potential sources of financing for
9  the debtor.  Do you see that?
10  A.  Yes.
11  Q.  And some of the documents -- do you recollect what
12  documents the debtor provided?
13  A.  I do.
14  Q.  Okay.  And would you describe those?
15  A.  Well, better than describing, I'll just refer to
16  the exhibits.  We provided documents related to two SBA
17  loans that we received, PPP loans, an EIDL loan.  And then
18  we also provided evidence of activities to secure some
19  additional funding, specifically the Main Street Lending
20  Program.
21  Q.  Now, the -- as I understood your testimony from
22  the 341, virtually the entirety of cash held by the debtor
23  now are PPP loan proceeds?
24  A.  That's correct.
25  Q.  Okay.  And when -- the 13 pages of documents

1  identified in response to request number 2 that you just
2  referenced relate to the SBA loans and the EIDL loan;
3  correct?
4  A.  That's correct.
5  Q.  You also mentioned efforts to secure financing
6  from Main Street funding; is that right?
7  A.  Main Street was another government sponsored loan,
8  somewhat analogous to the three that you just referenced.
9  Q.  Okay.  And has the debtor secured a loan through
10  the Main Street funding program?
11  A.  We did not.  We were not successful in doing so.
12  Q.  Has the debtor sought out other financing?
13  A.  No.
14  Q.  Does it intend to seek out other financing?
15  A.  Well, at this point, I think we have exhausted any
16  sources in the short run to secure financing.  Our best
17  shot was Main Street Lending.  It turned out that that
18  particular government sponsored program is not as well
19  received by the lenders as either PPP or EIDL where they
20  got cash for underwriting.  In the Main Street, they had to
21  take a credit risk.
22    And they simply -- we contacted a large
23  number of the potential lenders.  We've included an exhibit
24  of those -- some of those that we did contact.  And
25  universally, they were unprepared to underwrite a credit

**09:35:16-09:36:49**       Page 18

1  risk to a business that was, at the time, closed.
2     So despite a long history of operating
3  success -- and those were the attributes identified in the
4  Main Street Lending Program's promotional brochures, so
5  it -- I concluded this was a perfect source. It simply
6  didn't turn out to be so.
7  Q. You said that there's an exhibit of the lenders
8  that were contacted?
9  A. Yes.
10  Q. Where would I find that exhibit?
11  A. Well, it was -- it was the second to last page of
12  the -- of -- it's Bates-stamped 11.
13  Q. Okay. Let me see if I might be able to share that
14  with you. Are you seeing that on your screen, the first
15  page of this grouping of documents that's marked SU_0001?
16  A. I see it on the screen. As I previously
17  mentioned, I'm using the hard copy in front of me. But
18  yes.
19  Q. Understood. Understood.
20     MR. DAWES: And we'll make -- this exhibit
21  we'll make Exhibit 2 for our record.
22     (The document was marked as Exhibit 2 for
23  identification.)
24     BY MR. DAWES:
25  Q. This grouping of documents that are from 1 to 12

**09:37:06-09:38:34**       Page 19

1  for the record, that will become Exhibit 2.
2     And so, Mr. Wheaton, you're referring to, I
3  think, page 11 of this exhibit. I'll scroll down.
4     And so this -- is this the list that you
5  prepared of all the lenders that were contacted about the
6  Main Street Lending Program?
7  A. It is.
8  Q. Am I right that the debtor reached out to each one
9  of the lenders we see on page 11?
10  A. If there are any that we did not reach out to, I
11  don't recall. So the answer would be at least 95 percent I
12  don't recall not having talked to any of them.
13  Q. I had a hard time following the double negative
14  there.
15  A. I would say -- I will tell you that if you look at
16  the listing under Montana, all were contacted. If you look
17  at the listing under Colorado, Glacier Bank, for example,
18  was listed under both Colorado and Montana. I don't think
19  that I contacted Glacier twice. That's why I didn't want
20  to get caught misrepresenting my statement.
21     If you'll note, for example, that Bank of
22  America is on both of them. Also, on another listing, I
23  actually spoke to Bank of America in Arizona where I reside
24  because we have -- had Bank of America relationships. So
25  in the case of Bank of America, I didn't contact Bank of

**09:38:57-09:40:20**       Page 20

1  America from either of these lists; I contacted them from
2  an Arizona list, if that makes sense to you.
3  Q. When you say -- you used the term "I" and "we."
4  So on behalf of the debtor, who all did reach out to the
5  lenders you've identified?
6  A. The majority of the contact was my contact, but I
7  did assign certain of the banks to Ron Dowdy.
8  Q. All right. And in any event, you were
9  unsuccessful pursuing this line of financing with any of
10  these lenders; correct?
11  A. Unsuccessful -- well, the -- there were certain
12  lenders who would have considered financing with certain
13  security attachments associated with them that I was
14  unwilling to accept. So -- and a specific example of that
15  would be BMO Harris. Another example of that would be BOA
16  or Bank of America. And I had conversations with JPMorgan
17  Chase related to the same terms and conditions, which is
18  security that we weren't prepared to give.
19  Q. One of the forms of security would be in the way
20  of a personal guarantee from yourself, for example?
21  A. That would be a wonderful example.
22  Q. So that was requested by the -- these lenders and
23  rejected; correct?
24  A. That's correct. I will point out one other thing.
25  And I'm getting off the subject and not answering. And

**09:40:47-09:42:18**       Page 21

1  we'll get -- but -- but in the case of Citizens Alliance
2  Bank under Montana, when we contacted Citizens Alliance
3  for -- and our theory behind Montana -- you know, there's a
4  document like this for every state in all 50 states. We
5  contacted institutions where we were doing business and
6  states where we were doing business.
7     It turned out that Citizens Alliance was
8  unwilling to underwrite a Summit transaction. They were
9  unwilling to underwrite another legal entity where we
10  operate some restaurants, but they did refer us to a
11  government sponsored -- a state-sponsored program, which,
12  in fact, we did qualify for in another legal entity.
13     So we did spend an awful lot of time on this.
14  And you could say we struck out across the board, but we
15  didn't strike out across the board. We were able to secure
16  some state-sponsored programs that the -- that this group
17  of lenders were interested in underwriting. It's just that
18  the Main Street Lending Program was one that we struck out
19  on.
20  Q. So are you telling me that you're continuing to
21  pursue these finance options; is that correct?
22  A. No, I'm not. I was just pointing to the fact that
23  we -- that it was not as big a waste of time as it might
24  initially appear.
25  Q. Your original testimony was that you had exhausted

1  all options to raise financing; correct?
2  A.  I'm done.  That was my testimony and that
3  continues to be my testimony.  I am not pursuing any other
4  financing alternatives.
5  Q.  Did some of the lenders you reached out to also
6  request a guarantee from Star Buffet?
7  A.  None did.
8  Q.  Aside from a personal guarantee from you,
9  Mr. Wheaton, what other forms of security were requested by
10  some of these lenders?
11  A.  Well, with respect to -- specifically to Summit
12  Family Restaurants, we really did not have any security to
13  offer the lenders other than guarantees.
14  Q.  And that's -- so the personal guarantees were the
15  only form of security attachment, to use your term, that
16  was requested by these lenders; correct?
17  A.  That's correct.
18  Q.  I'm going to go back to the responses that we were
19  looking at.  So hopefully that's on your screen, Exhibit 1.
20      And so we've kind of talked through number 2.
21  Number 3 asks for documents relating to debtor's ability to
22  pay its debts or to fund a plan of reorganization in this
23  bankruptcy case.
24      And there are no responsive documents;
25  correct?

1  A.  That's correct.
2  Q.  Has the debtor made any arrangements or plans to
3  fund a plan of reorganization in this case?
4  A.  We are continuing to work on that.
5  Q.  As of today, there is no plan; correct?
6  A.  There are certainly options that we've looked at,
7  but no plan that I'm prepared to discuss.
8  Q.  When you say there are options you've looked at,
9  what are the options that the debtor has looked at to fund
10  a plan?
11  A.  My response is, I clearly didn't understand your
12  first question.  We are not yet prepared -- my response is,
13  we're not yet prepared to discuss any funding alternatives
14  or pro forma alternatives.
15      I would only say that since you are provided
16  with financial documents, it's very clear that the
17  financial documents that we have provided that we will get
18  to later show that funding is not necessary.  So I'm not
19  prepared to discuss different alternative approaches for
20  resolution of the bankruptcy, but the documents that have
21  been provided that I'm sure we're going to get to later
22  will clearly indicate that external third-party funding is
23  not necessary.
24  Q.  And why is a third party or external funding not
25  necessary to fund a plan of reorganization in this case?

1  A.  Well, because the pro formas, at least that have
2  been provided to you per request in later tabs, will show
3  that the cash flow generated from the business should be
4  adequate to meet all obligations.  I'm just not sure
5  which -- which final pro forma we will present.
6  Q.  So what is the debtor's plan, if any, to cure the
7  lease with the landlord?
8  A.  Well, it's my understanding that that response
9  isn't due yet.  I'm not prepared to discuss it yet.
10  Q.  Well, I'm asking you the question today in the
11  2004 examination.  If you're unwilling to answer the
12  question, I can't make you, but we can certainly request
13  some relief there.  So let me ask it again.
14      How does the debtor intend to cure the
15  landlord's lease?
16  A.  I will maintain the response I just gave you.
17  Q.  Okay.  You'll -- you're refusing to provide an
18  answer; correct?
19      MS. MINDER: Objection.  That's a
20  misstatement of what he said.
21      BY MR. DAWES:
22  Q.  Are you willing to answer the question,
23  Mr. Wheaton?
24  A.  Ask the question one more time, please.
25  Q.  Sure.

1      MR. DAWES: Madam Court Reporter, go ahead
2  and read that back, if you would.
3      (The record was read by the reporter as
4  follows:
5      Q  So what is the debtor's plan, if any, to
6  cure the lease with the landlord?)
7      THE WITNESS: The pro formas contained in
8  this document later on, which I'm sure we will get to,
9  indicate that the cash flow from the business will be more
10  than substantial to cure all obligations, including those
11  of the landlord.
12      BY MR. DAWES:
13  Q.  If I understand your testimony correctly, it's the
14  debtor's plan to cure the lease by using future revenues
15  from the business; is that correct?
16      MS. MINDER: Objection.  That's a
17  misstatement of testimony.
18      THE WITNESS: The cash flow pro formas that
19  are provided in this document show that there is -- will be
20  adequate cash generated to cure all obligations and to
21  repay the landlord.
22      MS. MINDER: Can we have a quick break?
23      MR. DAWES: In a moment.  Let me finish this
24  line of questioning, and I'm glad to take a break.
25      BY MR. DAWES:

09:49:20-09:50:22                                Page 26

1 Q. When does the landlord intend to cure the lease --
2 or excuse me -- when does the debtor intend to cure the
3 lease?
4 A. I am not prepared yet to answer that.
5 Q. When you say you're not prepared, is that because
6 you don't know or because you're refusing to answer the
7 question?
8 A. Because I don't know.
9 Q. Okay. And when do you understand -- do you
10 understand by when, legally, the debtor would be obligated
11 to cure the lease in connection with a plan of
12 reorganization?
13     MS. MINDER: Objection. That calls for a
14 legal conclusion.
15     BY MR. DAWES:
16 Q. You can answer.
17 A. In general, I understand.
18 Q. What, sir, is your understanding?
19 A. Within 90 days of today's date.
20 Q. And so -- and from where do you have that
21 understanding?
22 A. General conversations with counsel.
23 Q. Okay. I don't want to go into your conversations
24 with counsel.
25     But aside from discussions with counsel, have

09:50:43-09:51:44                                Page 27

1 you discussed the concept of curing the lease with anyone
2 else?
3 A. No one other than counsel.
4 Q. Have you had -- Casa Bonita shuttered its doors on
5 March 16, 2020; is that right?
6 A. That's correct.
7 Q. Since that time, have you ever reached out to
8 communicate with any representatives of the landlord?
9     MS. MINDER: Objection. Could you be more
10 specific?
11     BY MR. DAWES:
12 Q. Let's start with that very general question, which
13 I think is very fair. And let -- Mr. Wheaton, if you
14 didn't understand the question, I'm glad to rephrase it,
15 but it was pretty straightforward.
16 A. I understood the question. The answer is, there
17 should be a whole in the correspondence that your client
18 has provided you that details all the conversations we've
19 had about repayment to the landlord. And there has been
20 not one single deviation in that communication since we
21 shuttered the door in March of 2020.
22 Q. And so these are communications you have made, you
23 have directed to the landlord; is that correct?
24 A. In many cases, the landlord has communicated with
25 us, and we have provided responses to the landlord.

09:52:03-10:04:20                                Page 28

1 Q. Okay. When you say "we," who is "we"?
2 A. Well, "we" would be me, and Ron Dowdy would have
3 been on a number of conversations with Terry Burka,
4 representative from the landlord. He sometimes brought
5 other individuals in, but Terry Burka would have been the
6 primary contact.
7 Q. Okay.
8     MR. DAWES: Counsel, if you want to take a
9 break now, I'm glad do that for a couple minutes. Then we
10 can pick up with that.
11     MS. MINDER: That would be great. Thank you.
12     (A recess ensued.)
13     BY MR. DAWES:
14 Q. Mr. Wheaton, before we jump back in, is there --
15 now that we've had a break, is there any of your testimony
16 you'd like to change or alter?
17 A. No.
18 Q. So I had asked you earlier about the debtor's plan
19 to cure the lease.
20     Does the debtor intend to use any of the PPP
21 loan proceeds to do so?
22 A. The -- I really can't answer that. Because I
23 don't know.
24 Q. Okay. Is that something you've given thought to?
25 A. I've given thought to it. It's just I don't

10:04:40-10:05:28                                Page 29

1 really understand your question. We remitted a payment to
2 the landlord. We've actually remitted three payments to
3 the landlord. The proceeds are, obviously, from PPP.
4     So is that -- is that responsive to your
5 question? I just don't legally know without talking to
6 counsel.
7 Q. Sure. Well, let's see if we can zero in on it a
8 little.
9     The debtor is in default under the lease;
10 correct?
11 A. Yes.
12 Q. All right. That's for having failed to pay rent
13 going back to April 2020; is that right?
14 A. I thought in 341 we established the first missed
15 date as June of '20.
16 Q. Was that your testimony then?
17 A. It was.
18 Q. Okay. So in June 2020, the tenant or the debtor
19 went into payment default under the lease; correct?
20 A. That's correct.
21 Q. All right. And there's a balance owed under the
22 lease; correct?
23 A. Correct.
24 Q. What's the balance owed under the lease according
25 to the debtor?

Case 2:21-bk-02477-BKM    Doc 53-1    Filed 06/10/21    Entered 06/10/21 15:44:40    Desc
Exhibit Exhibits    Page 9 of 68

1 A. In round numbers, 350,000.
2 Q. All right. And that does not account for any of
3 the liquidated damages to which the landlord is entitled;
4 correct?
5 A. Correct. Well, no. I'm not sure they're entitled
6 to them, but it is -- does not reflect that total.
7 Q. All right. And of that $350,000, how does the
8 debtor intend to pay the $350,000 to the landlord?
9 A. There is no question that over a reasonable period
10 of time, the debtor intends to pay from proceeds of
11 operations. But technically, until we finalize the monthly
12 pro formas, I don't know if in -- just to use as an
13 example, in September of 2021, will the cash proceeds come
14 from operations or will they come from a balance that's
15 there now called PPP? I simply don't know that answer.
16 Q. Mr. Wheaton, with the $350,000 number that you
17 cited earlier in terms of what was owed to the landlord, is
18 that a disputed sum by the debtor?
19 A. The debtor doesn't dispute that balance.
20 Q. All right. I understand that we have a legal
21 issue on the issue of liquidated damages; correct?
22 A. Correct.
23 Q. And is it the debtor's position that the
24 liquidated damages provision ought not be enforceable?
25 A. I think the debtor's response is -- speaks for

1 itself.
2 Q. Okay. And when you say "the debtor's response
3 speaks for itself," what are you referring to exactly so
4 we're on the same page?
5 A. Allow me to look it up.
6 Q. Are you talking about a court filing in the case
7 when you talk about a response?
8 A. I am.
9 Q. So a brief submitted by debtor's counsel in these
10 proceedings; correct?
11 A. Yes.
12 Q. Is there -- and is that the sole response the
13 debtor has ever made with respect to the landlord's claim
14 for liquidated damages?
15 A. No.
16 Q. Okay. And what are the other -- where has it
17 otherwise been communicated or how?
18 A. It's been communicated to landlord representatives
19 via me, via phone.
20 Q. Any other means?
21 A. There may be an email or two, but I don't recall.
22 Q. And those emails would be between you and who?
23 A. It would it be between me and Terry Burka, copying
24 who else -- whoever else might have been on the emails that
25 Terry included.

1 Q. Are you privy to those emails?
2 A. Am I privy to them?
3 Q. Do you have the emails you have described?
4 A. I do not.
5 Q. Who would have them for the debtor?
6 A. I would have to call and check.
7 Q. Who would you call to check on that?
8 A. The first person I would call was Ron Dowdy.
9 Q. Do you not have access to your own emails?
10 A. I have access to my own emails, but communication
11 from Burka normally went to Ron Dowdy. It also went to a
12 email account that is no longer active, so I don't have
13 access to that.
14 Q. Okay. What email account was that?
15 A. Starbuffettaz@gmail.com.
16 Q. You also mentioned phone discussions with
17 Mr. Burka regarding the issue of liquidated damages.
18 How many such phone discussions did you
19 participate in?
20 A. At least two that I recall.
21 Q. Do you recall when those occurred?
22 A. Early 2021.
23 Q. Can you be any more specific than that?
24 A. I cannot.
25 Q. And was anyone else on these two phone calls?

1 A. I don't recall.
2 Q. Do you recollect -- let's start with the first
3 phone call.
4 What was the discussion about liquidated
5 damages?
6 A. I really don't recall the conversation in any
7 detail other than Terry and his normal job function wanted
8 an update on where we were, and the subject of liquidated
9 damages came up in that conversation.
10 Q. Do you recollect what he had to say about the
11 issue of liquidated damages?
12 A. No.
13 Q. Okay. Did the issue of co-tenancy issues come up
14 during that call or the second call?
15 A. I don't recall.
16 Q. Turning -- have you described for me everything
17 you recollect from the first call with Mr. Burka about the
18 issue of liquidated damages?
19 A. Yes.
20 Q. Do you see recollect anything in the second call
21 with Mr. Burka about that issue?
22 A. No specific recollection.
23 Q. Okay. Just a general recollection that the issue
24 came up and that's about it?
25 A. That's about it.

1 Q. Okay. Is there anyone else you've communicated
2 with by phone in terms of landlord's representatives since
3 March of 2020?
4 A. No.
5 Q. And have there been -- other than the two calls
6 you just described to me with Mr. Burka, have you been
7 party to other phone calls with landlord's representatives
8 since March of 2020?
9 A. I thought my testimony earlier is that there were
10 multiple calls, and I thought we were just talking about
11 the calls related to a specific item. I would say that
12 between March of 2020 and March of 2021 -- I thought I said
13 we had multiple conversations.
14 Q. Okay. Who were the multiple conversations with?
15 A. In general, they were always Terry Burka, Ronald
16 Dowdy, and myself. There were also other conversations
17 that were simply between Terry Burka and Ron Dowdy.
18 Q. Is it fair to say since March of 2020, you've
19 spoken with no one -- no landlord representative other than
20 Mr. Burka?
21 A. No, that's not true. There is a local on-site
22 landlord representative that -- by the name of Lucas. He's
23 the property manager. And I think I've had two
24 conversations with Lucas.
25 Q. And those are in person?

1 A. It's Lucas Aguilar, by the way, I think.
2 Q. Are those phone calls or actually talking in
3 person?
4 A. I thought your question was did I have other phone
5 calls, but if you said conversation, I would say that I had
6 two phone calls that I can remember. And I know that I met
7 him on site twice at a minimum, maybe three times.
8 Q. Okay. Other than Lucas or Mr. Burka, have you had
9 direct interaction with any landlord representatives
10 since --
11 A. No.
12 Q. -- since March of 2020?
13 So let me ask -- let me turn your attention
14 back to Exhibit 1. I want to focus on a couple more of the
15 document requests.
16 The debtor has provided tax returns for
17 several years in '18, '19, and '20, both federal and
18 Colorado. Is that your understanding?
19 A. That is.
20 Q. Has the debtor -- other than state tax returns in
21 Colorado, has the debtor filed tax returns in any other
22 state?
23 A. Yes.
24 Q. Okay. Which?
25 A. Arizona, Montana, Idaho, Utah, Florida, Texas,

1 New Mexico, Wyoming, Arkansas, and probably Mississippi.
2 And I think that would probably be it.
3 Q. Now, the debtor has not provided any of the tax
4 returns for those states, but they do exist; is that right?
5 A. They -- state tax returns would be part of a
6 consolidated tax return for those respective states.
7 Q. Is there a reason the debtor provided only the
8 federal income tax return and the Colorado state tax
9 return?
10 A. None other than we believed that that's what you
11 were asking for.
12 Q. Do you see document request number 5?
13 A. Not yet.
14 Q. Feel free to take a look at the screen where I
15 have it displayed. Or if you'd rather look on paper,
16 that's fine too.
17 A. I don't see it on the screen, but I will ...
18 Q. Let me see if I can --
19 A. I'm looking at it right now.
20 Q. Okay. Hopefully now you're seeing it on the
21 screen, Mr. Wheaton.
22 But in any event, now that you're seeing the
23 request, can you answer my prior question as to why the
24 debtor provided only federal, in Colorado, state tax
25 returns?

1 A. Well, you know, I look at state as singular, not
2 states as plural. And I guess we made a gross assumption
3 that the state you were referring to was Colorado.
4 Q. So again, Mr. Wheaton, the only state tax returns
5 debtors provided are for Colorado; right?
6 A. Yes.
7 Q. Okay. The topic number 7 asks about annual
8 budgets and financial statements for the debtors -- or for
9 the debtor.
10 The -- has the debtor been audited?
11 A. No.
12 Q. Has the debtor ever been audited?
13 A. I don't know the answer to that.
14 Q. All right. Who would know the answer to that,
15 Mr. Wheaton?
16 A. I have no idea.
17 Q. For how long have you been the CEO of the debtor?
18 A. I think I testified in excess of 25 years.
19 Q. Has that been --
20 A. But Summit was a legal entity prior to that, and I
21 have no idea whether it was -- and it was a public company
22 at one point, so presumably it could have been, but I don't
23 know the answer to that.
24 Q. Let's focus on your 25-year term as CEO.
25 During that time frame, has the debtor been

1  audited?
2  A.  No.
3  Q.  And who prepares financial statements for the
4  debtor?
5  A.  The Star Buffet financial management team.
6  Q.  And who heads the Star Buffet financial management
7  team?
8  A.  Ron Dowdy.
9  Q.  And so Mr. -- and has that always been the
10  case during your tenure as CEO?
11  A.  No.
12  Q.  When did that begin?
13  A.  2000 approximately.
14  Q.  That's been kind of the protocol or the team since
15  then?
16  A.  He would be the head of the team since then.
17  Q.  Okay.  And there are a couple documents that have
18  been provided in response to request number 7; correct?
19  A.  Yes.
20  Q.  And you're familiar with those?
21  A.  Yes.
22  Q.  Okay.  Skipping down to request number 9, it asks
23  for documents relating to fiscal policies or procedures,
24  including operating and capital budget policies, internal
25  controls for cash and property management.

1      Can you generally describe for me what the
2  debtor's fiscal policies or procedures are?
3  A.  I can tell you what I interpreted the fiscal
4  policies to be, and I can tell you what I interpreted
5  procedures to be.
6  Q.  Can you answer my question?
7  A.  I'm not sure that I understood your question.
8  Q.  What was it you didn't understand?
9  A.  You'll have to repeat the question, because I
10  thought I responded to it.
11  Q.  Sure.  No problem.
12      What are the debtor's fiscal policies or
13  procedures?
14  A.  Well, what I interpret it to be is the rules --
15  the accounting rules that we utilize and the control
16  procedures that we have in place to ensure that the
17  financial results are accurate.
18  Q.  Okay.  And what are the accounting rules employed
19  by the debtor?
20  A.  Well, in a simple response, it's generally
21  accepted accounting principles, GAAP.  We follow GAAP basis
22  accounting for all of our procedures.
23  Q.  Okay.  And you mentioned control procedures.  Can
24  you describe what the debtor's control procedures are?
25  A.  There's any number of them.  There are cash

1  control procedures.  There are capital control procedures.
2  There are accounting depreciation control procedures.
3  Q.  And whatever those are we'll see set forth in the
4  documents that have been labeled SU001012 through 1018;
5  correct?
6  A.  That's correct.
7  Q.  Document request number 10 -- scroll down to
8  that -- asks about accounts receivable for the debtor.
9      The debtor has no accounts receivable;
10  correct?
11  A.  That's correct.
12  Q.  And the -- one of the other requests is 11.  It
13  asks about pending or threatened litigation.
14      And we see a host of different documents
15  involving the -- was it Mr. Hernandez's lawsuit?
16  A.  That's correct.
17  Q.  All right.  That was ongoing as of the time of the
18  filing; correct, the petition?
19  A.  Correct.
20  Q.  Okay.  Are there other pending litigation -- put
21  aside the eviction action that the landlord filed.  Are
22  there other pending litigation matters that were out there
23  as of the petition date?
24  A.  None.
25  Q.  The -- let me ask about Exhibit [sic] 13.  It asks

1  about deferred maintenance of the leased premises.  Do you
2  see that?
3  A.  I do.
4  Q.  The landlord is now -- or excuse me -- the debtor
5  does not have any documents related to the issue of
6  deferred maintenance; correct?
7  A.  That's correct.
8  Q.  Is it debtor's position that there are no items of
9  deferred maintenance of the property?
10  A.  The debtor's position is there are no deferred
11  maintenance items.
12  Q.  One of the things we discussed at the 341 meeting
13  was an issue with the sprinkler system.  Do you recall
14  that?
15  A.  I do recall that.
16  Q.  And if memory serves, you were headed out to
17  Denver to meet with a contractor to address that issue; is
18  that correct?
19  A.  I don't recall that as my exact testimony, but I
20  did have the sprinkler systems on my agenda.
21  Q.  Okay.  And how did the -- what did you do
22  vis-à-vis the sprinkler system since the 341 meeting?
23  A.  Actually, I haven't been able to address a meeting
24  with our vendor for sprinklers, but I am up to speed on the
25  landlord's request and our position with respect to that.

Case 2:21-bk-02477-BKM    Doc 53-1    Filed 06/10/21    Entered 06/10/21 15:44:40    Desc
Exhibit Exhibits    Page 12 of 68

1   And I did so do some investigation -- further investigation
2   of that. I think I testified in the 341 that I didn't
3   think that the landlord's demand was appropriate, and I'm
4   certainly better able to address that at this point in
5   time.
6   Q. So you were scheduled to meet with a vendor or a
7   contractor on site to discuss the sprinkler issue, but that
8   has not happened; correct?
9   A. That has not happened.
10  Q. Have you consulted with any subcontractor or
11  vendor regarding the sprinkler system issues?
12  A. I have.
13  Q. Okay. Who is that?
14  A. Bell Plumbing and Heating.
15  Q. And who are you dealing with at Bell Plumbing and
16  Heating?
17  A. I don't -- I haven't been dealing with the Bell
18  representative; Ron Dowdy has. But I met with the on-site
19  employee who's been assigned, and the employee who is
20  assigned said he was not a qualified to respond to the
21  questions that I had about the landlord's request. He said
22  he's not licensed to respond. That's why the -- I assumed
23  that he was the person who was going to do that. He
24  preliminarily indicated he was, but he informed me when we
25  met that he was not allowed to touch the sprinkler riser

1   that was tripped during this incident.
2   Q. What is this employee's name?
3   A. I don't recall.
4   Q. When was this employee hired?
5   A. Well, he's not our employee. He's a Bell
6   employee.
7   Q. Okay. Well -- okay.
8   A. I don't --
9   Q. That was not clear to me from your testimony.
10  A. Okay. I apologize for not being clear.
11  Q. You spoke with a Bell Plumbing employee who was
12  not qualified to deal with the issue; correct?
13  A. Who told me he was not qualified and unwilling to
14  do -- to provide me with any guidance on the particular
15  item that was raised by the landlord.
16  Q. Has the debtor reached out to another contractor?
17  A. Not yet.
18  Q. All right. So you got no meaningful feedback from
19  Bell Plumbing; is that fair?
20  A. Sure.
21  Q. Okay. Now, it sounds like you wanted to talk
22  about your position on the sprinkler system issue a moment
23  ago. You indicated you were in a better position to
24  address that today.
25  A. I think that was my testimony.

1   Q. Do you want to expand on what you said before?
2   A. The only expansion is that the incident resulted
3   around one specific sprinkler triggering. It was unclear
4   to me that that sprinkler was triggered because of a dip in
5   temperatures. And so -- which was the allegation of the
6   landlord. The -- so because at that point in time, the
7   heating system in Casa Bonita, the date of the incident,
8   which I don't recall now, was working.
9      So one of the reasons that I wanted to meet
10  with Bell Plumbing, and the reason I did meet with Bell
11  Plumbing, is that I wanted to identify what caused the
12  sprinkler to actually trip. And he was -- said he wasn't
13  in a position to provide that explanation.
14     But I know now that it's a single -- I
15  reviewed all the videos. It was a single sprinkler head
16  that tripped in a storage area. But I also have confirmed
17  that the heating was working, so I would normally conclude
18  that it was a malfunction sprinkler, not a heating issue.
19  There's also -- so it's ...
20  Q. When you say you confirmed the heating was
21  working, how did you do that?
22  A. Because I talked to the security officer who
23  originally detected the -- or identified the flashing
24  signals, that there was a fire alarm that had been
25  triggered.

1   Q. Who was that?
2   A. His name is Nemo.
3   Q. Does the debtor, in fact, know what caused the
4   problem?
5   A. No.
6   Q. Since the debtor -- well, in 2021, has the debtor
7   done any kind of property inspection or assessment?
8   A. Yes.
9   Q. Okay. And there's no written report or assessment
10  for that inspection; correct?
11  A. No.
12  Q. How did that inspection -- how did it manifest
13  itself? There's no write-up. So what was done following
14  the inspection?
15  A. Well, I did the physical inspection of the
16  building. I identified what needed to be done from a -- my
17  physical observation of the property. And with respect to
18  plumbing, which is the primary -- one of two issues, the
19  boiler being one and plumbing being the second, we retained
20  the services of a firm that has repaired the plumbing
21  issues. And that same firm, which I referenced as Bell
22  Plumbing, had initially indicated that they had the
23  capability on staff to do the boiler repairs, but they have
24  since, in the last week, indicated that they don't have
25  either the time or the skill set to do the boiler repairs.

1 Q. So the debtor struck out again with Bell Plumbing?
2 A. The debtor struck out with Bell Plumbing.
3 Q. And with respect to the boiler issue you
4 referenced, has the debtor reached out to another
5 contractor since striking out with Bell Plumbing?
6 A. Actually, the debtor had conversations with at
7 least three other parties prior to Bell Plumbing. And
8 those conversations are still in progress.
9 Q. Okay. Those are alternative contractors?
10 A. Alternative contractors.
11 Q. Who are those contractors?
12 A. I'd have to have counsel provide you with that
13 list.
14 Q. That would be fine. Thank you.
15    So the inspections that have been done since
16 2018 were inspections you have personally done in the last
17 30 days; is that correct?
18 A. Did you say 2018?
19 Q. Yes.
20    MS. MINDER: Objection. Can you repeat the
21 question for clarity?
22    MR. DAWES: Sure. I'm glad to.
23    BY MR. DAWES:
24 Q. The only inspections that have been done with
25 respect to -- by the debtor with respect to the premises

1 since 2018 are the inspections you just described a moment
2 ago; correct?
3 A. I don't recall that being a -- you're going to
4 have to go back on that. I don't recall that being the
5 question that was asked.
6 Q. I'm asking you a question. So let me try it
7 again.
8    What inspections has the debtor made of the
9 premises since 2018?
10 A. Gosh, it would be -- as a regular course of
11 business, the management team of Casa Bonita would have
12 made any number of different inspections since 2018.
13 Q. There are no documents that the debtor has that
14 relate to any of those inspections; correct?
15 A. Correct.
16 Q. Okay. Now, you also indicated that there have
17 been pro formas that have been prepared by the debtor as of
18 late. Is that true?
19 A. I don't recall that being my exact testimony, but
20 I have referenced that we have made any number of --
21 prepared any number of pro formas over any given period of
22 time.
23 Q. So the debtor has prepared any number of pro
24 formas over any given period of time. Did I understand
25 your testimony right?

1 A. You did.
2 Q. Okay. So how about since the filing of the
3 bankruptcy petition, has the debtor prepared pro formas?
4 A. Yes.
5 Q. All right. And have those been disclosed in
6 connection with the debtor's 2004 response?
7 A. No.
8 Q. Okay. Where are those pro formas?
9 A. They would be in Ron Dowdy's office.
10 Q. A pro forma is a projection, is it not?
11 A. It is under my definition.
12 Q. All right. Now, those have not been provided by
13 the debtor; correct?
14 A. If you look under your request 17, I believe they
15 have.
16 Q. Well, sir, I didn't ask you if they've been
17 provided. You told me that they were -- Ron Dowdy had them
18 and they hadn't been provided. That was your testimony a
19 moment ago. I'm -- I want to make sure I understand what
20 you're saying because you are testifying under oath.
21    So have the pro formas all been disclosed in
22 connection with the debtor's response?
23 A. We're having difficulty with singular and plural.
24 I'm testifying that there are multiple pro formas that have
25 been prepared, and Ron has those multiple pro formas in his

1 possession. There was a specific request, and we provided
2 a single pro forma, and that's under tab 17. So I
3 apologize for not being able to transition between the
4 plural and the singular.
5 Q. Okay. So do you see that 17 refers to all
6 documents? Do you understand more than a single document?
7 A. We provided what -- well, let me --
8 Q. Let's focus on my question.
9    Do you understand all documents --
10 A. No, I'd like to -- okay. Please read exactly what
11 you just did before.
12 Q. Sure.
13    Why don't you read the document request
14 number 17 to yourself. Let me know when you've read that.
15 A. Yes.
16 Q. All right. Do you understand that -- do you
17 interpret 17 to request a single document, sir?
18 A. I did.
19 Q. Okay. What about 17 suggested there was a request
20 for a single document?
21 A. Well, it was bracketed with an "S." So I elected
22 to provide a single cash flow projection that represents
23 the most accurate singular projection at the point of time
24 which this was provided to you, which was yesterday
25 evening.

1  Q.   What are the first few words in request number 17?
2  A.   I'm lost on your question.  I'm sorry.
3  Q.   Can you read the first two words in request
4    number 17 out loud.
5  A.   "All documents."
6  Q.   So that's multiple documents.  You understand
7    that; correct?  That's all documents, whether it's one or a
8    thousand; right?
9  A.   Clearly I misunderstood.
10 Q.   In any event, the debtor is in a position to
11   supplement its response with all of the other documents
12   that are responsive; correct?
13 A.   I'll defer to counsel on that.
14 Q.   Well, I'm asking you.
15 A.   We are certainly prepared to provide all pro
16   formas that we have ever generated for Summit Family
17   Restaurants.
18 Q.   The bottom line is, the debtor is prepared to
19   supplement, to provide all responsive documents to
20   number 17; correct?
21 A.   Correct.
22 Q.   Okay.  So the one cash flow statement or one pro
23   forma -- or how do you -- the document that's marked 11 --
24   the document that has been marked Bates-labeled SU001140,
25   would you call that a pro forma?

1  A.   Yes.
2  Q.   The pro forma, sir, who was that prepared by?
3  A.   The actual document generation would have been Ron
4    Dowdy.  It's -- this level of detail would have been
5    prepared by me.
6  Q.   Okay.  So 11 -- the underlying analysis in numbers
7    in the pro forma is yours, although Mr. Dowdy physically
8    generated it.  Do I have that right?
9  A.   I rely on -- it would have -- I would have
10   provided the guidance to him.  I would have evaluated
11   whether it was accurate.  I would have checked the actual
12   columns.  But he would have actually dropped the numbers
13   into the model, and we would have discussed them jointly to
14   make sure that we were providing our best case -- not best
15   case from the most optimistic, but that this was our most
16   accurate representation of annualized pro formas to comply
17   with, which we clearly didn't, based on what you just told
18   me.  This was a singular best guess.
19 Q.   And the singular best guess was prepared when?
20 A.   In the last two or three days.
21 Q.   Okay.  And let me see if I can get that in front
22   of you here.  Bear with me just a moment.
23       So you are hopefully seeing the document that
24   the debtor Bates-labeled SU1140.  And this is the pro forma
25   you've been describing; is that right?

1  A.   That's correct.
2      MR. DAWES:  And we'll make 1140 -- I think
3    we're on Exhibit 3.
4      (The document was marked as Exhibit 3 for
5    identification.)
6      BY MR. DAWES:
7  Q.   So this Exhibit 3 was prepared in the last few
8    days?
9  A.   That's correct.
10 Q.   Okay.  And what were the underlying assumptions
11   that went into the objections set forth in this pro forma?
12 A.   The principal assumption is that the operating
13   results in any given year would replicate those that have
14   been generated for the last 25 years.  That's assumption
15   one.
16       Assumption two, and really the only other
17   meaningful assumption, is the assumption that we would
18   resume operations in August -- late August of 2000.  It's
19   our fiscal '22, but it's -- it's really the current year.
20   So it's -- January 31, 2022, is really the current calendar
21   year, but we're on a fiscal year.
22       So that's the only other assumption that was
23   of any material nature.  There are, obviously, individual
24   assumptions on every single component of the -- of these
25   particular P&Ls.

1  Q.   Let me see if I can understand this.
2      The assumption built into this pro forma is
3    that the debtor is fully operational and fully functioning
4    by when?
5  A.   What we call our period 8, which would be toward
6    the latter part of August.  I don't have the -- I don't
7    have our closing calendar in front of me, but it would be
8    essentially in late August.
9  Q.   Of 2021?
10 A.   Correct.
11 Q.   And do we see -- we would only know that
12   assumption is built into this document by you disclosing
13   that now; correct?  There's not, like, a note to that
14   effect, is there?
15 A.   No.
16 Q.   Okay.  I do see that there is a -- there is a
17   footnoted assumption which assumes full forgiveness of PPP
18   loan number 2; correct?
19 A.   That's correct.
20 Q.   All right.  How will -- or what are the conditions
21   for PPP loan number 2 to be forgiven?
22 A.   Well, you asked that in the 341.  And I am not as
23   skilled at knowing the line-by-line details of the rules.
24   But in basic -- basically we had to spend approximately
25   60 percent of the total PPP amount, which, in round

1   numbers, was a million dollars, on labor.  And then the
2   remainder is on some specific items, including rent,
3   insurance, utilities, and some de minimus other expenses.
4   Q.  And does your pro forma spell out how exactly the
5   PPP proceeds held by the debtor currently would be expended
6   going forward?
7   A.  This is a summary pro forma, but we have -- we
8   have detailed by period pro formas that address that.
9   Q.  Are those among the pro formas that were provided
10  last night, or are those among the pro formas Mr. Dowdy has
11  in his office?
12  A.  I think my testimony is that the pro forma that we
13  provided is attached as Bate 1140.  And I think we have
14  discussed the fact that there are other pro formas that we
15  have not provided.
16  Q.  So the answer is, in terms of documentation
17  provided by the debtor to date, we do not know how the
18  debtor intends to expend the PPP proceeds it currently
19  holds; correct?
20  A.  No.  I think I said in general guidelines,
21  60 percent of it would need to be expended in wages and
22  salary.  And a certain amount would be allowable for
23  utilities, a certain amount would be allowable for
24  insurance and rent.  So -- and I think I testified earlier
25  in our discussions today that I did not know and will not

1   know until we complete our final projections what
2   percentage of the PPP dollars and what percentage of cash
3   flow will be used to repay the landlord.
4   Q.  So where, sir, in Exhibit 3 will the reader find
5   how the debtor intends to expend the PPP loan proceeds?
6   A.  I don't think this is the document that we will
7   use to explain that.
8   Q.  All right.  And that's because it doesn't explain
9   that at all; correct?
10  A.  No, I don't think that's correct at all.  There
11  are very detailed categories of expenses listed in here.
12  And there is a pro forma for the current calendar year.
13  We've just gone through that.
14  Q.  Well, it may be that I'm a little dense.  And I
15  apologize for that.
16      But looking at Exhibit 3, where does that
17  tell me how the PPP loan proceeds are being expended?
18  A.  Well --
19  Q.  Walk me through it line by line.
20  A.  Fine.  I will walk you through line by line.
21  There would be no -- let's -- and just to be clear, we are
22  using -- we are talking about the fourth column over.  Is
23  that the column that you're -- the type that's entitled,
24  January 31, 2022?
25  Q.  You tell me.  You're the author.  You tell me

1   where it shows --
2   A.  Okay.  That's what I'm talking about.
3   Q.  -- where the loan proceeds are expended.
4   A.  That's the column I am addressing.  None of the
5   PPP loan proceeds would be expended in food costs, which we
6   have made an assumption of 23.85 percent of total revenue.
7   So there's a second assumption.
8       In terms of hourly labor, the number is
9   1,167,797.  I would hope that approximately 600,000 of that
10  number will be PPP allocated, but that won't be entirely
11  correct because some portion of the 118,136 will be PPP
12  allocated and some portion of the benefits will be.  But in
13  total, there won't be any more than 60 percent, which on a
14  million dollar loan, is 600,000.  So some percentage of one
15  million 457,273, almost -- almost to the dollar, 600,000 of
16  that will be PPP allocated.
17      Some percentage of the entertainment, the
18  22,770, the -- about 80 percent of the entertainment
19  account is labor.  So some percentage of the entertainment
20  dollars will also be PPP, and that will be combined when we
21  get the final totals and look at the payroll numbers, will
22  be part of the PPP.
23      Almost all of the utilities up to the cap
24  will be PPP.  And the cap is -- the cap will be split
25  between the utilities and, as I said, the fixed and

1   occupancy.  The largest component of fixed and occupancy,
2   which is 465,919, in round numbers, the landlord's take of
3   that is about 400,000.
4       There is another percentage of the 465,919
5   which relates to insurance.  Insurance is an allowable
6   expense under PPP.  The allocation of insurance is in the
7   fixed costs, and that will be allocated on.
8       And under controllables, the one that I
9   skipped, the 251,678, none of the controllables are
10  allowable expenses in PPP, and that would have to be --
11  those expenses would be covered from operating profits.
12      Is that detailed enough for you?  I can get
13  more detailed if you want.
14  Q.  That would be fine if you would like to.
15  A.  I have no interest in it.
16  Q.  I guess my question is -- you're telling me lots
17  of things that I don't see on the document.  Is there a
18  specific breakdown somewhere that specifically allocates
19  how the PPP money is going to be expended?  Is there a
20  document to that effect, or is there just your explanation?
21  A.  There are documents to that effect.
22  Q.  Okay.  Those are the documents the debtor has not
23  disclosed; correct?
24  A.  Correct.
25  Q.  All right.  But the debtor will be disclosing

1 shortly; correct?
2 A. I'll defer to counsel.
3 Q. Could I get an answer to that?
4     MS. MINDER: We will provide supplement when
5 received.
6     MR. DAWES: Thank you.
7     BY MR. DAWES:
8 Q. Let me next turn your attention to what we'll mark
9 as Exhibit 4, which is the petition.
10     (The document was marked as Exhibit 4 for
11 identification.)
12     BY MR. DAWES:
13 Q. There are a couple things I want to run through
14 with you.
15     Are you seeing the petition on your screen
16 Mr. Wheaton?
17 A. I am.
18 Q. So the principal place of business offered by the
19 debtor on the petition is 2501 North Hayden Road, Suite 103
20 in Scottsdale; correct?
21 A. That's correct.
22 Q. Okay. And for how long has this address been the
23 debtor's principal place of business?
24 A. At least eight years.
25 Q. Okay. Now, what is physically located at the

1 North Hayden road location?
2 A. At this point, the North Hayden Road location has
3 been disclosed.
4 Q. All right. So what is physically at the North
5 Hayden Road location, sir?
6 A. The former headquarters of the debtor.
7 Q. How many square feet did the debtor occupy at that
8 location?
9 A. Maybe 2,000.
10 Q. Who was officed at that location?
11 A. I was and at least two other individuals,
12 sometimes three.
13 Q. When -- and when did this location close?
14 A. In March of 2020.
15 Q. Now, what was the date that the debtor filed a
16 petition?
17 A. April the 6th of 2021.
18 Q. So that was 13 months after this location had
19 closed; correct?
20 A. That's correct.
21 Q. And did you sign this petition under oath?
22 A. I did.
23 Q. Why did you sign it under oath and indicate that
24 the debtor's principal place of business was the North
25 Hayden Road location at that time?

1 A. Because I understood that to be our primary
2 mailing address. And from that primary mailing address,
3 things were forwarded elsewhere.
4 Q. Okay.
5 A. It is also the address that was on file with the
6 SEC for financial reporting purposes.
7 Q. To be clear, that location has not served as a
8 principal place of business for now at least almost
9 18 months; correct?
10 A. As far as I understand, it's still a forwarding
11 address.
12 Q. All right. Do you understand -- in your mind, is
13 a principal place of business the same as a forwarding
14 address?
15     MS. MINDER: Objection; legal conclusion.
16     THE WITNESS: I deemed it to be our mailing
17 address.
18     BY MR. DAWES:
19 Q. So where has the debtor maintained a physical
20 place of business since March of 2020?
21 A. 4716 East Valley Vista Lane, Paradise Valley,
22 Arizona 85252.
23 Q. That's your home; correct?
24 A. That's correct.
25 Q. And let's skip down a little further here.

1     So we're looking at page 4 of 8. That is
2 your signature; correct?
3 A. It is.
4 Q. Then when we go to the next page, page 5 of
5 Exhibit 4, we have a balance sheet there; correct?
6 A. Yes.
7 Q. And was this prepared by you and Mr. Dowdy?
8 A. It would have been, yes.
9 Q. Okay. And there is a line item, a capital lease
10 asset for 2.489 million; correct?
11 A. Yes.
12 Q. And what is that referring to?
13 A. It's the capitalized value of the landlord's lease
14 under a new FASB pronouncement.
15 Q. What's the new FASB pronouncement you're talking
16 about?
17 A. Well, prior to our -- prior to 2020, GAAP did not
18 require -- generally accepted accounting principles did not
19 require the capitalization -- the placement on the balance
20 sheet of a leased asset, real estate asset. And it did not
21 require, when you get down to the liability side, a
22 liability reflecting the present value of the lease
23 obligations you would have with the landlord under the term
24 that's in place.
25     Under the new guideline effective in 2020,

1  you needed to put an asset on the -- create an asset on the
2  balance sheet on the asset side reflecting the present
3  value of the asset, and you needed to put on the liability
4  side the present value of the lease obligation, the asset
5  being driven by the value of -- the net present value of
6  the lease obligation on the liability side.
7  Q.  Is there an underlying worksheet representing or
8  reflecting the analysis to come up with that figure under
9  the FASB pronouncement?
10  A.  There is.
11  Q.  That's something Mr. Dowdy would have?
12  A.  Well, it was disclosed in Star Buffet, Inc.'s, '19
13  and '20 10-Ks, but there's also a documentation to get to
14  that.  If that's something that you request, presumably we
15  can provide it.
16  Q.  Sure.  I would take you up on that.
17     Then were those 10-Ks of Star Buffet
18  something the debtor has disclosed in these proceedings?
19  A.  No.
20  Q.  I will certainly take you up on that.  And I
21  appreciate that.
22     In rough terms, how would you describe coming
23  up with the 2.489 million figure for that line item?
24  A.  I just did.
25  Q.  Do you recollect the data inputs to get there?

1  A.  Yes.  I just did that as well.
2  Q.  Okay.  You described them, yes.
3  A.  No.  I told you the calculation is the present
4  value of the lease obligation.  And -- and the -- so you go
5  to the lease, you look at the lease, payments that are
6  required under the lease, you discount it back, and that
7  drives the liability side and then that creates the debit
8  on the asset side.
9  Q.  Okay.
10  A.  There are minor adjustments that take place
11  between the asset and liability side, and that's why you
12  see the equity that is provided to you, slightly different
13  from one version to another, footnoted whether, in fact, it
14  reflects the FASB calculation in it.
15  Q.  Okay.  Again, that will all be reflected in the
16  worksheets?
17  A.  No.  I thought what you wanted was the calculation
18  of the entry for the debit and the credit?  And that we
19  will provide.  Do you want more?
20  Q.  I may have misunderstood your testimony,
21  Mr. Wheaton.  For that, I apologize.
22     I thought you had indicated there were
23  worksheets prepared in connection with the generation of
24  that line item?
25  A.  Yes.

1  Q.  Okay.  Those worksheets I understood were
2  something you were going to -- the debtor was going to
3  provide.  Did I misunderstand that?
4  A.  You asked for that, and we will provide that.  I
5  didn't understand that to be your last question.
6  Q.  That's my fault.  For that, I apologize.
7  A.  Okay.  Apology accepted.  Okay.
8  Q.  So if we take a look on this balance sheet, you
9  also have a line item here for rent, licenses, and other.
10  That's the amount of base rent and CAM owed under the lease
11  to the landlord; is that correct?
12  A.  I'm going to have to move up.  I can't really read
13  this.  Say the question again.
14  Q.  Sure.
15     The line item, rent, licenses and other,
16  there's a figure of 329,770 as of March 22, 2021.  Is that
17  what the debtor believes is owed to the landlord under the
18  lease for rent and CAM?
19  A.  Yes.
20  Q.  All right.  Next let me take you to what we'll
21  mark as Exhibit 5.
22     (The document was marked as Exhibit 5 for
23  identification.)
24     BY MR. DAWES:
25  Q.  And this is the monthly operating report.  Are you

1  familiar with this document, sir?
2  A.  Yes.
3  Q.  Now, this is for the period of April 7th to 30 of
4  2021; correct?
5  A.  Yes.
6  Q.  All right.  Now, it's signed by Mr. Dowdy, but did
7  you participate in this document's preparation?
8  A.  Yes.
9  Q.  All right.  And we see a number of line items.
10  Number 1 is: Did the business operate during the entire
11  reporting period?  And the answer checked is yes.
12     How was it that the business was operating
13  during the reporting period?
14  A.  We still have obligations, utilities.  We provided
15  to you pro formas, so, you know, the -- not pro formas.
16  Actuals.  That's one of the questions asked in the
17  delivery.  We generated monthly P&Ls, so obviously -- we've
18  interpreted line 1 to mean, provide on an accurate basis
19  exactly what the P&L would look like for that entire
20  period.
21  Q.  Was the debtor open for business during the
22  reporting period?
23  A.  It was not.  But I don't read that interpretation
24  as what number line 1 says.
25  Q.  Item 4 asks about: Did you pay your employees on

Case 2:21-bk-02477-BKM    Doc 53-1    Filed 06/10/21    Entered 06/10/21 15:44:40    Desc
Exhibit Exhibits    Page 18 of 68

1 time?
2    For the reporting period, what employees did
3 the debtor have?
4 A. I'd have to be exactly accurate and responsive to
5 that. I'd have to see if there were any employees on time,
6 but on -- on payroll. If they were, they were paid on time
7 because we try to pay on time. If there were none, I would
8 say that the answer still is still accurate. The payments
9 were made.
10 Q. Well, the information provided in this report is
11 all under penalty of perjury, is it not?
12 A. That's what I read, yes.
13 Q. Okay. And so as you sit here now, you don't know
14 if you had employees who were paid during the reporting
15 period; correct?
16 A. I don't know that exact statistic, no.
17 Q. Line item 17 over on the next page asks: Have you
18 paid any bills you owed before you filed bankruptcy? If we
19 scroll up, the answer is no. Is that correct?
20 A. What are you referring to? I'm completely lost
21 now.
22 Q. No problem. Let me step back and slow it down.
23    So do you see item -- are you able to see 17?
24 A. Yes.
25 Q. All right. And the answer for the debtor was no;

1 correct?
2 A. Correct.
3 Q. All right. So I'm going to take you to the third
4 page of this document. And under employees, number 5, this
5 indicates that the number of employees at the time the case
6 was filed was zero. That is correct; right?
7 A. That is correct.
8 Q. Then as of the date of this report -- and I'm glad
9 to show you that was on May 21, 2021 -- there was a single
10 employee; correct?
11 A. Yes.
12 Q. All right. Now, you had indicated in the 341 that
13 there were three employees. What happened to the other two
14 in that period?
15 A. I don't recall my testimony in 341 necessarily.
16 From a payroll standpoint, I simply don't know the exact
17 accounting, but 27 is right. And that's why NA wasn't
18 checked up above when you showed me the table up above.
19 And the delta between one and three presumably would be
20 that employees were signed up as employees but had no
21 working hours, and therefore no payment, would be my only
22 explanation.
23 Q. Okay. In any event, the information set forth on
24 the monthly operating report is true and correct; right?
25    MS. MINDER: Chris, when you finish this line

1 of questioning, could we have another break?
2    MR. DAWES: Sure.
3    THE WITNESS: The -- yes.
4    MR. DAWES: Okay. Sure. We can take that
5 break.
6    (A recess ensued.)
7    BY MR. DAWES:
8 Q. So, Mr. Wheaton, I should ask you a more simple
9 question about the PPP loan proceeds. You may have heard
10 counsel and I had a colloquy during our break.
11    Is it the debtor's intent to expend the PPP
12 proceeds to obtain loan forgiveness from SBA?
13 A. Yes.
14 Q. Let me ask you a bit about the lease with the
15 landlord.
16    What was your role in connection with the
17 negotiation of that lease?
18 A. Fairly limited.
19 Q. Okay. How would you describe your fairly limited
20 role when negotiating the lease?
21 A. Fairly limited means fairly limited. I reviewed
22 documents and made sure that it was a lease that Summit
23 could fulfill its obligations to.
24 Q. Okay. So did you talk to anyone about the lease?
25 A. Other than Ron Dowdy -- I'm not sure I understand

1 the question.
2 Q. So I'm trying to understand your role in
3 connection with negotiation of the lease.
4    You told me it was fairly limited; correct?
5 A. Yes.
6 Q. You told me you reviewed some documents; correct?
7 A. The lease documents.
8 Q. You told me that you looked at it to make sure it
9 was something that Summit or the debtor could do; correct?
10 A. Yes.
11 Q. Is there anything else you did?
12 A. Not that I recall.
13 Q. Is there anyone you ever spoke to regarding
14 negotiations of the terms of the lease?
15 A. Yes. The point person on the lease, I don't
16 recall his second -- his last name, but it was Arlis
17 [phonetic]. I would have had a couple conversations with
18 Arlis and Ron Dowdy regarding certain aspects of the lease.
19 And I had at least two conversations with the principal of
20 the landlord regarding his overall objective for the
21 purchase of the center.
22    So that's my -- I just can't -- I can't
23 remember his -- but the senior principal of the landlord.
24 So those would be two conversations and two individuals
25 from the landlord that I recall having conversations with.

Min-U-Script®      Coash & Coash, Inc.
602-258-1440.    www.coashandcoash.com
    (17) Pages 66 - 69

1 Q.  Were these in person or phone calls or what?
2 A.  Well, they were all phone calls with one
3 exception.  My recollection is that I met with Mike in
4 Maryland on one occasion.  And I don't recall whether that
5 was in advance of signing the lease or after signing the
6 lease.
7 Q.  The lease -- let me just pull the lease up so we
8 have that.  It looks like maybe you have your paper copy
9 there too.
10 A.  I do.
11 Q.  All right.  So the lease will -- hopefully you're
12 seeing that on your screen.  We'll make that -- I believe
13 we're up to Exhibit 6.
14     (The document was marked as Exhibit 6 for
15 identification.)
16     BY MR. DAWES:
17 Q.  So looking at Exhibit 6, if we go to the second
18 page of it, it's dated September 12, 2014.  Do you see
19 that?
20 A.  Yes.
21 Q.  Okay.  And so you were telling me you had met with
22 Mike around the time of the lease; is that correct?
23 A.  I thought I said I don't recall whether it was
24 before the lease was finalized or after the lease was
25 finalized.

1 Q.  Okay.  Would your best estimate be sometime in the
2 year 2014?
3 A.  Yes.
4 Q.  Okay.  Do you recall negotiating the terms of the
5 lease with Mike at all?
6 A.  I don't recall -- I really don't recall.
7 Q.  Okay.  Did -- who was charged for the debtor with
8 undertaking negotiation of the lease?
9 A.  Ron Dowdy.
10 Q.  Okay.  And so is it your testimony Mr. Dowdy's
11 involvement was much greater than yours in negotiating the
12 lease?
13 A.  The details of the lease, the overall parameters,
14 I think I just testified that I was very sensitive to the
15 -- being able to meet the general economic terms of the
16 lease.  I would have laid out some guidelines to him in
17 terms of general lease economics.
18 Q.  Okay.  Was that your primary focus, the lease
19 economics?
20 A.  Yes.
21 Q.  And were you privy to -- it sounds like you also
22 spoke with Arlis.  Was that -- that's his first name?
23 A.  Yes.
24 Q.  Do you remember his last name?
25 A.  I think I just testified that I don't.

1 Q.  Do you recollect your discussions with Arlis?
2 A.  No.
3 Q.  Now, you're aware that the lease provides for
4 liquidated damages; correct?
5 A.  Yes.
6 Q.  All right.  And that is one of those economic
7 terms you would have had sensitivity to; correct?
8 A.  Not as much sensitivity than -- that you might
9 think.
10 Q.  I don't know how to -- I don't understand your
11 answer.  Can we try again?
12 A.  Well, we can.  I don't know always understand your
13 questions, so -- so I was CEO of a business for, at that
14 point in time, over 20 years.  And the issue of damages
15 associated with the operation of the business that never
16 closed other than the issue of around snow just didn't --
17 wouldn't have been a high priority item that I focused on.
18     Is that a better answer?
19 Q.  It's your answer.
20 A.  That's my -- that's my answer and I'm sticking to
21 it.
22 Q.  Okay.  Fair enough.
23     But in any event, you read and understood the
24 liquidated damages provision; correct?
25 A.  I read the document before it was signed.

1 Q.  Was there anything in the document you didn't
2 understand?
3 A.  Could you just -- did you say is there anything in
4 the document I didn't understand?
5 Q.  That was my question, yes.
6 A.  Well, since we've had a number of differences
7 between the landlord and tenant, there was certainly a
8 number of things that I understood to be different than the
9 landlord.
10 Q.  Did the debtor retain counsel or engage counsel
11 with respect to preparation of this lease?
12 A.  Yes.
13 Q.  Okay.  Who was the debtor's counsel in that
14 regard?
15 A.  I would have to get you that.  I don't recall the
16 firm.
17 Q.  Was the debtor working with a number of different
18 firms back in the 2014 time frame?
19 A.  Yes.
20 Q.  Which were those?
21 A.  Well, depending on the state and depending on the
22 issue, it could have been any number of firms.
23 Q.  And how about for this state and this lease?
24 A.  It was one firm, which I don't recall the name.
25     And I don't recall the name of the attorney.

1 Q. Now, the lease also provides for assignment of
2 intellectual property in the event of default; correct?
3 A. It does.
4 Q. And was that something that you had sensitivity to
5 in negotiating the lease?
6 A. I did.
7 Q. What was your sensitivity to that issue?
8 A. I wasn't particularly concerned about it because
9 the owner of intellectual property wasn't a party to the
10 lease.
11 Q. And the owner is who?
12 A. Casa Bonita Denver, Inc.
13 Q. So at the time the lease was signed, what interest
14 did the debtor have in the intellectual property?
15 A. None other than a verbal agreement, which we
16 discussed before, between Casa Bonita Denver, Inc., and
17 Summit Family Restaurants Inc.
18 Q. So I want to understand the IP a little better.
19 Was the IP -- who was the IP originally owned
20 by?
21 A. Taco Bueno, LLC.
22 Q. I'm going to go through -- I'd like to walk
23 through how it came from -- it went from being held by Taco
24 Bueno, LLC, to the present.
25 So who held the intellectual property next

1 after Taco Bueno?
2 A. You know what? I hear that you'd like to know. I
3 don't have all of those details, so I can't speak to them.
4 Q. Okay. Do you know how Casa Bonita Denver, Inc.,
5 came to have an interest in the IP?
6 A. I do.
7 Q. How?
8 A. In general, all IP is held at the Star Buffet,
9 Inc., level unless I deem there is a business reason to
10 have it somewhere else. And in this particular case, there
11 was a business reason to have it somewhere else.
12 Q. Okay. And that somewhere else was Casa Bonita,
13 Inc. -- or Casa Bonita Denver, Inc.?
14 A. Yes.
15 Q. And so how did Star Buffet come to have an
16 interest in the IP?
17 A. As I believe I testified in the 341, the
18 origination of Star Buffet, Inc., was detailed in an SEC
19 document called an S-1, which details a formation
20 transaction. And that formation transaction arose when a
21 company by the name of CKE Restaurants Inc., contributed
22 the assets of Summit to the -- to Star Buffet, Inc.
23 So it was originally -- at some point the
24 intellectual property was owned by Taco Bueno. At some
25 point, CKE Restaurants Inc., acquired Taco Bueno. They

1 acquired all the intellectual property associated with Taco
2 Bueno. And then Taco Bueno was disassembled and sold to
3 third parties all -- along with intellectual property.
4 The intellectual property associated with
5 Casa Bonita was transferred to Star Buffet, Inc., as part
6 of the formation transaction. And it resided in Star
7 Buffet, Inc., I believe, until there was a business reason
8 to transfer it to Casa Bonita Denver, Inc.
9 Q. When was that transfer to Casa Bonita Denver,
10 Inc.?
11 A. I think you asked me the last time and I said in
12 2011.
13 Q. What was the business reason in 2011 for that
14 transfer?
15 A. Well, the business reason was that we had a
16 request to utilize the Casa Bonita intellectual property.
17 And so we -- in a license arrangement. And to facilitate
18 that license arrangement, the IP, meaning the Casa Bonita
19 IP, was transferred from Star Buffet, Inc., to Casa Bonita
20 Denver, Inc. But that transaction that we had anticipated
21 never took place.
22 Q. When you said "we had a request," who is "we"?
23 A. Star Buffet, Inc.
24 Q. And a request from who and for what?
25 A. Well, the short answer is that during the

1 formation transaction and for the first, I'm going to say
2 ten years, but don't hold me to that number, we operated
3 two Casa Bonitas: one in Tulsa and one in Denver. The
4 lease expired on the facility in Tulsa. We elected not to
5 renew that lease.
6 The founder of Casa Bonita, an individual by
7 the name of Bill Waugh, assumed the lease from the landlord
8 in Tulsa. Bill Waugh wanted to utilize the Casa Bonita
9 name, which has an equally well-established reputation in
10 Oklahoma that Casa Bonita Denver has in Colorado. Bill
11 Waugh and I could not come to terms on the use of the Casa
12 Bonita name, primarily financial terms. And so Bill
13 elected to change the name to Casa Viva and operate the
14 business for about 18 months.
15 Q. So up until 2011, how was it that -- what was the
16 nature of the debtor's interest in the IP?
17 A. It was nothing other than a user of the IP or a
18 licensee of the IP.
19 Q. A licensee of Star Buffet?
20 A. A licensee of Star Buffet. And then it became a
21 licensee of Casa Bonita Denver, Inc.
22 Q. Did Star Buffet terminate its license arrangement
23 with the debtor in 2011?
24 A. You know, I don't know that there was an official
25 termination, nor do I believe that there was necessarily an

1  official initiation of a lease between -- a license
2  agreement between Casa Bonita Denver, Inc., and Casa
3  Bonita, because as I testified at the 341, those were
4  verbal arrangements.
5  Q.  The license from Star Buffet to the debtor has not
6  been terminated it, per se; correct?
7  A.  No, I don't think -- I don't think that's right.
8  I just don't think that I -- there is no question that the
9  original arrangement was -- was between Star Buffet, Inc.,
10  and Casa Bonita.  And it later became between Casa Bonita
11  Denver, Inc., and Summit.  And as I said, it's a business
12  reason, and as it -- it was a verbal agreement.
13  Q.  You said originally it was between Star Buffet and
14  Casa Bonita.
15  A.  Casa Bonita held the -- I'm sorry.  Star Buffet --
16  I think I just testified that Star Buffet, Inc., generally
17  held all of the intellectual property of any investment
18  that we might have unless there was a business reason to do
19  otherwise.
20  Q.  You said there was a verbal license agreement
21  between Star Buffet and Casa Bonita.  I want to make sure I
22  understand it because those were your words.  I'm not sure
23  that was -- I want to make sure I understand it.
24  Did I misspeak?  I'm sorry.  So repeat the
25  question again.

1  Q.  When the lease was signed in September of 2014,
2  was there a license agreement in place between Star Buffet
3  and the debtor?
4  A.  No.
5  Q.  Prior to 2011, was there a license arrangement
6  between Star Buffet and the debtor?
7  A.  Yes.
8  Q.  All right.  And if I'm understanding your
9  testimony, that changed in 2011; correct?
10  A.  For the business reason that you just asked a
11  description of, yes.
12  Q.  And so my question: In 2011, did Star Buffet
13  terminate the license arrangement with the debtor?
14  A.  I don't recall a termination.
15  Q.  If I understood what you said at the 341, there's
16  no documentation on any of this; correct?
17  A.  I think what I testified is that -- well, the
18  answer is, no documentation.
19  Q.  Okay.  All right.  So in 2011, you caused Star
20  Buffet to provide license rights to Casa Bonita Denver for
21  the IP; correct?
22  A.  Yes.
23  Q.  All right.  And did you also cause Casa Bonita
24  Denver, Inc., to license the IP to the debtor?
25  A.  Please repeat that.  I got lost somehow on that.

1  Please repeat that question again.
2  Q.  Sure.
3  MR. DAWES: Could we have that read back for
4  Mr. Wheaton, please?
5  (The record was read by the reporter as
6  follows:
7  Q  All right.  And did you also cause Casa
8  Bonita Denver, Inc., to license the IP to the debtor?)
9  THE WITNESS: Yes.
10  BY MR. DAWES:
11  Q.  Was that in 2011?
12  A.  Yes.
13  Q.  Have there been any other further agreements
14  regarding the IP since then?
15  A.  No.  No.
16  Q.  Aside from Star Buffet and Casa Bonita Denver,
17  Inc., and the debtor, does anyone else have a right or
18  interest to use any of the IP?
19  A.  You mean any of the Casa Bonita IP?
20  Q.  Yes.
21  A.  No.
22  Q.  Going back to the lease, you signed the lease as
23  president of the debtor; correct?
24  A.  I don't have a signature page, so I -- do you have
25  one up there?

1  Q.  Yes.
2  A.  I do have it.  Excuse me.  I do have it.  I signed
3  it as president -- I signed it as president.
4  Q.  I know you served as CEO for 25 years.  Have you
5  also served as president for 25 years?
6  A.  I think most of the employees of Casa Bonita would
7  deem me to be president, but my title is what was reported
8  in the 341 and what's on the financial -- the documents,
9  and that is CEO.
10  Q.  You have held yourself out as president, though;
11  correct?
12  A.  I didn't say I held myself out.  I said that the
13  employees would deem me to be the president of --
14  Q.  And my question to you, Mr. Wheaton, was: You have
15  held yourself out as the president of the debtor; correct?
16  A.  Well, in this particular case, I signed the
17  document as president.
18  Q.  And those are -- that's your marking on that page
19  where it says president; correct?
20  A.  It is.
21  Q.  Okay.  So you have held yourself out as president;
22  yes?
23  A.  Yes.
24  Q.  You have also held yourself as the president of
25  Star Buffet; correct?

**11:50:56-11:51:59**            Page 82

1 A. Yes.
2 Q. And for how long have you been president of Star
3 Buffet?
4 A. Since 1997.
5 Q. Okay. And you signed a guarantee of the lease on
6 behalf of Star Buffet as president; correct?
7 A. That's correct.
8 Q. And did Star Buffet also have counsel involved in
9 negotiation and documentation of the leasing guarantee?
10 A. No.
11 Q. Only the debtor?
12 A. The debtor.
13 Q. I will next show you what we've marked as Exhibit
14 -- we'll mark this as, I believe, Exhibit 7. It is a
15 letter from Broad Street to Summit Family Restaurants d/b/a
16 Casa Bonita
17 (The document was marked as Exhibit 7 for
18 identification.)
19 BY MR. DAWES:
20 Q. Are you seeing that on the screen?
21 A. Yes.
22 Q. And you have -- I'm glad to scroll you through the
23 letter. But my first question is: You have seen this
24 letter before?
25 A. Yes.

**11:52:13-11:53:18**            Page 83

1 Q. Okay. And has there been -- I may have asked you
2 this before. I apologize if I asked it.
3 Have you had communications with the landlord
4 regarding this letter?
5 A. No.
6 Q. Okay. So there is no response from the debtor to
7 this letter; correct?
8 A. I don't know that. Ron may have responded. I
9 simply don't know.
10 Q. All right. But as you sit here now, you're
11 unaware of any response; correct?
12 A. I am not aware.
13 Q. This is from John Deacon. That's a name I don't
14 think you've mentioned today.
15 Have you ever had any communications with
16 John Deacon?
17 A. None other than receipt of the letter.
18 Q. Okay. All right. Fair enough.
19 One of the things we had talked about during
20 the 341 was an issue with the grease trap at the restaurant
21 location. Do you recall that?
22 A. You asked me some questions, yes.
23 Q. And have you -- since then, have you done anything
24 to look into any issues with respect to the grease trap or
25 billings for that service?

**11:53:29-11:54:27**            Page 84

1 A. No.
2 Q. You don't intend to; is that fair?
3 A. No.
4 Q. No, you don't intend to or -- that was a poor
5 question. So let me ask you this.
6 Are you planning to look into any of the
7 issues with respect to the grease trap issues?
8 A. Well, my conclusion, it was that if you were all
9 that interested in it, somebody from the landlord would
10 have contacted me. I testified that I had no idea what you
11 were talking about. And if it was an interest to the
12 landlord, you would have said, hey, client, why don't you
13 give some information to Mr. Wheaton. So I'm really just
14 waiting for some information and then I will look into it.
15 Q. Sure. That's fine.
16 That is your prerogative; right? You're the
17 tenant. You can do what you want.
18 A. No, I don't think that's my prerogative, but I'm
19 responding to your question.
20 Q. Now, is it true that Casa -- that you have
21 indicated that the debtor plans to open the business as
22 soon as it's legally possible?
23 A. Yes.
24 Q. Okay. For how long has it been legally possible
25 to reopen the business?

**11:54:44-11:56:04**            Page 85

1 A. I think that's been a discussion with the
2 landlord. And I deem that at most, it's been less than a
3 month.
4 Q. What have you done to research when it's legally
5 possible for the debtor to open and operate in the state of
6 Colorado?
7 A. I think I testified a bit on that in 341. There
8 are a couple different aspects. Number 1, there are rules
9 set out by the Jefferson County Health Department. There
10 were state edicts, and they weren't always necessarily in
11 sync.
12 I think I've also testified that Mike Mason,
13 the former vice president and what I will call senior
14 operating officer, contacted the Jefferson County Health
15 Department about ways that we could reopen certain aspects
16 or all aspects of the business.
17 Q. Has the debtor ever retained counsel to look into
18 when it's legally permissible to reopen?
19 A. No.
20 Q. Is there any reason why the debtor never did so?
21 A. Because I can read.
22 Q. Okay. And are you trained as a lawyer?
23 A. I can read.
24 Q. What have you read to come to your conclusion that
25 the debtor could not legally operate until sometime within

Case 2:21-bk-02477-BKM   Doc 53-1   Filed 06/10/21   Entered 06/10/21 15:44:40   Desc
Exhibit Exhibits   Page 23 of 68

1  the last 30 days?
2  A.  I read all the documents that were available to
3  me.
4  Q.  What were those, sir?
5  A.  Well, there were state documents, and there were
6  Jefferson County health documents.
7  Q.  What are the state documents that you're eluding
8  to?
9  A.  Well, that -- there are actual documents.  And
10  then there was a state-sponsored website that each week
11  provided an update on each and every rule that they had
12  made up during the COVID outbreak.  And I read those
13  documents, and if I didn't understand them, I read them
14  again or sought some further guidance from the Jefferson
15  County Health Department through Mike Mason.
16  Q.  Just to be sure, you have not spoken with anyone
17  at Jeff Co. about any of this; correct?
18  A.  I have not.
19  Q.  So again, when I asked you what are the state
20  documents you looked at, are you able to identify them?
21  A.  Not without going back and reviewing the website.
22  Q.  Okay.  So the state documents you're alluding to
23  are documents on a website?
24  A.  Documents on the website that I would then print
25  and I would read.

1  Q.  Okay.  Do you recollect which website that is,
2  sir?
3  A.  No.
4  Q.  The Jefferson County documents you eluded to, what
5  are those documents?
6  A.  Again, they were website-based documents that if I
7  deemed them relevant, then I would print them out and read
8  them.
9  Q.  Just so we're clear, based on all the research
10  you've done, your testimony under oath is you could not
11  legally reopen in Colorado until some point in the last
12  30 days; correct?
13  A.  That is correct.
14  Q.  Okay.  So you mentioned Casa Bonita Denver.  What
15  is Casa Bonita Denver's business?
16  A.  Casa Bonita Denver, Inc., is a wholly owned
17  subsidiary of Star Buffet, Inc., that has no activity other
18  than the ownership of and licensing of the intellectual
19  property of Casa Bonita, which consists of two federal
20  marks.  And I think I spoke in the 341 of five state marks,
21  but there are actually six state marks.
22  Q.  Does Casa Bonita Denver have revenue?
23  A.  No.  Because I testified in the 341 that we did
24  not charge a license fee for the use of the Casa Bonita IP,
25  but doesn't mean that I can't change my mind.  So I told

1  you it was a business decision to hold it in, Casa Bonita
2  Denver, Inc.
3  Q.  Okay.  Does Casa Bonita Denver, Inc., own the IP?
4  A.  I would deem it as the owner of the IP.
5  Q.  Okay.  So Star Buffet does not have any direct
6  ownership of the Casa Bonita IP; correct?
7  A.  Star Buffet, Inc., owns 100 percent of the equity
8  of Casa Bonita.
9  Q.  You understand my question was different, though;
10  right?
11  A.  That was the best way I could answer the question.
12  Q.  So let me ask my question again just to make sure
13  we're understanding one another.
14      Star Buffet does not directly own the Casa
15  Bonita IP; correct?
16  A.  Correct.
17  Q.  You've testified the owner is Casa Bonita Denver,
18  Inc.; correct?
19  A.  Yes.
20  Q.  And I understand that you're saying Star Buffet
21  owns Casa Bonita Denver; right?
22  A.  Yes.
23  Q.  All right.  But it does not directly own the Casa
24  Bonita IP; correct?
25  A.  I think the licenses reflect that it's owned by

1  Casa Bonita Denver, Inc., the marks.
2  Q.  I want to be --
3  A.  The marks, not the license.
4  Q.  Okay.  Sorry.  I apologize.  I spoke over you.
5  What's the last thing you said?
6  A.  I made -- I misspoke.  The -- Casa Bonita Denver,
7  Inc., owns the marks.
8  Q.  You're drawing a distinction between the marks and
9  other IP?
10  A.  I don't believe so.
11  Q.  You've introduced marks for the first time today.
12      Let me ask it this way.
13      What intellectual property does Star Buffet
14  own?
15  A.  Star Buffet must own more than a half dozen marks.
16  Buddy Freddy's.  They own Holiday House.  They own JJ
17  North's.  They own JB's Restaurant, Inc., JB's.  I think
18  they own Pecos Diamond.
19  Q.  Okay.  So let's focus on the Casa Bonita IP and
20  marks, to use your term.
21      That is wholly owned and solely owned by Casa
22  Bonita Denver; is that correct?
23  A.  Certainly the two federal marks are.  And I
24  believe the state marks are as well, but I can't be
25  100 percent sure.

1 Q. Why not?
2 A. Well, because I haven't looked at the state marks
3 in a number of years.
4 Q. Okay. Does Star Buffet hold any state-registered
5 marks or IP for Casa Bonita?
6 A. Not to my knowledge.
7 Q. Okay. Again, I'm just trying to make sure I
8 understand what you're saying.
9 I think your testimony is, to the best of
10 your knowledge, Casa Bonita Denver Inc., is the only entity
11 that owns or holds the Casa Bonita trademarks and IP aside
12 from what it has licensed to the debtor?
13 A. That would be my testimony.
14 Q. In terms of controlling the IP and marks for Casa
15 Bonita, you control that exclusively; is that correct?
16 A. "I" mean Robert Wheaton?
17 Q. Yes.
18 A. You know, I am the majority shareholder of Star
19 Buffet Inc. Star Buffet Inc., is the majority holder of
20 Casa Bonita Denver, Inc. So to the extent that there is
21 some differentiation that you're looking for, I don't know
22 what it is, but I certainly make the decisions on all
23 intellectual property, all our business-related decisions.
24 Q. And you solely make those determinations; correct?
25 A. No. I wouldn't say that. Star Buffet, Inc., has

1 a board of directors. And intellectual property is a very
2 important component and asset of Star Buffet, Inc. And --
3 and intellectual property decisions are almost, without
4 exception, discussed with the board if there is a
5 significant business reason to do so.
6 Q. So you got the board's blessing to do the transfer
7 to Casa Bonita Denver; correct?
8 A. I am quite sure that the discussion of
9 intellectual property -- Casa Bonita's intellectual
10 property was discussed with the board, but it was discussed
11 more in context with the licensing request from Bill Waugh
12 for the Tulsa property.
13 Q. What recollections do you -- do you -- what
14 recollection do you have of discussions with the landlord
15 about the Casa Bonita intellectual property?
16 A. Absolutely none.
17 MR. DAWES: Mr. Wheaton, I will likely have a
18 few more questions for you. While I sort through my notes,
19 I'm going to pass you to Mr. Hawkins so we don't lose time.
20 THE WITNESS: Sounds great.
21
22 EXAMINATION
23 BY MR. HAWKINS:
24 Q. My name is Lamar Hawkins, and I represent Save
25 Casa Bonita, LLC. I think my client may have talked with

1 you or a few others in your organization about some things.
2 Just a couple of wrap-up questions I have
3 from some of the things that Chris raised and I wanted to
4 get clarification on.
5 When he was talking to you about your
6 questions at the creditor's meeting, referred to as the 341
7 meeting, and you referred to documents that were provided
8 at the creditor's meeting, because I do debtor work, I
9 understand that you would have produced a bunch of
10 documents to the U.S. trustee's office in anticipation of
11 your initial debtor interview, which would have happened
12 probably a couple weeks before the creditor's meeting.
13 Were the documents that you were referring to
14 that were produced at the creditor's meeting the documents
15 that were actually given for the initial debtor interview?
16 A. I don't know the answer to that. I did not
17 participate -- the first participation that I had in terms
18 of -- good afternoon.
19 Q. Hi.
20 A. I now see who I'm talking to.
21 -- were handled by Ron Dowdy. The 341 was
22 initial -- my initial involvement in an actual
23 conversation. So I'm not aware of what documents were
24 exchanged prior to that.
25 Q. Did you attend the initial debtor interview with

1 the U.S. trustee's office or did Mr. Dowdy do that?
2 A. No, I thought I just said -- no. I was not
3 involved until the 341, which was a couple weeks ago.
4 Q. The answers to your questions will make lot more
5 sense to all of us -- this -- just so you know, because we
6 don't get the documents that you produced to the U.S.
7 trustee's office unless we specifically ask for them. So
8 at this time, I am specifically asking for the same
9 documents that you provide to the U.S. trustee's office.
10 If you could please have those produced to both Chris and
11 I, that would be very helpful. Could we get that
12 commitment to do that?
13 A. Well, I'll say exactly what I said on other
14 document requests, which is I'll defer to counsel. I don't
15 know what documents you're referring to, but I'll defer to
16 counsel and then you can --
17 MR. HAWKINS: Counsel, could we get your
18 commitment to get the documents that were produced to the
19 U.S. trustee's office, please?
20 MS. MINDER: We will produce any documents
21 that further are needed to supplement the response to the
22 questions that were asked for in the 2014 [sic], but we
23 won't provide anything further than that without a little
24 bit more clarification about what you're specifically
25 asking for.

1     MR. HAWKINS: You said the 2014. Do you mean
2  the 2004?
3     MS. MINDER: I'm sorry. The 2004.
4     MR. HAWKINS: Okay. I am specifically asking
5  for production of all the documents that were produced to
6  the U.S. trustee's office. I will follow that up with a
7  letter. And yes, we want those documents.
8     MS. MINDER: We will produce any documents
9  that are needed to supplement the response to the request
10  in the 2004 request.
11     MR. HAWKINS: That's not a very nice
12  deflection right there, but I will follow it up with a
13  letter because this is not something that you cannot
14  produce if we ask for it, and we're asking for it.
15     MR. DAWES: I would have the same request.
16  So that's what I want to get on the record.
17     BY MR. HAWKINS:
18  Q.  Another one of his questions in -- with respect to
19  Exhibit 3, which was the single projection, I didn't quite
20  understand your complete answer, but let me just restate it
21  and tell me if this is what you were trying to say.
22     Is it the debtor's intent to use all of the
23  PPP loan money that you receive in a way to achieve
24  complete forgiveness of the PPP loan?
25  A.  We're going to follow, without any exceptions, the

1  rules under the PPP loan. And to the extent that by
2  following the rules we can use it up, we will do so.
3     And just, you know, to give you an example,
4  if we don't generate enough wage expense, then that's going
5  to limit some other expenses that we can take, and the
6  maximum deduction will not -- will -- we'll have to forfeit
7  the maximum reduction or forfeit the maximum forgiveness.
8  But the plan -- our pro formas suggest that we will be able
9  to follow the rules and -- and achieve maximum forgiveness
10  of the PPP.
11  Q.  Okay. Your questioning with Mr. Dawes clarified
12  some of my questions on the IP that I had.
13     And just to make sure that I understand a
14  little bit of your back and forth, my understanding from
15  what you said is the Casa Bonita Denver owns all of the
16  Casa Bonita IP presently; is that correct?
17  A.  Yes.
18  Q.  And presently, Casa Bonita Denver is not charging
19  the debtor anything for the license of that IP; is that
20  correct?
21  A.  At this time they are not.
22  Q.  Are there any documents that would give Casa
23  Bonita Denver the right to charge the debtor something for
24  its use of the IP?
25  A.  Since I repeatedly testified that it's a verbal

1  arrangement, I would deem that I have the right to do it at
2  any point in time.
3  Q.  So there's no documents; it's just an oral change
4  that you could make?
5  A.  I am most -- I am on both sides of the agreement.
6  I've negotiated with myself.
7  Q.  Okay. I'm assuming you could agree with yourself
8  too?
9  A.  Yes.
10  Q.  Has the debtor ever paid anything for the use of
11  the IP?
12  A.  No.
13  Q.  Has there --
14  A.  I would say -- I'm sorry to speak over you -- is
15  that as I testified, that particular design, there are --
16  there are business reasons for every single piece of IP we
17  have as to where it's placed and what is done. The
18  original design was so that we could have a legally binding
19  written agreement for Casa Bonita Tulsa that never
20  transpired. Had that transpired, I might have just had a
21  replicated document for Summit, but since that transaction
22  did not go through, it just never happened.
23  Q.  The IP that is owned by Casa Bonita Denver, is
24  there anyone that has a secured interest against that IP?
25  A.  No.

1  Q.  In the pro forma, there was a line item that
2  referenced benefits. What employee benefits does the
3  debtor have or provide?
4  A.  May I go to that schedule?
5  Q.  Sure.
6     MR. HAWKINS: Chris, if you can pull it up,
7  it's SU1140. That might be helpful.
8     THE WITNESS: I can get to it. So in the
9  benefit line -- and let's just use the same year we were
10  talking about. The number that you're asking me about is
11  171,339. That consists of all FICA and government-related
12  taxes. It also consists of workers' comp insurance. And
13  it also consists of ObamaCare payments to certain
14  individuals. And it also consists of vacation pay for
15  salary employees.
16     MR. DAWES: Just so we're clear, this is
17  Exhibit 4.
18     BY MR. HAWKINS:
19  Q.  What level of employee --
20     MR. HAWKINS: Thank you, Chris.
21     BY MR. HAWKINS:
22  Q.  What level of employees receive any kind of
23  healthcare benefits?
24  A.  Well, it's specific to those that are ObamaCare
25  compliant benefits. And because of the longevity and -- of

1   Casa Bonita employees, there were actually a number of
2   employees who were eligible for ObamaCare coverage, which
3   we would have paid for that coverage. It's what we call
4   bottom ObamaCare coverage. And so that expense, which in
5   round numbers is a little under $100 a month per employee,
6   that would be reflected.
7       But, you know, I have to speak to the -- I
8   don't recall the 2019 totals. Obviously, no employee now
9   would have ObamaCare provided -- compliance coverage
10   because they were all laid off, but there would be some pro
11   forma ObamaCare compliant coverage built into the pro forma
12   171,339.
13 Q.   The line item for management, how many managers
14   does that line item cover?
15 A.   It has historically covered five managers. And
16   it -- the pro formas would include five managers.
17 Q.   What are the -- since there's only five of them,
18   can you just tick off what those areas are?
19 A.   Sure. There is a gentleman by the name of Mike
20   Mason. Wonderful guy, very seasoned guy. He's actually
21   the highest paid employee in the company outside of -- has
22   historically been outside myself. He would be VP of
23   operations and the second most employee.
24       Then there would be a second person that is
25   kitchen related, back of the house responsibility and a

1   front of the house senior manager. And then two -- one
2   administrative manager and one sort of just secondary front
3   of the house manager.
4 Q.   The secondary run of the house, does that cover
5   all areas, just, like, backup to everybody?
6 A.   I think it would be backup. You know, the largest
7   volume of employees are actually front of house employees
8   during the majority of the year. And he would just be a
9   secondary backup to the senior manager in charge of the
10   front of the house responsibilities.
11       Front of the house -- I'm sorry -- I would
12   define -- that would be everything from your hostesses, to
13   your entertainers, to your servers. It would be those
14   three broad categories of employees.
15 Q.   So the entertainers fall under the front of the
16   house category, not the back of the house, nor are they a
17   separate category?
18 A.   No. I thought I testified earlier -- and if you
19   look at the P&L, you'll see an entertainment account. I
20   think I testified that the largest percentage of the
21   entertainment account is wages. And so -- but I thought I
22   was responding to your question, which is, what is it that
23   the front of the house manager manages. And I said
24   administrative. I said servers, hostess-related people.
25   They call them specialty in Casa Bonita, is the term that

1   they use. And the entertainment.
2 Q.   Gotcha. Okay.
3       The utilities category, what comes under a
4   utilities category?
5 A.   It would be electric, gas. It would be phone. It
6   would be internet, trash. It would also include our grease
7   trap-related activities. Those are the primary items.
8       You know, there were certain of those vendors
9   listed in the -- I think it's the 206 -- the schedule 206.
10   You know, the majority of those are national accounts.
11   Excel is a national account. It's not a Colorado account.
12   The phone and internet are national accounts. They're not
13   local. Electric is a local vendor. That's the only place
14   we use electric. Trash is a national account.
15 Q.   Thank you.
16       What comes -- what comes under the
17   controllables category?
18 A.   Good question. It's actually a very important
19   category. It consists of four components. It is -- it's
20   -- maintenance is one. Number 2, it is -- some restaurants
21   call them consumables. It's anything that we purchase. It
22   would be paper goods; it would be -- it would be
23   smallwares; it would be uniforms; it would be guest checks.
24   That type of thing. That's the second exponent.
25       The third component is cash management, which

1   are basically credit card fees and checking account fees.
2   They're bank-related fees. And any shortage -- cash
3   shortages get -- go through that third component.
4       And the fourth component we deem to be
5   miscellaneous. And they are things like our music. Well,
6   that's here. It's in entertainment. Miscellaneous is
7   security guards, which would be the largest category. It
8   would have security cameras, and it does have laundry.
9   Those would be the biggest. So those are the four that go
10   into controllables. The largest would be maintenance.
11       And in general, I'm more than -- probably
12   giving you more than you want to know. But in general, the
13   total budget is -- on any given year -- you can see it in
14   the numbers that we provided in response -- is 8 percent.
15   And the management team does a pretty good job most years
16   of staying under 8 percent for that controllable
17   category -- or the four elements of that controllable
18   category.
19 Q.   When you say 8 percent, 8 percent of gross sales?
20 A.   8 percent of the net sales.
21 Q.   Okay. Then your category of fixed and OCC, what
22   falls under that category?
23 A.   There are five broad categories. The first is
24   rent related to payments to the landlord, and there's three
25   broad categories under there. There's rent, there's CAM,

**12:25:24-12:26:47**          **Page 102**

1 and then there's percentage rent. That's one category.

2    The second category are taxes. Now, in the

3 case of Casa Bonita, the taxes are included in CAM, but

4 there are also state taxes that aren't in the CAM, property

5 taxes in the CAM. That's the next category.

6    The third category is insurance. There are

7 only -- there are very limited number of allocations at the

8 Star Buffet level to any of our investments, but one of

9 them is insurance. We buy insurance at the corporate level

10 and we allocate the cost of that insurance across all the

11 different investments that Star Buffet has.

12    The next category is MIS support, POS

13 technology support. And then the last category is business

14 and license fees.

15 Q. Thank you. That answers my question about where

16 the landlord payments come up in the projection.

17    In that first January 31, 2022, column, is

18 that where you also cure your deficiencies with the

19 landlord in that $465,000 number, or is that coming from

20 some other category outside of these projections?

21 A. No, that's the -- curing our projections that we

22 will provide. At some point in time we'll show that the

23 landlord will be brought current.

24 Q. I think I misunderstood your answer.

25    Are you saying that the 465 includes the

---

**12:27:08-12:28:08**          **Page 103**

1 curing of the landlord or is that someplace else?

2    A.   No, it includes the curing -- well, no. Actually,

3 I misspoke. And you're -- because the curing of the

4 landlord is on the balance sheet. This is just the expense

5 for the -- for the landlord for the current fiscal year.

6    Q.   So the curing of the landlord is going to be a

7 balance sheet entry to take away a current payable or a

8 long-term payable maybe offsetting against the cash balance

9 so it's not ever going to hit the P&L?

10    A.   It already has hit the P&L.

11    Q.   All right.

12    A.   That's how it gets to the balance sheet.

13    Q.   Gotcha. Okay.

14          MR. HAWKINS: Chris, that's all.

15          MS. MINDER: We can't hear you.

16         MR. DAWES: I think you're frozen up, Lamar.

17          MR. HAWKINS: That's all the questions I

18 have. Pass it back to you.

19         MR. DAWES: For the moment, I don't have any

20 further questions. Of course, I would like to see the

21 remaining responsive documents and reserve judgment from

22 there. But I appreciate your time today, Mr. Wheaton.

23         (The proceedings concluded at 12:28 p.m.)

24

25                 ROBERT WHEATON

---

                                      **Page 104**

1 STATE OF ARIZONA  )
   COUNTY OF MARICOPA )

2

3    BE IT KNOWN that the foregoing 2004 exam was taken by

4 me pursuant to stipulation of counsel; that I was then and

5 there a Certified Court Reporter in the State of Arizona,

6 and by virtue hereof authorized to administer an oath; that

7 the witness before testifying was duly sworn by me to

8 testify to the whole truth; pursuant to request,

9 notification was provided that the 2004 exam is available

10 for review and signature; that the questions propounded by

11 counsel and the answers of the witness thereto were taken

12 down by me in shorthand and thereafter transcribed into

13 typewriting under my direction; that the foregoing pages

14 are a full, true and accurate transcript of all the

15 proceedings had upon the taking of 2004 exam, all done to

16 the best of my skill and ability.

17    I FURTHER CERTIFY that I am in no way related

18 to nor employed by any parties hereto; nor am I in any

19 way interested in the outcome thereof.

20    Dated at Phoenix, Arizona, this 8th day of

21 June, 2021.

22

23                       _____

24         CINDY MAHONEY, RPR, RMR NO. 50680

25

Case 2:21-bk-02477-BKM    Doc 53-1   Filed 06/10/21   Entered 06/10/21 15:44:40   Desc
Exhibit Exhibits   Page 28 of 68

**$**

**$100 (1)** 98:5
**$350,000 (3)** 30:7,8,16
**$465,000 (1)** 102:19

**[**

**[phonetic] (1)** 69:17
**[sic] (1)** 40:25;93:22

**A**

**ability (1)** 22:21
**able (10)** 12:5;18:13;
21:15;41:23;42:4;49:3;
66:23;71:15;86:20;
95:8
**above (2)** 67:18,18
**Absolutely (1)** 91:16
**accept (2)** 9:14;20:14
**acceptable (1)** 10:23
**accepted (3)** 39:21;
61:18;64:7
**accepting (2)** 9:7;10:12
**access (3)** 32:9,10,13
**according (1)** 29:24
**account (10)** 30:2;
32:12,14;56:19;99:19,
21;100:11,11,14;101:1
**accounting (7)** 39:15,
18,21,22;40:2;61:18;
67:17
**accounts (4)** 40:8,9;
100:10,12
**accurate (8)** 16:5;
39:17;49:23;51:11,16;
65:18;66:4,8
**achieve (2)** 94:23;95:9
**acquired (2)** 75:25;76:1
**across (3)** 21:14,15;
102:10
**action (1)** 40:21
**active (2)** 9:4;32:12
**activities (7)** 10:6,8,11;
11:12;12:10;16:18;
100:7
**activity (1)** 87:17
**actual (4)** 51:3,11;86:9;
92:22
**actually (16)** 5:13;8:15;
9:5;19:23;29:2;35:2;
41:23;44:12;46:6;
51:12;87:21;92:15;
98:1,20;99:7;100:18
**Actuals (1)** 65:16
**add (1)** 8:10
**added (1)** 7:11
**additional (3)** 7:20;
8:10;16:19
**address (2)** 41:17,23;
42:4;43:24;54:8;58:22;
60:2,2,5,11,14,17
**addressing (1)** 56:4
**adequate (2)** 24:4;
25:20
**adjustments (1)** 63:10
**administrative (2)** 99:2,
24
**advance (1)** 70:5
**afternoon (1)** 92:18
**again (16)** 6:14;14:5;
24:13;37:4;46:1;47:7;
63:15;64:13;72:11;
78:25;80:1;86:14,19;
87:6;88:12;90:7
**against (1)** 96:24
**agenda (1)** 41:20
**agendas (1)** 5:23
**ago (8)** 4:18;5:14,15;
10:15;43:23;47:2;
48:19;93:3
**agree (1)** 96:7
**agreement (7)** 74:15;
78:2,12,20;79:2;96:5,
19
**agreements (1)** 80:13
**Aguilar (1)** 35:1
**ahead (2)** 4:8;25:1
**alarm (1)** 44:24
**allegation (1)** 44:5
**Alliance (3)** 21:1,2,7
**allocate (1)** 102:10
**allocated (4)** 56:10,12,
16;57:7
**allocates (1)** 57:18
**allocation (1)** 57:6
**allocations (1)** 102:7
**Allow (1)** 31:5
**allowable (4)** 54:22,23;
57:5,10
**allowed (1)** 42:25
**alluding (1)** 86:22
**almost (5)** 56:15,15,23;
60:8;91:3
**along (1)** 76:3
**alter (1)** 28:16
**alternative (3)** 23:19;
46:9,10
**alternatives (3)** 22:4;
23:13,14
**although (4)** 9:1;51:7
**always (4)** 34:15;38:9;
72:12;85:10
**America (6)** 19:22,23,
24,25;20:1,16
**among (2)** 54:9,10
**amount (6)** 8:10,10;
53:25;54:22,23;64:10
**analogous (1)** 17:8
**analysis (2)** 51:6;62:8
**annual (1)** 37:7
**annualized (1)** 51:4
**anticipated (1)** 76:20
**anticipation (1)** 92:10
**apologize (7)** 43:10;
49:3;55:15;63:21;64:6;
83:2;89:4
**Apology (1)** 64:7
**Apparently (1)** 15:5
**appear (1)** 21:24
**applicants (1)** 9:8
**applications (5)** 8:11,
13;9:7,14;10:12
**applied (1)** 9:9
**appreciate (1)** 62:21
**approach (1)** 9:17
**approaches (1)** 23:19
**appropriate (1)** 42:3
**approximately (4)** 12:8;
38:13;53:24;56:9
**April (4)** 11:21;29:13;
59:17;65:3
**arcade (6)** 6:20,22;9:3;
10:5;11:2,2,9
**arcades (3)** 9:1;11:5,6
**area (2)** 12:19;44:16
**areas (2)** 98:18;99:5
**Arizona (8)** 5:20;15:12,
13,18;19:23;20:2;
35:25;60:22
**Arkansas (1)** 36:1
**Arlis (4)** 69:16,18;
71:22;72:1
**arose (1)** 75:20
**around (5)** 12:18,19;
44:3;70:22;72:16
**arrangement (7)** 76:17,
18;77:22;78:9;79:5,13;
96:1
**arrangements (2)** 23:2;
78:4
**Aside (5)** 22:8;26:25;
40:21;80:16;90:11
**aspects (4)** 69:18;85:8,
15,16
**assessment (2)** 45:7,9
**asset (11)** 61:10,20,20;
62:1,1,2,3,4;63:8,11;
91:2
**assets (2)** 15:2;75:22
**assign (1)** 20:7
**assigned (2)** 42:19,20
**assignment (1)** 74:1
**assistants (1)** 13:12
**associated (4)** 20:13;
72:15;76:1,4
**assumed (2)** 42:22;
77:7
**assumes (1)** 53:17
**assuming (1)** 96:7
**assumption (12)** 37:2;
52:12,14,16,17,17,22;
53:2,12,17;56:6,7
**assumptions (2)** 52:10,
24
**attached (1)** 54:13
**attachment (1)** 22:15
**attachments (1)** 20:13
**attend (1)** 92:25
**attention (2)** 35:13;58:8
**attorney (1)** 73:25
**attributes (1)** 18:3
**audited (3)** 37:10,12;
38:1
**August (4)** 52:18,18;
53:6,8
**author (1)** 55:25
**available (3)** 9:1;11:7;
86:2
**aware (4)** 16:3;72:3;
83:12;92:23
**awful (1)** 21:13

**B**

**back (19)** 8:19;9:12,24;
13:14;22:18;25:2;
28:14;29:13;35:14;
47:4;63:6;66:22;73:18;
80:3,22;86:21;95:14;
98:25;99:16
**backup (3)** 99:5,6,9
**balance (9)** 29:21,24;
30:14,19;61:5,19;62:2;
64:8
**Bank (8)** 19:17,21,23,
24,25,25;20:16;21:2
**bank-related (1)** 101:2
**bankruptcy (4)** 22:23;
23:20;48:3;66:18
**banks (1)** 20:7
**bar (1)** 11:17
**base (1)** 64:10
**based (2)** 51:17;87:9
**basic (1)** 53:24
**basically (2)** 53:24;
101:1
**basis (2)** 39:21;65:18
**Bate (1)** 54:13
**Bates-labeled (2)** 50:24;51:24
**Bates-stamped (1)** 18:12
**Bear (1)** 51:22
**became (2)** 77:20;
78:10
**become (1)** 19:1
**begin (1)** 38:12
**behalf (2)** 20:4;82:6
**behind (1)** 21:3
**believes (1)** 64:17
**Bell (13)** 42:14,15,17;
43:5,11,19;44:10,10;
45:21;46:1,2,5,7
**benefit (1)** 97:9
**benefits (5)** 56:12;97:2,
2,23,25
**best (9)** 16:5;17:16;
51:14,14,18,19;71:1;
88:11;90:9
**better (6)** 10:3;16:15;
42:4;43:23;72:18;
74:18
**big (2)** 13:4;21:23
**biggest (1)** 101:9
**Bill (5)** 77:7,8,10,12;
91:11
**billings (1)** 83:25
**bills (1)** 66:18
**binding (1)** 96:18
**bit (6)** 68:14;85:7;
93:24;95:14
**blessing (1)** 91:6
**BMO (1)** 20:15
**BOA (1)** 20:15
**board (9)** 9:24;11:23;
21:14,15;91:1,4,10
**board's (1)** 91:6
**boiler (4)** 45:19,23,25;
46:3
**Bonita (72)** 6:19;8:22;
11:5;12:17;27:4;44:7;
47:11;74:12,16;75:4,
12,13;76:5,8,9,16,18,
19;77:6,8,10,12,21;
78:2,3,10,10,14,15,21;
79:20,23;80:8,16,19;
81:6;82:16;87:14,15,
16,19,22,24;88:1,13,6,8,
15,17,21,24;89:1,6,19,
22;90:5,10,11,15,20;
91:7,15,25;95:15,16,
18,23;96:19,23;98:1;
99:25;102:3
**Bonitas (1)** 77:3
**Bonita's (1)** 91:9
**both (6)** 7:2;19:18,22;
35:17;93:10;96:5
**bottom (2)** 50:18;98:4
**bracketed (1)** 49:21
**break (7)** 25:22,24;
28:9,15;68:1,5,10
**breakdown (2)** 12:6;
57:18
**brief (1)** 31:9
**bring (1)** 9:24
**Broad (4)** 82:15;99:14;
101:23,25
**brochures (1)** 18:4
**brought (3)** 11:23;28:4;
102:23
**Buddy (1)** 89:16
**budget (2)** 38:24;
101:13
**budgets (1)** 37:8
**Bueno (2)** 74:21,24;
75:1,24,25;76:2,2
**Buffet (46)** 7:16;22:6;
38:5,6;62:12,17;75:8,
15,18,22;76:5,7,19,23;
77:19,20,22;78:5,9,13,
15,16,21;79:2,6,12,20;
80:16;81:25;82:3,6,8;

Min-U-Script®

Case 2:21-bk-02477-BKM    Doc 53-1    Filed 06/10/21    Entered 06/10/21 15:44:40    Desc
Exhibit Exhibits    Page 29 of 68

Coash & Coash, Inc.
602-258-1440    www.coashandcoash.com

(1) $100 - Buffet

87:17;88:5,7,14,20;
89:13,15;90:4,19,19,
25;91:2;102:8,11
**building (1)** 45:16
**built (3)** 53:2,12;98:11
**bunch (1)** 92:9
**Burka (12)** 28:3,5;
31:23;32:11,17;33:17,
21;34:6,15,17,20;35:8
**business (43)** 5:8;6:19;
9:3;10:2;11:10,11,17;
15:1;18:1;21:5,6;24:3;
25:9,15;47:11;58:18,
23;59:24;60:8,13,20;
65:10,12,21;72:13,15;
75:9,11;76:7,13,15;
77:14;78:11,18;79:10;
84:21,25;85:16;87:15;
88:1;91:5;96:16;
102:13
**business-related (1)**
90:23
**buy (1)** 102:9

**C**

**calculation (3)** 63:3,14,
17
**calendar (3)** 52:20;
53:7;55:12
**call (14)** 32:6,7,8;33:3,
14,14,17,20;50:25;
53:5;85:13;98:3;99:25;
100:21
**called (2)** 30:15;75:19
**calls (12)** 6:1;26:13;
32:25;34:5,7,10,11;
35:2,5,6;70:1,2
**CAM (4)** 64:10,18;
101:25;102:3,4,5
**came (4)** 33:9,24;
74:23;75:5
**cameras (1)** 101:8
**can (35)** 8:16;12:8;
24:12;25:22;26:16;
28:10;29:7;32:23;35:6;
36:18,23;39:1;3,4,6,23;
46:20;50:3;51:21;53:1;
57:12;62:15;68:4;
72:11,12;84:17;85:21,
23;93:16;95:2,5;97:6,
8;98:18;101:13
**cap (3)** 56:23,24,24
**capability (1)** 45:23
**capacity (1)** 4:11
**capital (3)** 38:24;40:1;
61:9
**capitalization (1)** 61:19
**capitalized (1)** 61:13
**card (1)** 101:1
**Casa (76)** 6:18;8:22;
11:5;12:17;27:4;44:7;
47:11;74:12,16;75:4,

12,13;76:5,8,9,16,18,
19;77:3,6,8,10,11,13,
21;78:2,2,10,10,14,15,
21;79:20,23;80:7,16,
19;81:6;82:16;84:20;
87:14,15,16,19,22,24;
88:1,3,6,8,14,17,21,23;
89:1,6,19,21;90:5,10,
11,14,20;91:7,9,15,25;
95:15,16,18,22;96:19,
23;98:1;99:25;102:3
**case (15)** 4:14;6:13;
19:25;21:1;22:23;23:3,
25;31:6;38:10;51:14,
15;67:5;75:10;81:16;
102:3
**cases (1)** 27:24
**cash (14)** 16:22;17:20;
24:3;25:9,18,20;30:13;
38:25;39:25;49:22;
50:22;55:2;100:25;
101:2
**catch (1)** 15:23
**categories (4)** 55:11;
99:14;101:23,25
**category (18)** 99:16,17;
100:3,4,17,19;101:7,
17,18,21,22;102:1,2,5,
6,12,13,20
**caught (1)** 19:20
**cause (5)** 79:23;80:7
**caused (3)** 44:11;45:3;
79:19
**center (1)** 69:21
**CEO (7)** 4:13;37:17,24;
38:10;72:13;81:4,9
**certain (9)** 20:7,11,12;
54:22,23;69:18;85:15;
97:13;100:8
**certainly (8)** 23:6;
24:12;42:4;50:15;
62:20;73:7;89:23;
90:22
**change (4)** 28:16;
77:13;87:25;96:3
**changed (1)** 79:9
**characterization (1)**
12:3
**charge (3)** 87:24;
95:23;99:9
**charged (1)** 71:7
**charging (1)** 95:18
**Chase (1)** 20:17
**check (3)** 8:8;32:6,7
**checked (4)** 12:2;
51:11;65:11;67:18
**checking (1)** 101:1
**checks (1)** 100:23
**Chris (6)** 4:16;67:25;
92:3;93:10;97:6,20
**cited (1)** 30:17
**Citizens (3)** 21:1,2,7
**CKE (2)** 75:21,25

**claim (1)** 31:13
**clarification (2)** 92:4;
93:24
**clarified (1)** 95:11
**clarity (1)** 46:21
**classifies (1)** 9:20
**classify (1)** 5:9
**cleaning (2)** 12:12;13:3
**cleanup (1)** 6:16
**clear (8)** 8:20;23:16;
43:9;10:5;21:60:7;
87:9;97:16
**clearly (4)** 23:11,22;
50:9;51:17
**client (3)** 27:17;84:12;
91:25
**close (1)** 59:13
**closed (3)** 18:1;59:19;
72:16
**closing (1)** 53:7
**Co (1)** 86:17
**colloquy (1)** 68:10
**Colorado (19)** 19:17,
18;35:18,21;36:8,24;
37:3,5;77:10;85:6;
87:11;100:11
**column (4)** 55:22,23;
56:4;102:17
**columns (1)** 51:12
**combined (1)** 56:20
**coming (5)** 9:12;10:7;
13:14;62:22;102:19
**commitment (2)** 93:12,
18
**communicate (1)** 27:8
**communicated (4)**
27:24;31:17,18;34:1
**communication (2)**
27:20;32:10
**communications (3)**
27:22;83:3,15
**comp (1)** 97:12
**company (3)** 37:21;
75:21;98:21
**complete (3)** 55:1;
94:20,24
**completely (2)** 12:16;
66:20
**compliance (1)** 98:9
**compliant (2)** 97:25;
98:11
**comply (1)** 51:16
**component (7)** 9:3;
52:24;57:1;91:2;
100:25;101:3,4
**components (2)** 6:19;
100:19
**comprises (1)** 6:9
**concept (1)** 27:1
**concerned (1)** 74:8
**conclude (1)** 44:17
**concluded (1)** 18:5
**conclusion (4)** 26:14;

60:15;84:8;85:24
**conditions (2)** 20:17;
53:20
**conference (1)** 8:16
**confess (1)** 15:15
**confident (1)** 8:22
**confirmed (2)** 44:16,20
**connection (6)** 26:11;
48:6,22;63:23;68:16;
69:3
**considered (1)** 20:12
**consists (6)** 87:19;
97:11,12,13,14;100:19
**consolidated (1)** 36:6
**consulted (1)** 42:10
**consumables (1)**
100:21
**contact (6)** 13:13;
17:24;19:25;20:6,6;
28:6
**contacted (11)** 8:21;
17:22;18:8;19:5,16,19;
20:1;21:2,5;84:10;
85:14
**contained (1)** 25:7
**context (1)** 91:11
**continue (1)** 12:19
**continues (1)** 22:3
**continuing (2)** 21:20;
23:4
**contractor (4)** 41:17;
42:7;43:16;46:5
**contractors (3)** 46:9,10,
11
**contributed (1)** 75:21
**control (7)** 39:15,23,24;
40:1,1,2;90:15
**controllable (2)** 101:16,
17
**controllables (4)** 57:8,9;
100:17;101:10
**controlling (1)** 90:14
**controls (1)** 38:25
**conversation (4)** 33:6,9;
35:5;92:23
**conversations (15)**
20:16;26:22,23;27:18;
28:3;34:13,14,16,24;
46:6,8;69:17,19,24,25
**copy (2)** 18:17;70:8
**copying (1)** 31:23
**corporate (1)** 102:9
**correctly (2)** 7:20;25:13
**correspondence (1)**
27:17
**cost (1)** 102:10
**costs (2)** 56:5;57:7
**co-tenancy (1)** 33:13
**counsel (20)** 14:18;
26:22,24,25;27:3;28:8;
29:6;31:9;46:12;50:13;
58:2;68:10;73:10,10,
13;82:8;85:17;93:14,

16,17
**County (5)** 85:9,14;
86:6,15;87:4
**couple (11)** 11:24;
13:12;28:9;35:14;
38:17;58:13;69:17;
85:8;92:2,12;93:3
**coupons (1)** 10:9
**course (1)** 47:10
**Court (2)** 25:1;31:6
**cover (2)** 98:14;99:4
**coverage (5)** 98:2,3,4,9,
11
**covered (3)** 9:23;57:11;
98:15
**COVID (2)** 12:25;86:12
**create (1)** 62:1
**creates (1)** 63:7
**credit (4)** 17:21,25;
63:18;101:1
**creditor's (4)** 92:6,8,12,
14
**crew (3)** 12:18,20;13:2
**cure (11)** 24:6,14;25:6,
10,14,20;26:1,2,11;
28:19;102:18
**curing (2)** 27:1;102:21
**current (4)** 52:19,20;
55:12;102:23
**currently (5)** 7:4;54:5,
18
**customers (1)** 11:8

**D**

**d/b/a (1)** 82:15
**damages (12)** 30:3,21,
24;31:14;32:17;33:5,9,
11,18;72:4,14,24
**data (1)** 62:25
**date (9)** 8:20;15:3;
26:19;29:15;40:23;
44:7;54:17;59:15;67:8
**dated (1)** 70:18
**dates (1)** 12:12
**DAWES (35)** 4:6,16;
13:24;14:2;18:20,24;
24:21;25:1,12,23,25;
26:15;27:11;28:8,13;
46:22,23;52:2,6;58:6,7,
12;60:18;64:24;68:2,4,
7;70:16;80:3,10;82:19;
91:17;94:15;95:11;
97:16
**Dawn (1)** 6:15;13:12
**days (7)** 15:4;26:19;
46:17;51:20;52:8;86:1;
87:12
**de (1)** 54:3
**Deacon (2)** 83:13,16
**deal (1)** 43:12
**dealing (2)** 42:15,17
**debit (2)** 63:7,18

**debtor (115)** 4:12;6:10;
7:2,4;8:14;11:20;
13:22;14:19;15:21;
16:9,12,22;17:9,12;
19:8;20:4;23:2,9;
24:14;26:2,10;28:20;
29:9,18,25;30:8,10,18,
19;31:13;32:5;35:16,
20,21;36:3,7,24;37:9,
10,12,17,25;38:4;
39:19;40:8,9;41:4;
43:16;45:3,6,6;46:1,2,
4,6,25;47:8,13,17,23;
48:3,13;50:10,18;
51:24;53:3;54:5,17,18;
55:5;57:22,25;58:19;
59:6,7,15;60:19;62:18;
64:2,17;65:21;66:3,25;
69:9;71:7;73:10,17;
74:14;77:23;78:5;79:3,
6,13,24;80:8,17,23;
81:15;82:11,12;83:6;
84:21;85:5,17,20,25;
90:12;92:8,11,15,25;
95:19,23;96:10;97:3
**debtors (2)** 37:5,8
**debtor's (27)** 5:17;
14:25;15:6,11,17;
22:21;24:6;25:5,14;
28:18;30:23,25;31:2,9;
39:2,12,24;41:8,10;
48:6,22;58:23;59:24;
68:11;73:13;77:16;
94:22
**debts (1)** 22:22
**decision (1)** 88:1
**decisions (3)** 90:22,23;
91:3
**deduction (1)** 95:6
**deem (7)** 75:9;81:7,13;
85:2;88:4;96:1;101:4
**deemed (1)** 60:16;87:7
**default (3)** 29:9,19;74:2
**defer (4)** 50:13;58:2;
93:14,15
**deferred (4)** 41:1,6,9,10
**deficiencies (1)** 102:18
**define (1)** 48:11
**definition (1)** 99:12
**deflection (1)** 94:12
**delivery (1)** 65:17
**delta (1)** 67:19
**demand (1)** 42:3
**dense (1)** 55:14
**Denver (37)** 5:21,22;
9:2;41:17;74:12,16;
75:4,13;76:8,9,20;77:3,
10,21;78:2,11;79:20,
24;80:8,16;87:14,16,
22;88:2,3,17,21;89:1,6,
22;90:10,20;91:7;
95:15,18,23;96:23
**Denver's (1)** 87:15

**Department (3)** 85:9,
15;86:15
**depending (2)** 73:21,21
**deposition (2)** 4:24;
5:12
**depositions (2)** 5:3,6
**depreciation (1)** 40:2
**describe (6)** 12:5;
16:14;39:1,24;62:22;
68:19
**described (6)** 11:24;
32:3;33:16;34:6;47:1;
63:2
**describing (2)** 16:15;
51:25
**description (1)** 79:11
**design (2)** 96:15,18
**despite (1)** 18:2
**detail (2)** 33:7;51:4
**detailed (7)** 15:19,20;
54:8;55:11;57:12,13;
75:18
**details (5)** 27:18;53:23;
71:13;75:3,19
**detected (1)** 44:23
**determinations (1)**
90:24
**deviation (1)** 27:20
**Diamond (1)** 89:18
**differences (1)** 73:6
**different (11)** 8:15;
11:24;23:19;40:14;
47:12;63:12;73:8,17;
85:8;88:9;102:11
**differentiation (1)** 90:21
**difficult (1)** 5:9
**difficulty (1)** 48:23
**dip (1)** 44:4
**direct (2)** 35:9;88:5
**directed (1)** 27:23
**directly (2)** 88:14,23
**director (1)** 5:25
**directors (1)** 91:1
**disassembled (1)** 76:2
**discarding (1)** 12:11
**disclosed (6)** 48:5,21;
57:23;59:3;62:12,18
**disclosing (2)** 53:12;
57:25
**discount (1)** 63:6
**discounted (1)** 10:10
**discuss (3)** 23:7,13,19;
24:9;42:7
**discussed (8)** 27:1;
41:12;51:13;54:14;
74:16;91:4,10,10
**discussion (1)** 33:4;
85:1;91:8
**discussions (6)** 26:25;
32:16,18;54:25;72:1;
91:14
**displayed (1)** 36:15
**dispute (1)** 30:19

**disputed (1)** 30:18
**distinction (1)** 89:8
**document (34)** 13:25;
18:22;21:4;25:8,19;
35:15;36:12;40:7;49:6,
13,17,20;50:23,24;
51:3,23;52:4;53:12;
55:6;57:17,20;58:10;
64:22;65:1;67:4;70:14;
72:25;73:1,4;75:19;
81:17;82:17;93:14;
96:21
**documentation (6)**
16:8;54:16;62:13;
79:16,18;82:9
**documents (65)** 14:25;
15:5,10,12,22;16:1,3,
11,12,16,25;18:15,25;
22:21,24;23:16,17,20;
38:17,23;40:4,14;41:5;
47:13;49:6,9;50:5,6,7,
11,19;57:21,22;68:22;
69:6,7;81:8;86:2,5,6,7,
9,13,20,22,23,24;87:4,
5,6;92:7,10,13,14,23;
93:6,9,15,18,20;94:5,7,
8;95:22;96:3
**document's (1)** 65:7
**dollar (2)** 56:14,15
**dollars (3)** 54:1;55:2;
56:20
**domicile (1)** 15:1
**done (12)** 12:17;22:2;
45:7,13,16;46:15,16,
24;83:23;85:4;87:10;
96:17
**door (1)** 27:21
**doors (1)** 27:4
**double (1)** 19:13
**Dowdy (22)** 7:17;
14:20;20:7;28:2;32:8,
11;34:16,17;38:8;
42:18;48:17;51:4,7;
54:10;61:7;62:11;65:6;
68:25;69:18;71:9;
92:21;93:1
**Dowdy's (2)** 48:9;71:10
**down (6)** 19:3;38:22;
40:7;60:25;61:21;
66:22
**dozen (2)** 11:16;89:15
**drafted (1)** 14:16
**drawing (1)** 89:8
**driven (1)** 62:5
**drives (1)** 63:7
**Dropbox (1)** 13:21
**dropped (1)** 51:12
**due (1)** 24:9
**duly (1)** 4:2
**during (15)** 15:2,4;
33:14;37:25;38:10;
43:1;65:10,13,21;
66:14;68:10;76:25;

83:19;86:12;99:8

## E

**earlier (5)** 28:18;30:17;
34:9;54:24;99:18
**Early (1)** 32:22
**East (1)** 60:21
**economic (2)** 71:15;
72:6
**economics (2)** 71:17,19
**edicts (1)** 85:10
**effect (3)** 53:14;57:20,
21
**effective (1)** 61:25
**efforts (4)** 6:17;9:23;
11:25;17:5
**EIDL (3)** 16:17;17:2,19
**eight (1)** 58:24
**either (4)** 14:16;17:19;
20:1;45:25
**elected (3)** 49:21;77:4,
13
**electric (3)** 100:5,13,14
**elements (1)** 101:17
**eligible (1)** 98:2
**else (12)** 14:18,21;
27:2;31:24,24;32:25;
34:1;69:11;75:10,11,
12;80:17
**elsewhere (1)** 60:3
**eluded (1)** 87:4
**eluding (1)** 86:7
**email (3)** 31:21;32:12,
14
**emails (6)** 31:22,24;
32:1,3,9,10
**employ (1)** 7:5
**employed (1)** 39:18
**employee (13)** 42:19,
19;43:4,5,6,11;67:10;
97:2,19;98:5,8,21,23
**employees (37)** 7:2,4,7,
13,16,19,20;8:11,18,
21;9:10,11,24;11:23;
12:6;13:6,7,11,13;
65:25;66:2,5,14;67:4,5,
13,20,20;81:6,13;
97:15,22;98:1,2;99:7,7,
14
**employee's (1)** 43:2
**encouragement (1)** 6:7
**end (1)** 14:3
**enforceable (1)** 30:24
**engage (1)** 73:10
**enough (4)** 57:12;
72:22;83:18;95:4
**ensued (2)** 28:12;68:6
**ensure (1)** 39:16
**entertainers (1)** 99:13,
15
**entertainment (7)**
56:17,18,19;99:19,21;

100:1;101:6
**entire (2)** 65:10,19
**entirely (1)** 56:10
**entirety (1)** 16:22
**entitled (3)** 30:3,5;
55:23
**entity (4)** 21:9,12;
37:20;90:10
**entry (1)** 63:18
**equally (1)** 77:9
**equipment (2)** 12:2,13
**equity (2)** 63:12;88:7
**essentially (1)** 53:8
**established (2)** 8:24;
29:14
**estate (1)** 61:20
**estimate (1)** 71:1
**evaluated (1)** 51:10
**evening (3)** 13:22;14:6;
49:25
**event (7)** 16:2;20:8;
36:22;50:10;67:23;
72:23;74:2
**everybody (1)** 99:5
**eviction (1)** 40:21
**evidence (6)** 15:6,11,
13,16,17;16:18
**evidencing (1)** 14:25
**exact (5)** 9:8;41:19;
47:19;66:16;67:16
**exactly (7)** 8:7;31:3;
49:10;54:4;65:19;66:4;
93:13
**exam (1)** 15:8,9,10
**EXAMINATION (5)** 4:5,
25;15:22;24:11;91:22
**examined (1)** 4:3
**example (9)** 15:14;
19:17,21;20:14,15,20,
21;30:13;95:3
**exceeded (1)** 12:12
**Excel (1)** 100:11
**exception (2)** 70:3;91:4
**exceptions (1)** 94:25
**excess (1)** 37:18
**exchanged (1)** 92:24
**exclusively (1)** 90:15
**excuse (3)** 26:2;41:4;
81:2
**exhausted (2)** 17:15;
21:25
**Exhibit (32)** 13:24,25;
14:15;17:23;18:7,10,
20,21,22;19:1,3,22:19;
35:14;40:25;52:3,4,7;
55:4,16;58:9,10;61:5;
64:21,22;70:13,14,17;
82:13,14,17;94:19;
97:17
**exhibits (1)** 16:16
**exist (1)** 36:4
**expand (1)** 44:1
**expansion (1)** 44:2

Case 2:21-bk-02477-BKM    Doc 53-1    Filed 06/10/21    Entered 06/10/21 15:44:40    Desc
Exhibit Exhibits    Page 31 of 68

**expend (2)** 54:18;55:5;
68:11
**expended (6)** 54:5,21;
55:17;56:3,5;57:19
**expense (3)** 57:6;95:4;
98:4
**expenses (5)** 54:3;
55:11;57:10,11;95:5
**expired (1)** 77:4
**explain (2)** 55:7,8
**explanation (3)** 44:13;
57:20;67:22
**exponent (1)** 100:24
**expressed (2)** 9:12;
13:9
**extent (2)** 90:20;95:1
**external (3)** 23:22,24

**F**

**facilitate (2)** 14:19;
76:17
**facility (2)** 8:25;77:4
**fact (5)** 21:12,22;45:3;
54:14;63:13
**failed (1)** 29:12
**fair (8)** 5:11;12:3;
27:13;34:18;43:19;
72:22;83:18;84:2
**Fairly (5)** 68:18,19,21,
21;69:4
**fall (1)** 99:15
**falls (1)** 101:22
**familiar (2)** 38:20;65:1
**Family (4)** 22:12;50:16;
74:17;82:15
**far (1)** 60:10
**FASB (4)** 61:14,15;
62:9;63:14
**fault (1)** 64:6
**federal (5)** 35:17;36:8,
24;87:19;89:23
**fee (1)** 87:24
**feedback (1)** 43:18
**feel (2)** 12:21;36:14
**fees (4)** 101:1,1,2;
102:14
**feet (1)** 59:7
**few (8)** 4:17;5:15;14:6,
23;50:1;52:7;91:18;
92:1
**FICA (1)** 97:11
**figure (3)** 62:8,23;64:16
**file (1)** 60:5
**filed (5)** 13:22;35:21;
40:21;59:15;66:18;
67:6
**filing (3)** 31:6;40:18;
48:2
**final (3)** 24:5;55:1;
56:21
**finalize (1)** 30:11
**finalized (2)** 70:24,25

**finance (1)** 21:21
**financial (10)** 23:16,17;
37:8;38:3,5,6;39:17;
60:6;77:12;81:8
**financing (9)** 16:8;17:5,
12,14,16;20:9,12;22:1,
4
**find (2)** 18:10;55:4
**fine (5)** 36:16;46:14;
55:20;57:14;84:15
**finish (2)** 25:23;67:25
**fire (1)** 44:24
**firm (4)** 45:20,21;73:16,
24
**firms (2)** 73:18,22
**first (14)** 4:2;5:1;18:14;
23:12;29:14;32:8;33:2,
17;50:1,3;71:22;77:1;
82:23;89:11;92:17;
101:23;102:17
**fiscal (3)** 38:23;39:2,3,
12;52:19,21
**five (6)** 12:8;87:20;
98:15,16,17;101:23
**fixed (4)** 56:25;57:1,7;
101:21
**flashing (1)** 44:23
**Florida (1)** 35:25
**flow (6)** 24:3;25:9,18;
49:22;50:22;55:3
**focus (5)** 35:14;37:24;
49:8;71:18;89:19
**focused (1)** 72:17
**folks (3)** 8:14;9:18;
13:16
**follow (5)** 39:21;94:6,
12,25;95:9
**following (3)** 19:13;
45:13;95:2
**follows (3)** 4:3;25:4;
80:6
**food (3)** 6:20;12:11;
56:5
**food-related (1)** 6:14
**footnoted (2)** 53:17;
63:13
**forfeit (2)** 95:6,7
**forgiven (1)** 53:21
**forgiveness (5)** 53:17;
68:12;94:24;95:7,9
**form (1)** 22:15
**forma (18)** 23:14;24:5;
48:10;49:2;50:23,25;
51:2,7,24;52:11;53:2;
54:4,7,12;55:12;97:1;
98:11,11
**formas (22)** 24:1;25:7,
18;30:12;47:17,21,24;
48:3,8,21,24,25;50:16;
51:16;54:8,9,10,14;
65:15,15;95:8;98:16
**formation (4)** 75:19,20;
76:6;77:1

**former (9)** 8:18,21;9:10,
11;13:7,11,13;59:6;
85:13
**forms (2)** 20:19;22:9
**forth (4)** 40:3;52:11;
67:23;95:14
**forward (1)** 54:6
**forwarded (1)** 60:3
**forwarding (2)** 60:10,13
**founder (1)** 77:6
**fountain (2)** 12:18,20
**four (4)** 8:9;100:19;
101:9,17
**fourth (2)** 55:22;101:4
**frame (2)** 37:25;73:18
**Freddy's (1)** 89:16
**free (2)** 10:8;36:14
**Friday (4)** 9:3;10:15,21,
24
**front (12)** 9:6,15;18:17;
51:21;53:7;99:1,2,7,10,
11,15,23
**fulfill (1)** 68:23
**full (1)** 53:17
**fully (2)** 53:3,3
**function (1)** 33:7
**functional (1)** 11:7
**functioning (1)** 53:3
**functions (2)** 12:7,14
**fund (4)** 22:22;23:3,9,
25
**funding (7)** 16:19;17:6,
10;23:13,18,22,24
**further (6)** 42:1;60:25;
80:13;86:14;93:21,23
**future (1)** 25:14

**G**

**GAAP (3)** 39:21,21;
61:17
**games (5)** 6:20;11:4,6,
6,7
**garden (1)** 12:17
**garden-related (1)**
12:18
**gas (1)** 100:5
**gave (2)** 5:12;24:16
**general (16)** 5:7;8:9;
11:24;12:7;14:13;
26:17,22;27:12;33:23;
34:15;54:20;71:15,17;
75:8;101:11,12
**generally (5)** 5:5;39:1,
20;61:18;78:16
**generate (1)** 95:4
**generated (8)** 10:20;
11:20;24:3;25:20;
50:16;51:8;52:14;
65:17
**generation (2)** 51:3;
63:23
**gentleman (1)** 98:19

**gift (6)** 6:21,23;8:25;
10:4,13,21
**giveaways (3)** 10:22,
25;11:1
**given (8)** 4:24;28:24,
25;47:21,24;52:13;
92:15;101:13
**giving (1)** 101:12
**Glacier (2)** 19:17,19
**glad (6)** 25:24;27:14;
28:9;46:22;67:8;82:22
**Good (5)** 4:7;6:5;
92:18;100:18;101:15
**goods (2)** 12:11;100:22
**Gosh (1)** 47:10
**Gotcha (1)** 100:2
**government (3)** 17:7,
18;21:11
**government-related (1)**
97:11
**grease (4)** 83:20,24;
84:7;100:6
**great (2)** 28:11;91:20
**greater (1)** 71:11
**Gronert (2)** 6:13,24
**gross (2)** 37:2;101:19
**group (1)** 21:16
**grouping (2)** 18:15,25
**guarantee (5)** 20:20;
22:6,8;82:5,9
**guarantees (2)** 22:13,
14
**guards (1)** 101:7
**guess (4)** 37:2;51:18,
19;57:16
**guest (1)** 100:23
**guidance (3)** 43:14;
51:10;86:14
**guideline (1)** 61:25
**guidelines (2)** 54:20;
71:16
**guy (2)** 98:20,20

**H**

**half (1)** 89:15
**handle (1)** 6:14
**handled (2)** 7:15;92:21
**handling (1)** 6:16
**happened (5)** 42:8,9;
67:13;92:11;96:22
**hard (2)** 18:17;19:13
**Harris (1)** 20:15
**Hawkins (12)** 91:19,23,
24;93:17;94:1,4,11,17;
97:6,18,20,21
**Hayden (5)** 58:19;59:1,
2,5,25
**head (2)** 38:16;44:15
**headed (1)** 41:16
**headquarters (1)** 59:6
**heads (1)** 38:6
**Health (4)** 85:9,14;

86:6,15
**healthcare (1)** 97:23
**hear (1)** 75:2
**heard (1)** 68:9
**Heating (6)** 42:14,16;
44:7,17,18,20
**held (12)** 16:22;54:5;
74:23,25;75:8;78:15,
17;81:10,12,15,21,24
**help (1)** 14:19
**helpful (2)** 93:11;97:7
**herein (1)** 4:2
**Hernandez's (1)** 40:15
**hey (1)** 84:12
**Hi (1)** 92:19
**high (1)** 72:17
**highest (1)** 98:21
**highly (1)** 8:22
**hire (1)** 9:23
**hired (4)** 7:7,20;8:4;
43:4
**hiring (2)** 8:14;9:18
**historically (3)** 6:2;
98:15,22
**history (1)** 18:2
**hold (5)** 77:2;88:1;90:4
**holder (1)** 90:19
**holds (2)** 54:19;90:11
**Holiday (1)** 89:16
**home (1)** 60:23
**hope (1)** 56:9
**hopefully (5)** 10:24;
22:19;36:20;51:23;
70:11
**host (1)** 40:14
**hostesses (1)** 99:12
**hostess-related (1)**
99:24
**hourly (1)** 56:8
**hours (3)** 10:18,19;
67:21
**house (12)** 6:15;89:16;
98:25;99:1,3,4,7,10,11,
16,16,23

**I**

**Idaho (1)** 35:25
**idea (3)** 37:16,21;84:10
**identification (7)** 14:1;
18:23;52:5;58:11;
64:23;70:15;82:18
**identified (5)** 17:1;18:3;
20:5;44:23;45:16
**identify (4)** 44:11;86:20
**immediately (1)** 15:3
**important (2)** 91:2;
100:18
**Inc (41)** 74:12,16,17;
75:4,9,13,13,18,21,22,
25;76:5,7,8,10,19,20,
23;77:21;78:2,9,11,16;
79:24;80:8,17;87:16,

Min-U-Script®

Geash & Ceash, Inc.
602-258-1440    www.ceashandceash.com

(4) expend - Inc

Case 2:21-bk-02477-BKM    Doc 53-1    Filed 06/10/21    Entered 06/10/21 15:44:40    Desc
Exhibit Exhibits    Page 32 of 68

17;88:2,3,7,18;89:1,7,
17;90:10,19,19,20,25;
91:2
**incident (3)** 43:1;44:2,7
**include (2)** 98:16;100:6
**included (3)** 17:23;
31:25;102:3
**includes (1)** 102:25
**including (3)** 25:10;
38:24;54:2
**income (1)** 36:8
**Inc's (1)** 62:12
**indicate (3)** 23:22;25:9;
59:23
**indicated (13)** 8:17,19;
9:11;10:1;13:9;42:24;
43:23;45:22,24;47:16;
63:22;67:12;84:21
**indicates (1)** 67:5
**individual (3)** 7:15;
52:23;77:6
**individuals (5)** 12:8;
28:5;59:11;69:24;
97:14
**information (4)** 66:10;
67:23;84:13,14
**informed (1)** 42:24
**initial (8)** 8:16;92:11,
15,22,22,25
**initially (2)** 21:24;45:22
**initiation (1)** 78:1
**inputs (1)** 62:25
**inspection (5)** 45:7,10,
12,14,15
**inspections (7)** 46:15,
16,24;47:1,8,12,14
**institutions (1)** 21:5
**insurance (10)** 54:3,24;
57:5,5,6;97:12;102:6,9,
9,10
**intellectual (18)** 74:2,9,
14,25;75:24;76:1,3,4,
16;78:17;87:18;89:13;
90:23;91:1,3,9,9,15
**intend (8)** 17:14;24:14;
26:1,2;28:20;30:8;
84:2,4
**intends (3)** 30:10;
54:18;55:5
**intent (2)** 68:11;94:22
**interaction (1)** 35:9
**interest (12)** 9:12;
13:10,10,14;57:15;
74:13;75:5,16;77:16;
80:18;84:11;96:24
**interested (3)** 10:7;
21:17;84:9
**internal (1)** 38:24
**internet (2)** 100:6,12
**interpret (2)** 39:14;
49:17
**interpretation (1)** 65:23
**interpreted (3)** 39:3,4;

65:18
**interview (3)** 92:11,15,
25
**into (14)** 13:21;14:8;
26:23;29:19;51:13;
52:11;53:2,12;83:24;
84:6,14;85:17;98:11;
101:10
**introduced (1)** 89:11
**inventory (2)** 12:1,10
**inventory-related (1)**
12:14
**investigation (2)** 42:1,1
**investment (1)** 78:17
**investments (2)** 102:8,
11
**involved (7)** 7:11;82:8;
93:3
**involvement (3)** 14:10;
71:11;92:22
**involving (1)** 40:15
**IP (36)** 74:18,19,19;
75:5,8,16;76:18,19;
77:16,17,18;79:21,24;
80:8,14,18,19;87:24;
88:3,4,6,15,24;89:9,19;
90:5,11,14;95:12,16,
19,24;96:11,16,23,24
**issue (21)** 30:21,21;
32:17;33:11,13,18,21,
23;41:5,13,17;42:7;
43:12,22;44:18;46:3;
72:14,16;73:22;74:7;
83:20
**issues (7)** 33:13;42:11;
45:18,21;83:24;84:7,7
**item (14)** 34:11;43:15;
61:9;62:23;63:24;64:9,
15;65:25;66:17,23;
72:17;97:1;98:13,14
**items (6)** 12:11;41:8,
11;54:2;65:9;100:7

**J**

**January (3)** 52:20;
55:24;102:17
**JB's (2)** 89:17,17
**Jeff (1)** 86:17
**Jefferson (5)** 85:9,14;
86:6,14;87:4
**Jim (1)** 6:13
**JJ (1)** 89:16
**job (2)** 33:7;101:15
**John (2)** 83:13,16
**joint (1)** 6:1
**jointly (1)** 51:13
**JPMorgan (1)** 20:16
**jump (1)** 28:14
**juncture (1)** 11:3,9
**June (2)** 29:15,18

**K**

**keep (1)** 6:7
**keeps (1)** 13:15
**kind (8)** 9:21;12:1,1,6;
22:20;38:14;45:7;
97:22
**kitchen (4)** 5:25,25;
6:14;98:25
**kitchen-related (2)** 12:9,
13
**knowing (1)** 53:23
**knowledge (3)** 16:6;
90:6,10

**L**

**labeled (1)** 40:4
**labor (3)** 54:1;56:8,19
**laid (2)** 71:16;98:10
**Lamar (1)** 91:24
**landlord (45)** 4:20;
24:7;25:6,11,21;26:1;
27:8,19,23,24,25;28:4;
29:2,3;30:3,8,17;
31:18;34:19,22;35:9;
40:21;41:4;43:15;44:6;
55:3;61:23;64:11,17;
68:15;69:20,23,25;
73:7,9;77:7;83:3;84:9,
12;85:2;91:14;101:24;
102:16,19,23
**landlord's (9)** 24:15;
31:13;34:2,7;41:25;
42:3,21;57:2;61:13
**Lane (1)** 60:21
**large (2)** 9:7;17:22
**larger (1)** 8:10
**largest (5)** 57:1;99:6,
20;101:7,10
**last (19)** 5:12;7:12;
13:22;14:6;18:11;
45:24;46:16;51:20;
52:7,14;54:10;64:5;
69:16;71:24;76:11;
86:1;87:11;89:5;
102:13
**late (3)** 47:18;52:18;
53:8
**later (5)** 23:18,21;24:2;
25:8;78:10
**latter (1)** 53:6
**laundry (1)** 101:8
**lawsuit (1)** 40:15
**lawyer (1)** 85:22
**lease (64)** 24:7,15;
25:6,14,26:1,3,11;
27:1;28:19;29:9,19,22,
24;61:9,13,22;62:4,6;
63:4,5,5,6;64:10,18;
68:14,17,20,22,24;
69:3,7,14,15,18;70:5,6,

7,7,11,22,24,24;71:5,8,
12,13,16,17,18;72:3;
73:11,23;74:1,5,10,13;
77:4,5,7;78:1;79:1;
80:22,22;82:5
**leased (2)** 41:1;61:20
**leasing (1)** 82:9
**least (9)** 4:17;5:14;
19:11;24:1;32:20;46:7;
58:24;59:11;60:8;
69:19
**legal (6)** 21:9,12;26:14;
30:20;37:20;60:15
**legally (9)** 26:10;29:5;
84:22,24;85:4,18,25;
87:11;96:18
**lenders (14)** 17:19,23;
18:7;19:5,9;20:5,10,12,
22;21:17;22:5,10,13,16
**Lending (5)** 16:19;
17:17;18:4;19:6;21:18
**less (3)** 5:4;11:15;85:2
**letter (8)** 82:15,23,24;
83:4,7,17;94:7,13
**level (7)** 10:24;51:4;
75:9;97:19,22;102:8,9
**levels (2)** 11:4,5
**liability (6)** 61:21,22;
62:3,6;63:7,11
**license (16)** 76:17,18;
77:22;78:1,5,20;79:2,5,
13,20,24;80:8;87:24;
89:3;95:19;102:14
**licensed (2)** 42:22;
90:12
**licensee (4)** 77:18,19,
20,21
**licenses (3)** 64:9,15;
88:25
**licensing (2)** 87:18;
91:11
**likely (1)** 91:17
**limit (1)** 95:5
**Limited (7)** 10:19;
68:18,19,21,21;69:4;
102:7
**line (21)** 20:9;25:24;
50:18;55:19,19,20,20;
61:9;62:23;63:24;64:9,
15;65:9,18,24;66:17;
67:25;97:1;9:98:13,14
**line-by-line (1)** 53:23
**liquidated (11)** 30:3,21,
24;31:14;32:17;33:4,8,
11,18;72:4,24
**list (8)** 11,13;13:15;
19:4;20:2;46:13
**listed (3)** 19:18;55:11;
100:9
**listing (3)** 19:16,17,22
**lists (2)** 13:11;20:1
**litigation (3)** 40:13,20,
22

**little (7)** 39:8;55:14;
60:25;74:18;93:23;
95:14;98:5
**LLC (3)** 74:21,24;91:25
**loan (18)** 16:17,23;
17:2,7,9;28:21;53:18,
21;55:5,17;56:3,5,14;
68:9;12;94:23,24;95:1
**loans (3)** 16:17,17;17:2
**local (3)** 34:21;100:13,
13
**located (1)** 58:25
**location (12)** 14:25;
15:6;59:1,2,5,8,10,13,
18,25;60:7;83:21
**long (4)** 4:14;8:11,13;
18:2;37:17;58:22;82:2;
84:24
**longer (1)** 32:12
**longevity (1)** 97:25
**look (16)** 19:15,16;
31:5;36:14,15;37:1;
48:14;56:21;63:5;64:8;
65:19;83:24;84:6,14;
85:17;99:19
**looked (6)** 23:6,8,9;
69:8;86:20;90:2
**looking (6)** 22:19;
36:19;55:16;61:1;
70:17;90:21
**looks (1)** 70:8
**lose (1)** 91:19
**lost (3)** 50:2;66:20;
79:25
**lot (5)** 12:22;13:3,4;
21:13;93:4
**lots (1)** 57:16
**loud (1)** 50:4
**Lucas (3)** 34:22,24;
35:1,8

**M**

**Madam (1)** 25:1
**mailing (3)** 60:2,2,16
**Main (9)** 16:19;17:6,7,
10,17,20;18:4;19:6;
21:18
**maintain (2)** 12:19;
24:16
**maintained (1)** 60:19
**maintenance (8)** 6:4,
17;41:1,6,9,11;100:20;
101:10
**majority (6)** 5:20;20:6;
90:18,19;99:8;100:10
**makes (1)** 20:2
**making (1)** 12:2
**malfunction (1)** 44:18
**management (14)** 5:23,
24;6:9,9,11,12,24;38:5,
6,25;47:11;98:13;
100:25;101:15

**manager (7)** 5:25;
34:23;99:1,2,3,9,23
**managers (3)** 98:13,15,
16
**manages (2)** 7:14;
99:23
**manifest (1)** 45:12
**manifested (1)** 13:10
**many (12)** 5:3;7:4,8,9;
11:13;12:6,24;13:6;
27:24;32:18;59:7;
98:13
**March (11)** 27:5,21;
34:3,8,12,12,18;35:12;
59:14;60:20;64:16
**mark (4)** 13:24;58:8;
64:21;82:14
**marked (11)** 13:25;
18:15,22;50:23,24;
52:4;58:10;64:22;
70:14;82:13,17
**marking (1)** 81:18
**marks (15)** 87:20,20,
21;89:1,3,7,8,11,15,20,
23,24;90:2,5,14
**Maryland (1)** 70:4
**Mason (3)** 85:12;86:15;
98:20
**Masteas (2)** 6:15,25
**material (1)** 52:23
**matter (1)** 5:7
**matters (2)** 5:6;40:22
**maximum (4)** 95:6,7,7,9
**May (10)** 10:16;31:21;
55:14;63:20;67:9;68:9;
83:1,8;91:25;97:4
**maybe (3)** 35:7;59:9;
70:8
**meals (1)** 10:10
**mean (5)** 65:18;80:19;
87:25;90:16;94:1
**meaning (2)** 15:11;
76:18
**meaningful (2)** 43:18;
52:17
**means (2)** 31:20;68:21
**meet (6)** 24:4;41:17;
42:6;44:9,10;71:15
**meeting (13)** 4:17;5:15;
6:5,8;8:4;41:12,22,23;
92:6,7,8,12,14
**member (1)** 6:12
**members (1)** 5:24
**memory (1)** 41:16
**mentioned (10)** 6:15;
10:11;11:12;13:6;17:5;
18:17;32:16;39:23;
83:14;87:14
**met (8)** 4:17;6:3,13;
35:6;42:18,25;70:3,21
**methodology (2)** 9:17;
12:25
**Mexico (1)** 36:1

**might (7)** 18:13;21:23;
31:24;72:8;78:18;
96:20;97:7
**Mike (6)** 70:3,22;71:5;
85:12;86:15;98:19
**million (5)** 54:1;56:14,
15;61:10;62:23
**mind (2)** 60:12;87:25
**MINDER (13)** 24:19;
25:16,22;26:13;27:9;
28:11;46:20;58:4;
60:15;67:25;93:20;
94:3,8
**minimum (1)** 35:7
**minimus (1)** 54:3
**minor (1)** 63:10
**minus (2)** 7:22;8:3
**minutes (1)** 28:9
**MIS (1)** 102:12
**miscellaneous (2)**
101:5,6
**misrepresenting (1)**
19:20
**missed (1)** 29:14
**Mississippi (1)** 36:1
**misspeak (1)** 78:24
**misspoke (1)** 89:6
**misstatement (2)** 24:20;
25:17
**mistyped (1)** 15:4
**misunderstand (1)** 64:3
**misunderstood (3)**
50:9;63:20;102:24
**model (1)** 51:13
**moment (5)** 25:23;
43:22;47:1;48:19;
51:22
**money (2)** 57:19;94:23
**Monstercom (1)** 9:22
**Montana (5)** 19:16,18;
21:2,3;35:25
**month (1)** 85:3;98:5
**monthly (4)** 30:11;
64:25;65:17;67:24
**months (3)** 59:18;60:9;
77:14
**more (20)** 4:25;5:4;
10:3;24:24;25:9;27:9;
32:23;35:14;49:6;
56:13;57:13;63:19;
68:8;89:15;91:11,18;
93:4,24;101:11,12
**morning (1)** 4:7
**most (9)** 6:12;49:23;
51:15,15;81:6;85:2;
96:5;98:23;101:15
**move (1)** 64:12
**moved (1)** 13:21
**much (2)** 71:11;72:8
**multiple (4)** 34:10,13,
14;48:24,25;50:6
**music (1)** 101:5
**must (1)** 89:15

**myself (4)** 34:16;81:12;
96:6;98:22

## N

**NA (1)** 67:17
**name (19)** 4:8,16;7:15;
34:22;43:2;45:2;69:16;
71:22,24;73:24,25;
75:21;77:7,9,12,13;
83:13;91:24;98:19
**national (4)** 100:10,11,
12,14
**nature (1)** 52:23;77:16
**necessarily (3)** 67:15;
77:25;85:10
**necessary (3)** 23:18,23,
25
**need (1)** 54:21
**needed (5)** 45:16;62:1;
3;93:21;94:9
**negative (1)** 19:13
**negotiated (1)** 96:6
**negotiating (4)** 68:20;
71:4,11;74:5
**negotiation (4)** 68:17;
69:3;71:8;82:9
**negotiations (1)** 69:14
**Nemo (1)** 45:2
**net (2)** 62:5;101:20
**New (4)** 36:1;61:14,15,
25
**next (8)** 58:8;61:4;
64:20;66:17;74:25;
82:13;102:5,12
**nice (1)** 94:11
**night (1)** 54:10
**non (1)** 9:9
**none (12)** 9:21;11:22;
15:8;22:7;36:10;40:24;
56:4;57:9;66:7;74:15;
83:17;91:16
**nor (2)** 77:25;99:16
**normal (1)** 33:7
**normally (2)** 32:11;
44:17
**North (5)** 58:19;59:1,2,
4,24
**North's (1)** 89:17
**note (2)** 19:21;53:13
**notes (1)** 91:18
**number (48)** 9:7,8;
10:22;14:9,24;16:4,7;
17:1,23;22:20,21;28:3;
30:16;36:12;37:7;
38:18,22;39:25;40:7;
47:12,20,21,23;49:14;
50:1,4,20;53:18,21;
56:8,10;65:9,10,24;
67:4,5;73:6,8,17,22;
77:2;85:8;90:3;97:10;
98:1;100:20;102:7,19
**numbers (8)** 30:1;51:6,

12;54:1;56:21;57:2;
98:5;101:14

## O

**oath (6)** 4:22;16:3;
48:20;59:21,23;87:10
**ObamaCare (6)** 97:13,
24;98:2,4,9,11
**Objection (6)** 24:19;
25:16;26:13;27:9;
46:20;60:15
**objections (1)** 52:11
**objective (1)** 69:20
**obligated (1)** 26:10
**obligation (3)** 62:4,6;
63:4
**obligations (6)** 24:4;
25:10,20;61:23;65:14;
68:23
**observation (1)** 45:17
**obtain (1)** 68:12
**obviously (5)** 6:20;
29:3;52:23;65:17;98:8
**OCC (1)** 101:21
**occasion (1)** 70:4
**occupancy (2)** 57:1,1
**occupy (1)** 59:7
**occurred (1)** 32:21
**off (3)** 20:25;98:10,18
**offer (2)** 6:7;22:13
**offered (1)** 58:18
**office (11)** 15:11,12,18;
48:9;54:11;92:10;93:1,
7,9,19;94:6
**officed (1)** 59:10
**officer (2)** 44:22;85:14
**official (2)** 77:24;78:1
**Oklahoma (1)** 77:10
**one (49)** 5:10,24;6:19;
7:16,17;8:20;11:15,25;
13:8,11;19:8;20:19,24;
21:18;24:24;27:3,20;
34:19;37:22;40:12;
41:12;44:3,9;45:18,19;
50:7,22,22;52:15;
56:14;57:8;63:13;
65:16;67:19;70:2,4;
72:6;73:24;77:3,3;
80:25;83:19;88:13;
94:18;99:1,2;100:20;
102:1,8
**ongoing (1)** 40:17
**only (16)** 22:15;23:15;
36:7,24;37:4;44:2;
46:24;52:16,22;53:11;
67:21;82:11;90:10;
98:17;100:13;102:7
**on-site (3)** 34:21;42:18
**open (16)** 8:20,25,25;
9:3;10:2,4,5,13,18;
11:3,9,11,17;65:21;
84:21;85:5

**opening (1)** 6:22
**operate (5)** 21:10;
65:10;77:13;85:5,25
**operated (1)** 77:2
**operating (8)** 18:2;
38:24;52:12;57:11;
64:25;65:12;67:24;
85:14
**operation (1)** 72:15
**operational (1)** 53:3
**operations (4)** 30:11,
14;52:18;98:23
**optimistic (1)** 51:15
**options (5)** 21:21;22:1;
23:6,8,9
**oral (1)** 96:3
**organization (1)** 92:1
**original (3)** 21:25;78:9;
96:18
**originally (4)** 44:23;
74:19;75:23;78:13
**origination (1)** 75:18
**others (1)** 92:1
**otherwise (2)** 31:17;
78:19
**ought (1)** 30:24
**out (31)** 10:9;17:12,14,
17;18:6;19:8,10;20:4,
24;21:7,14,15,18;22:5;
27:7;40:22;41:16;
43:16;46:1,2,4,5;50:4;
54:4;71:16;81:10,12,
15,21;85:9;87:7
**outbreak (1)** 86:12
**outside (3)** 98:21,22;
102:20
**over (10)** 4:17;8:18;
30:9;47:21,24;55:22;
66:17;72:14;89:4;
96:14
**overall (2)** 69:20;71:13
**owed (6)** 29:21,24;
30:17;64:10,17;66:18
**own (11)** 32:9,10;88:3,
14,23;89:14,15,16,16,
17,18
**owned (7)** 74:19;75:24;
87:16;88:25;89:21,21;
96:23
**owner (4)** 74:9,11;88:4,
17
**ownership (2)** 87:18;
88:6
**owns (5)** 88:7,21;89:7;
90:11;95:15

## P

**P&L (2)** 65:19;99:19
**P&Ls (2)** 52:25;65:17
**page (13)** 18:11,15;
19:3;9:31:4;61:1,4,4;
66:17;67:4;70:18;

Min-U-Script®

Ceash & Ceash, Inc.
602-258-1440 www.coashandcoash.com

(6) manager - page

Case 2:21-bk-02477-BKM   Doc 53-1   Filed 06/10/21   Entered 06/10/21 15:44:40   Desc
Exhibit Exhibits   Page 34 of 68

80:24;81:18
**pages (1)** 16:25
**paid (5)** 66:6,14,18;
96:10;98:3,21
**painting (3)** 12:21,21,
22
**paper (3)** 36:15;70:8;
100:22
**Paradise (1)** 60:21
**parameters (1)** 71:13
**part (4)** 36:5;53:6;
56:22;76:5
**participate (3)** 32:19;
65:7;92:17
**participation (1)** 92:17
**particular (8)** 5:9;6:13;
17:18;43:14;52:25;
75:10;81:16;96:15
**particularly (1)** 74:8
**particulars (1)** 14:8
**parties (2)** 46:7;76:3
**party (3)** 23:24;34:7;
74:9
**pass (1)** 91:19
**passing (1)** 10:9
**pay (7)** 22:22;29:12;
30:8;10;65:25;66:7;
97:14
**payment (3)** 29:1,19;
67:21
**payments (6)** 29:2;
63:5;66:8;97:13;
101:24;102:16
**payroll (7)** 7:12,14;8:8;
12:9;56:21;66:6;67:16
**Pecos (1)** 89:18
**penalty (1)** 66:11
**pending (3)** 40:13,20,
22
**people (4)** 6:4;9:9;
10:6;99:24
**per (3)** 24:2;78:6;98:5
**percent (13)** 19:11;
53:25;54:21;56:6,13,
18;88:7;89:25;101:14,
16,19,19,20
**percentage (8)** 55:2,2;
56:14,17,19;57:4;
99:20;102:1
**perfect (1)** 18:5
**performing (1)** 12:13
**period (13)** 30:9;47:21,
24;53:5;54:8;65:3,11,
13,20,22;66:2,15;67:14
**perjury (1)** 66:11
**permissible (1)** 85:18
**person (7)** 32:8;34:25;
35:3;42:23;69:15;70:1;
98:24
**personal (3)** 20:20;
22:8,14
**personally (1)** 46:16
**petition (9)** 15:3;40:18,
23;48:3;58:9,15,19;
59:16,21
**phases (1)** 11:25
**phone (15)** 4:17;31:19;
32:16,18,25;33:3;34:2,
7;35:2,4,6;70:1,2;
100:5,12
**physical (3)** 45:15,17;
60:19
**physically (4)** 5:18;
51:7;58:25;59:4
**pick (1)** 28:10
**piece (1)** 96:16
**place (14)** 12:17;15:1;
39:16;58:18,23;59:24;
60:8,13,20;61:24;
63:10;76:21;79:2;
100:13
**placed (1)** 96:17
**placement (1)** 61:19
**places (1)** 12:21
**plan (12)** 22:22;23:3,5,
7,10,25;24:6;25:5,14;
26:11;28:18;95:8
**planning (2)** 10:5;84:6
**plans (5)** 5:17;23:2;
84:21
**please (8)** 4:9;24:24;
49:10;79:25;80:1,4;
93:10,19
**Plumbing (14)** 42:14,
15;43:11,19;44:10,11;
45:18,19,20,22;46:1,2,
5,7
**plural (3)** 37:2;48:23;
49:4
**Plus (1)** 10:11
**pm (1)** 10:19
**point (17)** 6:11;7:1,10;
17:15;20:24;37:22;
42:4;44:6;49:23;59:2;
69:15;72:14;75:23,25;
87:11;96:2;102:22
**pointing (1)** 21:22
**policies (3)** 38:23,24;
39:2,4,12
**poor (1)** 84:4
**portion (2)** 56:11,12
**POS (1)** 102:12
**position (3)** 30:23;41:8,
10,25;43:22,23;44:13;
50:10
**possession (2)** 15:6;
49:1
**possible (3)** 84:22,24;
85:5
**post (1)** 12:25
**potential (2)** 16:8;17:23
**PPP (30)** 16:17,23;
17:19;28:20;29:3;
30:15;53:17,21,25;
54:5,18;55:2,5,17;56:5,
10,11,16,20,22,24;
57:6,10,19;68:9,11;
94:23,24;95:1,10
**preceding (1)** 15:3
**preliminarily (1)** 42:24
**premises (3)** 41:1;
46:25;47:9
**preparation (2)** 65:7;
73:11
**prepare (1)** 14:19
**prepared (22)** 19:5;
20:18;23:7,12,13,19;
24:9;26:4,5;47:17,21,
23;48:3,25;50:15,18;
51:2,5,19;52:7;61:7;
63:23
**prepares (1)** 38:3
**preparing (1)** 14:10
**prerogative (2)** 84:16,
18
**present (7)** 24:5;61:22;
62:2,4,5;63:3;74:24
**presently (2)** 95:16,18
**president (15)** 80:23;
81:3,3,5,7,10,13,15,17,
19,21,24;82:2,6;85:13
**presumably (3)** 37:22;
62:14;67:19
**pretty (3)** 6:5;27:15;
101:15
**previously (2)** 4:24;
18:16
**primarily (1)** 77:12
**primary (2)** 28:6;45:18;
60:1,2;71:18;100:7
**principal (10)** 15:1,2;
52:12;58:18,23;59:24;
60:8,13;69:19,23
**principles (2)** 39:21;
61:18
**print (2)** 86:24;87:7
**prior (7)** 36:23;37:20;
46:7;61:17,17;79:5;
92:24
**priority (1)** 72:17
**privy (4)** 15:15;32:1,2;
71:21
**pro (40)** 23:14;24:1,5;
25:7,18;30:12;47:17,
21,23;48:3,8,10,21,24,
25;49:2;50:15,22,25;
51:2,7,16,24;52:11;
53:2;54:4,7,8,9,10,12,
14;55:12;65:15,15;
95:8;97:1;98:10,11,16
**probably (5)** 9:2;36:1,2;
92:12;101:11
**problem (3)** 39:11;
45:4;66:22
**procedure (2)** 13:3,3
**procedures (11)** 38:23;
39:2,5,13,16,22,23,24;
40:1,1,2
**proceedings (2)** 31:10;
57:6,10,19;68:9,11;
94:23,24;95:1,10
**proceeds (13)** 16:23;
28:21;29:3;30:10,13;
54:5,18;55:5,17;56:3,
5;68:9,12
**process (1)** 6:7
**produce (3)** 93:20;94:8,
14
**produced (6)** 92:9,14;
93:6,10,18;94:5
**production (1)** 94:5
**products (1)** 12:11
**profits (1)** 57:11
**Program (6)** 16:20;
17:10,18;19:6;21:11,
18
**programs (1)** 21:16
**Program's (1)** 18:4
**progress (1)** 46:8
**projection (5)** 48:10;
49:22,23;94:19;102:16
**projections (1)** 55:1;
102:20,21
**projects (1)** 6:4
**promotional (5)** 10:6,8,
10;11:12;18:4
**pronouncement (3)**
61:14,15;62:9
**property (25)** 34:23;
38:25;41:9;45:7,17;
74:2,9,14,25;75:24;
76:1,3,4,16;78:17;
87:19;89:13;90:23;
91:1,3,9,10,12,15;
102:4
**protocol (1)** 38:14
**provide (20)** 15:21,21;
24:17;43:14;44:13;
46:12;49:22;50:15,19;
58:4;62:15;63:19;64:3,
4;65:18;79:20;93:9,23;
97:3;102:22
**provided (42)** 5:3;
11:13;15:8,9,11,13,24,
25;16:12,16,18;23:15,
17,21;24:2;25:19;
27:18,25;35:16;36:3,7,
24;37:5;38:18;48:12,
17,18;49:1,7,24;51:10;
54:9,13,15,17;63:12;
65:14;66:10;86:11;
92:7;98:9;101:14
**provides (2)** 72:3;74:1
**providing (1)** 51:14
**provision (2)** 30:24;
72:24
**public (2)** 10:14;37:21
**pull (2)** 70:7;97:6
**purchase (2)** 69:21;
100:21
**purpose (1)** 5:22
**purposes (1)** 60:6
**pursue (1)** 21:21

62:18
**proceeds (13)** 16:23;
28:21;29:3;30:10,13;
54:5,18;55:5,17;56:3,
5;68:9,12
**process (1)** 6:7
**produce (3)** 93:20;94:8,
14
**produced (6)** 92:9,14;
93:6,10,18;94:5
**production (1)** 94:5
**products (1)** 12:11
**profits (1)** 57:11
**Program (6)** 16:20;
17:10,18;19:6;21:11,
18
**programs (1)** 21:16
**Program's (1)** 18:4
**progress (1)** 46:8
**projection (5)** 48:10;
49:22,23;94:19;102:16
**projections (1)** 55:1;
102:20,21
**projects (1)** 6:4
**promotional (5)** 10:6,8,
10;11:12;18:4
**pronouncement (3)**
61:14,15;62:9
**property (25)** 34:23;
38:25;41:9;45:7,17;
74:2,9,14,25;75:24;
76:1,3,4,16;78:17;
87:19;89:13;90:23;
91:1,3,9,10,12,15;
102:4
**protocol (1)** 38:14
**provide (20)** 15:21,21;
24:17;43:14;44:13;
46:12;49:22;50:15,19;
58:4;62:15;63:19;64:3,
4;65:18;79:20;93:9,23;
97:3;102:22
**provided (42)** 5:3;
11:13;15:8,9,11,13,24,
25;16:12,16,18;23:15,
17,21;24:2;25:19;
27:18,25;35:16;36:3,7,
24;37:5;38:18;48:12,
17,18;49:1,7,24;51:10;
54:9,13,15,17;63:12;
65:14;66:10;86:11;
92:7;98:9;101:14
**provides (2)** 72:3;74:1
**providing (1)** 51:14
**provision (2)** 30:24;
72:24
**public (2)** 10:14;37:21
**pull (2)** 70:7;97:6
**purchase (2)** 69:21;
100:21
**purpose (1)** 5:22
**purposes (1)** 60:6
**pursue (1)** 21:21

**pursuing (2)** 20:9;22:3
**put (3)** 40:20;62:1,3

**Q**

**qualified (3)** 42:20;
43:12,13
**qualify (1)** 21:12
**quick (1)** 25:22
**quite (2)** 91:8;94:19

**R**

**raise (1)** 22:1
**raised (2)** 43:15;92:3
**rather (1)** 36:15
**reach (2)** 19:10;20:4
**reached (5)** 19:8;22:5;
27:7;43:16;46:4
**read (21)** 25:2,3;49:10,
13,14;50:3;64:12;
65:23;66:12;72:23,25;
80:3,5;85:21,23,24;
86:2,12,13,25;87:7
**reader (1)** 55:4
**ready (2)** 9:2;13:1
**real (1)** 61:20
**really (11)** 15:25;22:12;
28:22;29:1;33:6;52:16,
19,20;64:12;71:6;
84:13
**reason (12)** 36:7;
44:10;75:9,11;76:7,13,
15;78:12,18;79:10;
85:20;91:5
**reasonable (1)** 30:9
**reasons (2)** 44:9;96:16
**recall (33)** 5:13;7:9;
19:11,12;31:21;32:20,
21;33:1,6,15;41:13,15,
19;43:3;44:8;47:3,4,
19;67:15;69:12,16,25;
70:4,23;71:4,6,6;73:15,
24,25;79:14;83:21;
98:8
**receipt (1)** 83:17
**receivable (2)** 40:8,9
**receive (2)** 94:23;97:22
**received (4)** 14:5;
16:17;17:19;58:5
**recess (2)** 28:12;68:6
**recollect (8)** 16:11;
33:2,10,17,20;62:25;
72:1;87:1
**recollection (4)** 33:22,
23;70:3;91:14
**recollections (1)** 91:13
**record (6)** 4:9;18:21;
19:1;25:3;80:5;94:16
**records (1)** 8:8
**reduction (1)** 95:7
**refer (3)** 8:16;16:15;
21:10

referenced (6) 17:2,8; 45:21;46:4;47:20;97:2
referred (2) 92:6,7
referring (8) 15:16; 19:2;31:3;37:3;61:12; 66:20;92:13;93:15
refers (1) 49:5
reflect (2) 30:6;88:25
reflected (2) 63:15;98:6
reflecting (3) 61:22; 62:2,8
reflects (1) 63:14
refusing (2) 24:17;26:6
regard (1) 73:14
regarding (9) 15:17; 16:8;32:17;42:11; 69:13,18,20;80:14; 83:4
register (1) 10:23
regular (1) 47:10
rejected (1) 20:23
relate (2) 17:2;47:14
related (7) 5:9;16:16; 20:17;34:11;41:5; 98:25;101:24
relates (1) 57:5
relating (2) 22:21;38:23
relationships (1) 19:24
relevant (1) 87:7
relief (1) 24:13
rely (1) 51:9
remainder (2) 13:2; 54:2
remember (3) 35:6; 69:23;71:24
remitted (2) 29:1,2
renew (1) 77:5
rent (10) 29:12;54:2, 24;64:9,10,15,18; 101:24,25;102:1
reopen (6) 10:10,14; 84:25;85:15,18;87:11
reopened (1) 12:24
reopening (2) 7:12; 13:1
re-opens (1) 8:23
reorganization (4) 22:22;23:3,25;26:12
repaired (1) 45:20
repairs (2) 45:23,25
repay (2) 25:21;55:3
repayment (1) 27:19
repeat (5) 39:9;46:20; 78:24;79:25;80:1
repeatedly (1) 95:25
rephrase (1) 27:14
replicate (1) 52:13
replicated (1) 96:21
report (7) 8:17,18;45:9; 64:25;66:10;67:8,24
reported (1) 81:7
Reporter (3) 25:1,3; 80:5

reporting (6) 60:6; 65:11,13,22;66:2,14
represent (2) 4:20; 91:24
representation (1) 51:16
representative (4) 28:4; 34:19,22;42:18
representatives (5) 27:8;31:18;34:2,7; 35:9
representing (1) 62:7
represents (1) 49:22
reputation (1) 77:9
request (29) 14:11,12; 16:4;17:1;22:6;24:2, 12;36:12,23;38:18,22; 40:7;41:25;42:21; 48:14;49:1,13,17,19; 50:1,3;62:14;76:16,22, 24;91:11;94:9,10,15
requested (2) 20:22; 22:9,16
requests (5) 14:12,14; 35:15;40:12;93:14
require (3) 61:18,19,21
required (1) 63:6
research (2) 85:4;87:9
reside (1) 19:23
resided (1) 76:6
residence (1) 15:1
residency (1) 15:13
resolution (1) 23:20
respect (12) 12:15; 22:11;31:13;41:25; 45:17;46:3,25,25; 73:11;83:24;84:7; 94:18
respective (1) 36:6
respond (2) 42:20,22
responded (2) 39:10; 83:8
responding (2) 84:19; 99:22
response (26) 7:10; 10:4;13:22;14:16,17; 15:19;16:5;17:1;23:11, 12;24:8,16;30:25;31:2, 7,12;38:18;39:20;48:6, 22;50:11;83:6,11; 93:21;94:9;101:14
responses (6) 14:7,11, 14,19;22:18;27:25
responsibilities (1) 99:10
responsibility (1) 98:25
responsive (6) 16:3; 22:24;29:4;50:12,19; 66:4
restate (1) 94:20
restaurant (10) 6:6; 8:25;9:6,15;10:9; 11:17;13:1,4;83:20;

89:17
restaurants (9) 12:25; 21:10;22:12;50:17; 74:17;75:21,25;82:15; 100:20
resulted (1) 44:2
results (2) 39:17;52:13
resume (1) 52:18
retain (1) 73:10
retained (2) 45:19; 85:17
return (3) 36:6,8,9
returns (7) 35:16,20,21; 36:4,5,25;37:4
revenue (2) 56:6;87:22
revenues (3) 10:20; 11:20;25:14
review (1) 5:23
reviewed (4) 14:16; 44:15;68:21;69:6
reviewing (1) 86:21
right (62) 6:6;7:25;8:5; 9:6,12,15;10:1;15:7; 17:6;19:8;20:8;27:5; 29:12,13,21;30:2,7,20; 36:4,19;37:5,14;40:17; 43:18;47:25;48:5,12; 49:16;50:8;51:8,25; 53:20;55:8;57:25;59:4; 60:12;64:20;65:6,9; 66:25;67:3,6,12,17,24; 70:11;72:6;78:7;79:8, 19,23;80:7,17;83:10, 18;84:16;88:10,21,23; 94:12;95:23;96:1
rights (1) 79:20
riser (1) 42:25
risk (2) 17:21;18:1
Road (5) 58:19;59:1,2, 5,25
ROBERT (3) 4:1,10; 90:16
role (3) 68:16,20;69:2
Ron (18) 7:17;14:20; 20:7;28:2;32:8,11; 34:17;38:8;42:18;48:9, 17,25;51:3;68:25; 69:18;71:9;83:8;92:21
Ronald (1) 34:15
rough (1) 62:22
round (4) 30:1;53:25; 57:2;98:5
rule (1) 86:11
rules (8) 39:14,15,18; 53:23;85:8;95:1,2,9
run (5) 7:12,14;17:16; 58:13;99:4
running (2) 11:25;12:2

**S**

S-1 (1) 75:19
safe (1) 11:15

salary (2) 54:22;97:15
sales (4) 10:4,25; 101:19,20
same (7) 20:17;31:4; 45:21;60:13;93:8; 94:15;97:9
sanitizing (1) 13:3
Save (1) 91:24
Sawyer (1) 7:16
saying (5) 5:8;48:20; 88:20;90:8;102:25
SBA (3) 16:16;17:2; 68:12
schedule (2) 97:4; 100:9
scheduled (1) 42:6
Scottsdale (3) 15:12, 18;58:20
screen (11) 13:21,23; 18:14,16;22:19;36:14, 17,21;58:15;70:12; 82:20
scroll (1) 19:3;40:7; 66:19;82:22
se (1) 78:6
seasoned (1) 98:20
SEC (2) 60:6;75:18
second (10) 18:11; 33:14,20;45:19;56:7; 69:16;70:17;98:24; 100:24;102:2
secondary (3) 99:2,4,9
secure (4) 16:18;17:5, 16;21:15
secured (2) 17:9;96:24
security (8) 20:13,18, 19;22:9,12,15;44:22; 101:7,8
seeing (7) 18:14;36:20, 22;51:23;58:15;70:12; 82:20
seek (1) 17:14
senior (6) 6:12;69:23; 85:13;98:23;99:1,9
sense (2) 20:2;93:5
sensitive (1) 71:14
sensitivity (4) 72:7,8; 74:4,7
separate (1) 99:17
September (3) 30:13; 70:18;79:1
series (1) 15:25
served (3) 60:7;81:4,5
servers (2) 99:13,24
serves (1) 41:16
service (1) 83:25
serviced (1) 11:6
services (1) 45:20
set (6) 9:6;40:3;45:25; 52:11;67:23;85:9
several (1) 35:17
share (2) 13:20;18:13
shareholder (1) 90:18

sharing (1) 13:23
sheet (4) 61:5,20;62:2; 64:8
shop (6) 6:21,23;8:25; 10:4,13,21
short (2) 17:16;76:25
shortage (1) 101:2
shortages (1) 101:3
shortly (1) 58:1
shot (1) 17:17
show (6) 23:18;24:2; 25:19;67:9;82:13; 102:22
showed (1) 67:18
showing (1) 14:3
shows (1) 56:1
shuttered (2) 27:4,21
side (9) 6:14;11:15; 61:21;62:2,4,6;63:7,8, 11
sides (1) 96:5
sign (2) 59:21,23
signals (1) 44:24
signature (2) 61:2; 80:24
signed (6) 6:6;67:20; 72:25;74:13;79:1; 80:22;81:2,3,16;82:5
significant (1) 91:5
signing (2) 70:5,5
simple (2) 39:20;68:8
simply (6) 17:22;18:5; 30:15;34:17;67:16; 83:9
single (13) 13:8;27:20; 44:14,15;49:2,6,17,20, 22;52:24;67:9;94:19; 96:16
single-day (1) 5:21
singular (6) 37:1;48:23; 49:4,23;51:18,19
sit (3) 16:2;66:13;83:10
site (2) 35:7;42:7
six (1) 87:21
skill (1) 45:25
skilled (1) 53:23
skip (1) 60:25
skipped (1) 57:9
Skipping (1) 38:22
slightly (1) 63:12
slow (1) 66:22
small (1) 8:9
smallwares (1) 100:23
snow (1) 72:16
sold (1) 76:2
sole (1) 31:12
solely (2) 89:21;90:24
somebody (1) 84:9
somehow (1) 79:25
sometime (2) 71:1; 85:25
sometimes (2) 28:4; 59:12

**somewhat (1)** 17:8
**somewhere (5)** 13:15; 57:18;75:10,11,12
**soon (2)** 8:19;84:22
**sorry (8)** 15:22;50:2; 78:15,24;89:4;94:3; 96:14;99:11
**sort (2)** 91:18;99:2
**sought (2)** 17:12;86:14
**sounds (3)** 43:21; 71:21;91:20
**source (2)** 8:21;18:5
**sources (2)** 16:8;17:16
**speak (3)** 75:3;96:14; 98:7
**speaking (1)** 5:5
**speaks (2)** 30:25;31:3
**spearheading (1)** 6:21
**specialty (1)** 99:25
**specific (13)** 10:4; 14:12;15:25;20:14; 27:10;32:23;33:22; 34:11;44:3;49:1;54:2; 57:18;97:24
**specifically (8)** 4:25; 16:19;22:11;57:18; 93:7,8,24;94:4
**speed (1)** 41:24
**spell (1)** 54:4
**spend (2)** 21:13;53:24
**spending (1)** 5:18
**spent (1)** 13:5
**split (1)** 56:24
**spoke (6)** 19:23;43:11; 69:13;71:22;87:20; 89:4
**spoken (2)** 34:19;86:16
**sponsored (3)** 17:7,18; 21:11
**spring (1)** 12:17
**sprinkler (12)** 41:13,20, 22;42:7,11,25;43:22; 44:3,4,12,15,18
**sprinklers (1)** 41:24
**square (1)** 59:7
**staff (2)** 7:9;45:23
**standpoint (1)** 67:16
**Star (46)** 7:16;22:6; 38:5,6;62:12,17;75:8, 15,18,22;76:5,6,19,23; 77:19,20,22;78:5,9,13, 15,16,21;79:2,6,12,19; 80:16;81:25;82:2,6,8; 87:17;88:5,7,14,20; 89:13,15;90:4,18,19, 25;91:2;102:8,11
**Starbuffettaz@gmailcom (1)** 32:15
**start (4)** 13:23;14:9; 27:12;33:2
**starting (1)** 14:24
**state (23)** 4:8;21:4; 35:20,22;36:5,8,24;

37:1,3,4;73:21,23;85:5, 10;86:5,7,19,22;87:20, 21;89:24;90:2;102:4
**statement (2)** 19:20; 50:22
**statements (2)** 37:8; 38:3
**state-registered (1)** 90:4
**States (6)** 15:2;21:4,6; 36:4,6;37:2
**state-sponsored (3)** 21:11,16;86:10
**statistic (1)** 66:16
**status (1)** 8:16
**staying (1)** 101:16
**step (1)** 66:22
**sticking (1)** 72:20
**still (5)** 46:8;60:10; 65:14;66:8,8
**storage (1)** 44:16
**straightforward (1)** 27:15
**Street (10)** 16:19;17:6, 7,10,17,20;18:4;19:6; 21:18;82:15
**strike (1)** 21:15
**striking (1)** 46:5
**struck (4)** 21:14,18; 46:1,2
**stuff (1)** 9:21
**SU_0001 (1)** 18:15
**SU001012 (1)** 40:4
**SU001140 (1)** 50:24
**SU1140 (1)** 51:24;97:7
**subcontractor (1)** 42:10
**subject (5)** 5:7;20:25; 33:8
**submitted (2)** 8:17;31:9
**subsidiary (1)** 87:17
**substantial (1)** 25:10
**success (1)** 18:3
**successful (1)** 17:11
**suggest (1)** 95:8
**suggested (1)** 49:19
**Suite (1)** 58:19
**sum (1)** 30:18
**summary (1)** 54:7
**Summit (11)** 21:8; 22:11;37:20;50:16; 68:22;69:9;74:17; 75:22;78:11;82:15; 96:21
**supplement (5)** 50:11, 19;58:4;93:21;94:9
**support (2)** 102:12,13
**sure (35)** 8:7;12:2; 23:21;24:4,25;25:8; 29:7;30:5;39:7,11; 43:20;46:22;48:19; 49:12;51:14;62:16; 64:14;68:2,4,22,25; 69:8;78:21,22,23;80:2;

84:15;86:16;88:12; 89:25;90:7;91:8;95:13; 97:5;98:19
**sworn (1)** 4:2
**sync (1)** 85:11
**system (6)** 10:23;41:13, 22;42:11;43:22;44:7
**systems (1)** 41:20

**T**

**tab (1)** 49:2
**table (3)** 9:6,14;67:18
**tabs (1)** 24:2
**Taco (7)** 74:21,23;75:1, 24,25;76:1,2
**talk (3)** 31:7;43:21; 68:24
**talked (5)** 19:12;22:20; 44:22;83:19;91:25
**talking (5)** 29:5;31:6; 34:10;35:2;55:22;56:2; 61:15;84:11;92:5,20; 97:10
**tasks (1)** 13:12
**tax (10)** 35:16,20,21; 36:3,5,6,8,8,24;37:4
**taxes (5)** 97:12;102:2, 3,4,5
**team (13)** 5:23,24;6:9, 9,11,12,24;38:5,7,14, 16;47:11;101:15
**technically (1)** 30:11
**technology (1)** 102:13
**telling (3)** 21:20;57:16; 70:21
**temperatures (1)** 44:5
**ten (1)** 77:2
**tenant (3)** 29:18;73:7; 84:17
**tenure (1)** 38:10
**term (6)** 20:3;22:15; 37:24;61:23;89:20; 99:25
**terminate (2)** 77:22; 79:13
**terminated (1)** 78:6
**termination (2)** 77:25; 79:14
**terms (20)** 5:1,17; 11:20,24;12:7;20:17; 30:17;34:2;54:16;56:8; 62:22;69:14;71:4,15, 17;72:7;77:11,12; 90:14;92:17
**Terry (7)** 28:3,5;31:23, 25;33:7;34:15,17
**testified (19)** 4:3;37:18; 42:2;54:24;71:14,25; 75:17;78:3,16;79:17; 84:10;85:7,12;87:23; 88:17;95:25;96:15; 99:18,20

**testifying (2)** 48:20,24
**testimony (27)** 4:24; 7:18;8:7;15:24;16:21; 21:25;22:2,3;25:13,17; 28:15;29:16;34:9; 41:19;43:9,25;47:19, 25;48:18;54:12;63:20; 67:15;71:10;79:9; 87:10;90:9,13
**testing (1)** 12:12
**Texas (1)** 35:25
**thanking (1)** 6:5
**theory (1)** 21:3
**therefore (1)** 67:21
**thinking (1)** 15:24
**third (9)** 6:21;9:5; 10:11;23:24;67:3;76:3; 100:25;101:3;102:6
**third-party (1)** 23:22
**though (2)** 81:10;88:9
**thought (16)** 8:6;15:19; 28:24,25;29:14;34:9, 10,12;35:4;39:10; 63:17,22;70:23;93:2; 99:18,21
**thousand (1)** 50:8
**threatened (1)** 40:13
**three (22)** 5:14;6:19, 22;7:16,19,22,22,24; 8:3,8;11:4,5;17:8;29:2; 35:7;46:7;51:20;59:12; 67:13;69:19,24,24; 77:3;87:19;89:23;99:1
**tick (1)** 98:18
**times (2)** 13:4;35:7
**title (2)** 4:11;81:7
**today (10)** 4:21;5:19; 7:5;16:2;23:5;24:10; 43:24;54:25;83:14; 89:11
**today's (1)** 26:19
**told (8)** 43:13;48:17; 51:17;63:3;69:4,6,8; 87:25
**tomorrow (1)** 8:11
**took (1)** 76:21
**topic (1)** 37:7
**total (5)** 30:6;53:25; 56:6,13;101:13
**totals (2)** 56:21;98:8
**touch (1)** 42:25
**touch-up (2)** 12:21,22
**tours (2)** 10:9;11:13
**toward (1)** 53:5
**track (1)** 13:15
**trademarks (1)** 90:11
**traditional (1)** 12:16
**trained (1)** 85:22
**transaction (7)** 21:8; 75:20,20;76:6,20;77:1; 96:21
**transfer (4)** 76:8,9,14; 91:6
**transferred (2)** 76:5,19

**transition (1)** 9:2;49:3
**transpired (2)** 96:20,20
**trap (3)** 83:20,24;84:7
**trap-related (1)** 100:7
**trash (2)** 100:6,14
**triggered (2)** 44:4,25
**triggering (1)** 44:3
**trip (1)** 44:12
**tripped (2)** 43:1;44:16
**trips (2)** 5:21,22
**true (5)** 10:2;34:21; 47:18;67:24;84:20
**trustee's (6)** 92:10;93:1, 7,9,19;94:6
**try (3)** 47:6;66:7;72:11
**trying (3)** 69:2;90:7; 94:21
**Tulsa (5)** 77:3,4,8; 91:12;96:19
**turn (3)** 18:6;35:13; 58:8
**turned (2)** 17:17;21:7
**Turning (1)** 33:16
**twice (2)** 19:19;35:7
**two (26)** 5:13,21;6:22; 8:9,15;11:5;16:16; 31:21;32:20,25;34:5, 23;35:6;45:18;50:3; 51:20;52:16;59:11; 67:13;69:19,24,24; 77:3;87:19;89:23;99:1
**type (2)** 55:23;100:24
**types (1)** 5:5

**U**

**unaware (1)** 83:11
**unclear (1)** 44:3
**under (36)** 4:22;16:2; 19:16,17,18;21:2;29:9, 19,21,24;48:11,14,20; 49:2;57:6,8;59:21,23; 61:14,23,25;62:8;63:6; 64:10,17;66:11;67:4; 87:10;95:1;98:5;99:15; 100:3,16;101:16,22,25
**underlying (3)** 51:6; 52:10;62:7
**understood (11)** 11:2; 16:21;18:19,19;27:16; 39:7;60:1;64:1;72:23; 73:8;79:15
**undertaking (1)** 71:8
**underwrite (3)** 17:25; 21:8,9
**underwriting (2)** 17:20; 21:17
**uniforms (1)** 100:23
**United (1)** 15:2
**universally (1)** 17:25
**unless (3)** 75:9;78:18; 93:7
**unprepared (1)** 17:25

Case 2:21-bk-02477-BKM    Doc 53-1    Filed 06/10/21    Entered 06/10/21 15:44:40    Desc
Exhibit Exhibits    Page 37 of 68

**unsuccessful (2)** 20:9, 11
**unwilling (5)** 20:14; 21:8,9;24:11;43:13
**up (30)** 9:6;11:25;12:2; 14:3;28:10;31:5;33:9, 13,24;41:24;56:23; 62:8,16,20,23;64:12; 66:19;67:18,18,20; 70:7,13;77:15;80:25; 86:12;94:6,12;95:2; 97:6;102:16
**update (2)** 33:8;86:11
**use (15)** 22:15;28:20; 30:12;55:7;77:11; 80:18;87:24;89:20; 94:22;95:2,24;96:10; 97:9;100:1,14
**used (3)** 6:2;20:3;55:3
**used-by (1)** 12:12
**user (1)** 77:17
**using (3)** 18:17;25:14; 55:22
**Utah (1)** 35:25
**utilities (7)** 54:3,23; 56:23,25;65:14;100:3, 4
**utilize (3)** 39:15;76:16; 77:8

### V

**vacation (1)** 97:14
**Valley (2)** 60:21,21
**value (7)** 61:13,22; 62:3,4,5,5;63:4
**vendor (5)** 6:1;41:24; 42:6,11;100:13
**vendors (2)** 6:1;100:8
**verbal (5)** 74:15;78:4, 12,20;95:25
**version (1)** 63:13
**via (2)** 31:19,19
**vice (1)** 85:13
**videos (1)** 44:15
**virtually (1)** 16:22
**vis-à-vis (1)** 41:22
**Vista (1)** 60:21
**Viva (1)** 77:13
**volume (1)** 99:7
**VP (1)** 98:22

### W

**wage (1)** 95:4
**wages (2)** 54:21;99:21
**waiting (1)** 84:14
**walk (5)** 14:6,23;55:19, 20;74:22
**walk-in (1)** 11:8
**warrant (1)** 12:22
**waste (1)** 21:23
**Waugh (4)** 77:7,8,11;

91:11
**way (5)** 20:19;35:1; 88:11;89:12;94:23
**ways (2)** 8:15;85:15
**website (5)** 86:10,21, 23,24;87:1
**website-based (1)** 87:6
**week (4)** 10:5,15; 45:24;86:10
**weekend (1)** 11:8
**weeks (4)** 4:17;5:15; 92:12;93:3
**well-established (1)** 77:9
**Wendy (1)** 7:16
**weren't (2)** 20:18;85:10
**what's (5)** 12:5;29:24; 61:15;81:8;89:5
**WHEATON (22)** 4:1,10, 11,16;14:3;19:2;22:9; 24:23;27:13;28:14; 30:16;36:21;37:4,15; 58:16;63:21;68:8;80:4; 81:14;84:13;90:16; 91:17
**whole (1)** 27:17
**wholly (2)** 87:16;89:21
**who's (1)** 42:19
**whose (2)** 12:11,12
**willing (1)** 24:22
**Within (2)** 26:19;85:25
**without (5)** 29:5;86:21; 91:3;93:23;94:25
**witness (8)** 4:2;25:7,18; 60:16;68:3;80:9;91:20; 97:8
**wonderful (2)** 20:21; 98:20
**words (3)** 50:1,3;78:22
**work (6)** 8:19,22;12:19; 13:14;23:4;92:8
**workers' (1)** 97:12
**workforce (2)** 6:6,16
**working (8)** 6:6;10:23; 13:2;44:8,17,21;67:21; 73:17
**works (1)** 5:16
**worksheet (1)** 62:7
**worksheets (3)** 63:16, 23;64:1
**wrap-up (1)** 92:2
**write-up (1)** 45:13
**written (2)** 45:9;96:19
**Wyoming (1)** 36:1

### Y

**year (11)** 11:13,14; 52:13,19,21,21;55:12; 71:2;97:9;99:8;101:13
**years (13)** 4:15;5:14; 15:13;35:17;37:18; 52:14;58:24;72:14;

77:2;81:4,5;90:3; 101:15
**yesterday (2)** 7:12; 49:24

### Z

**zero (2)** 29:7;67:6

### 1

**1 (13)** 13:24,25;14:9, 15,24;16:4;18:25; 22:19;35:14;65:10,18, 24;85:8
**1,167,797 (1)** 56:9
**10 (1)** 40:7
**10:00 (1)** 10:19
**100 (4)** 5:4,6;88:7; 89:25
**1018 (1)** 40:4
**103 (1)** 58:19
**10-Ks (2)** 62:13,17
**11 (6)** 18:12;19:3,9; 40:12;50:23;51:6
**1140 (2)** 52:2;54:13
**118,136 (1)** 56:11
**12 (2)** 18:25;70:18
**13 (3)** 16:25;40:25; 59:18
**15 (2)** 7:20;12:15
**16 (1)** 27:5
**17 (14)** 7:22;8:3,4; 48:14;49:2,5,14,17,19; 50:1,4,20;66:17,23
**171,339 (2)** 97:11; 98:12
**18 (4)** 7:6;35:17;60:9; 77:14
**180 (2)** 15:2,4
**19 (2)** 35:17;62:12
**1997 (1)** 82:4

### 2

**2 (9)** 16:7;17:1;18:21; 22;19:1;22:20;53:18, 21;100:20
**2,000 (1)** 59:9
**2.489 (2)** 61:10;62:23
**20 (9)** 7:11,13,22;8:3; 13:6;29:15;35:17; 62:13;72:14
**2000 (2)** 38:13;52:18
**2004 (7)** 4:25;5:2; 24:11;48:6;94:2,3,10
**2011 (9)** 76:12,13; 77:15,23;79:5,9,12,19; 80:11
**2014 (6)** 70:18;71:2; 73:18;79:1;93:22;94:1
**2018 (5)** 46:16,18;47:1, 9,12

**2019 (1)** 98:8
**2020 (14)** 11:21;27:5, 21;29:13,18;34:3,8,12, 18;35:12;59:14;60:20; 61:17,25
**2021 (10)** 11:14;30:13; 32:22;34:12;45:6;53:9; 59:17;64:16;65:4;67:9
**2022 (3)** 52:20;55:24; 102:17
**206 (2)** 100:9,9
**21 (1)** 67:9
**22 (2)** 52:19;64:16
**22,770 (1)** 56:18
**23.85 (1)** 56:6
**25 (5)** 41:5;37:18; 52:14;81:4,5
**2501 (1)** 58:19
**251,678 (1)** 57:9
**25-year (1)** 37:24
**27 (1)** 67:17
**28th (1)** 10:16

### 3

**3 (7)** 22:21;52:3,4,7; 55:4,16;94:19
**3:00 (1)** 10:19
**30 (5)** 15:13;46:17; 65:3;86:1;87:12
**31 (3)** 52:20;55:24; 102:17
**329,770 (1)** 64:16
**341 (33)** 4:17;5:15,19, 21;6:15;7:9,18;8:4; 15:8,9,10,19,20,22; 16:22;29:14;41:12,22; 42:2;53:22;67:12,15; 75:17;78:3;79:15;81:8; 83:20;85:7;87:20,23; 92:6,21;93:3
**350,000 (1)** 30:1

### 4

**4 (6)** 58:9,10;61:1,5; 65:25;97:17
**400,000 (1)** 57:3
**457,273 (1)** 56:15
**465 (1)** 102:25
**465,919 (2)** 57:2,4
**4716 (1)** 60:21

### 5

**5 (5)** 36:12;61:4;64:21, 22;67:4
**50 (3)** 5:4,6;21:4

### 6

**6 (3)** 70:13,14,17
**60 (3)** 53:25;54:21;

56:13
**600,000 (3)** 56:9,14,15
**6th (1)** 59:17

### 7

**7 (4)** 37:7;38:18;82:14, 17
**75 (2)** 8:18;13:9
**7th (1)** 65:3

### 8

**8 (7)** 53:5;61:1;101:14, 16,19,19,20
**80 (1)** 56:18
**85252 (1)** 60:22

### 9

**9 (1)** 38:22
**90 (1)** 26:19
**95 (1)** 19:11

# EXHIBIT "B"

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>SUMMIT FAMILY RESTAURANTS INC,<br><br>Debtor. | Chapter 11 Proceedings<br><br>Case No. 2:21-bk-02477-BKM<br><br>**TRANSCRIPTION OF 341 CREDITORS MEETING CONDUCTED ON MAY 11, 2021** |

| | |
|---|---|
| Patti Chan | Good morning, my name is Patti Chan, I'm with the Office of the United States Trustee. This is the first Meeting of Creditors regarding Summit Family Restaurants, Inc. It is case number 2-21-02477. The date is Tuesday, May 11, 2021 and the time is about 9 am. Can I please have the appearance of the attorney for the Debtor? |
| | Hello, my name is Sierra Minder representing the Debtor. |
| Patti Chan | Thank you. And, I believe I have Robert Wheaton with – who is representing the Debtor Entity. |
| Robert Wheaton | Yes. |
| Patti Chan | Okay, and we also have Mr. Ron Dowdy, is that correct? |
| Ron Dowdy | Yes. |
| Patti Chan | Okay. So, Mr. Wheaton, I'm going to swear you in first. Could you please raise your right hand? Is your right hand raised? |
| Robert Wheaton | Yes |
| Patti Chan | Okay, do you solemnly swear or affirm to tell the truth, the whole truth and nothing but the truth? |
| Robert Wheaton | Yes |
| Patti Chan | Thank you. And, Mr. Dowdy? Can you please raise your right hand? |
| Ron Dowdy | Yes |

| | |
|---|---|
| Patti Chan | Is your right hand raised? |
| Ron Dowdy | Yeah |
| Patti Chan | Okay, do you solemnly swear or affirm to tell the truth, the whole truth and nothing but the truth? |
| Ron Dowdy | Yeah |
| Patti Chan | Thank you. Okay, um, Mr. Wheaton, I'm going to direct my questions to you, if you need Mr. Dowdy's assistance, please state so. Okay? |
| Robert Wheaton | Yes |
| Patti Chan | Alright. Ah, Mr. Wheaton, where are you currently located? |
| Robert Wheaton | 4716 East Valley Vista Lane, Paradise Valley, Arizona 85253 |
| Patti Chan | Okay. So, are you currently in the same location with your attorney? |
| Robert Wheaton | No |
| Patti Chan | Oaky. Again, just for the record, if I have asked you a question or if parties asked you a question, please complete your answer before you ask or refer to your attorney, okay? |
| Robert Wheaton | Yes |
| Patti Chan | Okay. The purpose of this meeting is to examine the Debtor and be heard on the administration of the case. This is not a judicial proceeding so the Federal Rules of Civil Procedure and the Federal Rules of Evidence do not apply. This meeting is being electronically recorded. I will begin by asking certain questions of the Debtor to get started and then Creditors will be given an opportunity to ask the Debtor questions. I am also the Trial Attorney assigned to this case and we are still working outside the office so the direct number to reach me is 202-306-6181. Going forward, when I refer to the Debtor, I am referring to Summit Family Restaurant, okay? Mr. Wheaton? |
| Robert Wheaton | Yes. |
| Patti Chan | Okay. Mr. Wheaton, in regards to the Debtor, what is your official title? |
| Robert Wheaton | CEO |
| Patti Chan | And my understanding is that you are also the sole Director of Star Buffet and Star Buffet owns 45%, I guess through that ownership – I'm sorry, Star Buffet owns 100% of the Debtor and you own 44.5% of Star Buffet, is that correct? |

| | |
|---|---|
| Robert Wheaton | That is correct. You did make a statement, however that I am the sole Director of Star Buffet, and I am not the sole Director of Star Buffet, I'm the sole Director of Summit Family Restaurant, Inc. |
| Patti Chan | Okay, thank you for that clarification. As the CEO, and sole Director, what are your duties and responsibilities with the Debtor? |
| Robert Wheaton | I manage the day to day activities of the business, Casa Bonita, which is the sole operating business owed by Summit at this point in time. I'm very active in monitoring capital expenditures, personnel matters, allocation of capital, accounting. |
| Patti Chan | Okay. And do you, are you the person who signs off on the tax returns? |
| Robert Wheaton | Generally, yes |
| Patti Chan | Are you compensated for your position? |
| Robert Wheaton | I have not been compensated for my position |
| Patti Chan | Okay. Were you compensated for your position or are you, I guess, I guess through some contract or agreement you are generally compensated? |
| Robert Wheaton | Through the date of this hearing I have never been compensated for, directly, for the, or indirectly |
| Patti Chan | Okay |
| Robert Wheaton | for the position |
| Patti Chan | Okay. Was your compensation different before the filing of the bankruptcy? Mr. Wheaton? |
| Robert Wheaton | My compensation arrangement has been thoroughly consistent for a number of years, I operate under a written contract. However, since March of 2020 I have not been compensated. |
| Patti Chan | Okay. |
| Robert Wheaton | At all. |
| Patti Chan | Okay. Can you give me a daytime phone number where you can be reached? |
| Robert Wheaton | 602-684-5536 |
| Patti Chan | Did you help prepare the Petitions, Schedules and Statements and any Amendment, so when I refer to these documents together, I'm going to refer to them as the "Bankruptcy Documents." Did you help prepare the Bankruptcy Documents in this case? |

| | |
|---|---|
| Robert Wheaton | I certainly provided guidance on the responses. I did not do the actual administrative preparation of the responses, but I am familiar with each and, line that is included in the document. |
| Patti Chan | Okay. You understand that the Bankruptcy Documents are signed under penalty or perjury? |
| Robert Wheaton | Yes |
| Patti Chan | Did you sign the Bankruptcy Documents? |
| Robert Wheaton | I did |
| Patti Chan | Have you reviewed the Bankruptcy Documents for this case, for their accuracy? |
| Robert Wheaton | Yes |
| Patti Chan | Are the Bankruptcy Documents true and accurate to your knowledge? |
| Robert Wheaton | Yes |
| Patti Chan | And, Mr. Dowdy attended our initial Debtor interview, what is his official title? |
| Robert Wheaton | His official title is Group Controller of Star Buffet, Inc. |
| Patti Chan | Okay. Does he have a title with Summit Family Restaurants? |
| Robert Wheaton | He does not, to my knowledge. |
| Patti Chan | Does he have any ownership of the Debtor? |
| Robert Wheaton | Not to my knowledge |
| Patti Chan | Is he compensated for his position through the Debtor? |
| Robert Wheaton | Mr. Dowdy would have to answer that. I'm not familiar. |
| Patti Chan | Okay. Mr. Dowdy? |
| Ron Dowdy | I'm the Secretary Treasurer of Summit Family Restaurant, Inc. and I am not compensated by Summit Family Restaurant. |
| Patti Chan | What entity are you compensated by? |
| Ron Dowdy | Florida Buffet Holdings, Inc. |
| Patti Chen | Okay. Okay, thank you. And has your compensation changed since the Petition was filed? |
| Ron Dowdy | No |

| | |
|---|---|
| Patti Chen | Okay, thank you. I'm going to direct my questions back to Mr. Wheaton. Mr. Wheaton, is the mailing address for the Debtor 4340 East Indian Road, School Road, Suite 21-305, Phoenix, Arizona? |
| Robert Wheaton | Yes |
| Patti Chan | Okay, on the Petition the Debtors also operate as Casa Bonita. Is there any other different names? |
| Robert Wheaton | No. |
| Patti Chan | For the record, what is the nature of the Debtor's business? |
| Robert Wheaton | Restaurant and entertainment venue |
| Patti Chan | This restaurant entertainment venue is located in Denver, Colorado, is that correct? |
| Robert Wheaton | Yes |
| Patti Chan | On the Petition its listed as a small business, is that correct? |
| Robert Wheaton | Yes |
| Patti Chan | Okay, has it operating since, I think its 1974? |
| Robert Wheaton | Yes |
| Patti Chan | Does the Debtor have any other source of income aside from its principal business? |
| Robert Wheaton | No |
| Patti Chan | There were some, I guess like, inventory and supplies, maybe from the gift shop that's related to the business, are all of those, the items, are they located at the restaurant? |
| Robert Wheaton | Yes |
| Patti Chan | You listed a leasehold interest of 6715 West Colfax Avenue in Denver, Colorado, is that the restaurant location? |
| Robert Wheaton | Yes |
| Patti Chan | Okay, does it expire in 2029? Do you know? |
| Robert Wheaton | I'm not familiar with the expiration date |
| Patti Chan | Okay |

| | |
|---|---|
| Robert Wheaton | Today |
| Patti Chan | And you didn't list any value, for the leasehold, is there a reason why there was no value listed? |
| Robert Wheaton | Well, in the Schedule we provide an aggregate value of $153,907 which is furniture and fixtures but in terms of leasehold interest, we have no value on our books so we didn't provide one. |
| Patti Chan | Okay. Does the Debtor hold or have an interest in any other property? |
| Robert Wheaton | The Debtor owns one other piece of property in St. George, Utah. It is, we have a leasehold interest, a building interest in a property in St. George, Utah. |
| Patti Chan | Okay, I think I saw that on Schedule G, is that being subleased to Star Buffet, Inc.? |
| Robert Wheaton | Well the technical – the short answer is its actually being leased to a third party, that third party is Pathway Partners, LLC. Pathway Partners operates a Black Bear Diner. And, that is the short answer. |
| Patti Chan | Does the Debtor or its affiliates have any interest in this Black Bear Diner? |
| Robert Wheaton | None |
| Patti Chan | Okay. I did – so the $20,500 I saw in the Statements, what was that? Who is paying that and where – which – how is that transaction going around? Is that from the Black Bear Diner to the Debtor? |
| Robert Wheaton | Well, the longer answer is that in 1998 Star Buffet, Inc. acquired certain real estate from and business from CTE Restaurant, Inc. One of the assets that was involved in that transaction in 1998 was a lease. Summit had a valuable land lease in St. George, Utah. The Board authorized the purchase of a larger transaction which included that piece of property. Since 1998, with a few minor exceptions, that property has been leased to third parties because it's a, a significantly valuable lease with a rate that's well under market. It has resided in Summit Family Restaurants since 1998. But the essence of the transaction has always been to lease to a third party. The most recent tenant, as I just referenced, was a Black Bear Diner. A number of years ago, as Star Buffet sought growth capital, I invested in purchasing the spread between the amount of rent that was paid to the owner of the property and the amount of rent that was received for that property. So, I paid a lump sum in cash to, I believe, FBI Leasing. And in return for that, on a monthly basis, it's an amortized schedule over approximately 12 years, I receive a $2,500 payment that has historically come from FBI Leasing, Inc., but was reported in the last year, from time to time, as a payment from Summit. |
| Patti Chan | Okay, so Summit |

| | |
|---|---|
| Robert Wheaton | Is the transaction that has been discussed with Chris by Ron Dowdy. |
| Patti Chan | Okay.  So that amount actually, in the end, is coming to you, individually? |
| Robert Wheaton | Coming to me individually?  Yes |
| Patti Chan | Okay.  Currently does the Debtor have any employees? |
| Robert Wheaton | Yes |
| Patti Chan | How many? |
| Robert Wheaton | I believe as of today, 3 and I believe by the end of this week, somewhere between 30 and 40. |
| Patti Chan | Okay, and are these going to be full-time employees? |
| Robert Wheaton | I would say less than 10% of a – if I use a 40-employee number, less than 10% would be full-time.  The majority would be part-time. |
| Patti Chan | Okay.  Does the Debtor own any vehicles? |
| Robert Wheaton | No |
| Patti Chan | On Schedule B, No. 15, the Debtor lists 100% interest in HTB Restaurants, Inc. worth $0.  What is the nature of HTB Restaurants? |
| Robert Wheaton | In 1997, Star Buffet, Inc. filed an S1 detailing what was defined under the SEC as a formation transaction.  That formation transaction included the purchase of two operating businesses that existed in Summit.  One was HTB Restaurant, Inc., which was a chain of buffet restaurants and the second was two Casa Bonita Restaurants.  One in Denver and one in Tulsa.  So, at the – in 1996, Summit had more than one business, you asked that question a little bit earlier, and had Mexican restaurants and it had American, a chain of American buffets.  Those chain, that chain of American buffets has long ago been closed and discontinued but the subsidiary remains, the inactive subsidiary remains intact. |
| Patti Chan | Okay.  Does the Debtor have or hold any interest in any other businesses? |
| Robert Wheaton | No |
| Patti Chan | Could you just tell me the nature of the Stars Inc.  What is the nature of that business? |
| Robert Wheaton | It's essentially nothing more than an administrative service provider for the 5 operating subsidiaries of Star Buffet, Inc.  It, it receives cash, issues checks primarily of an administrative nature, and it's really that simple. |
| Patti Chan | Okay.  How does it get cash?  Is there some kind of flow, like a percentage that goes into Starts Inc.? |

| | |
|---|---|
| Robert Wheaton | Cash is remitted to Starts, and I might have to look to Ron to correct me if that isn't' the case, it – receipt of cash is based on where the disbursements are set. So it may receive cash from one of the five operating subsidiaries and then remit it for operating expenses of that subsidiary. It's a simple pass through administrative record keeping entity only. |
| Patti Chan | Okay. So, would it be correct to say that almost – at least for the subsidiaries, all the cash does flow through Starts Inc.? |
| Robert Wheaton | Not all cash flows through Starts but the majority of cash received in payments do, but I would defer to Ron if that is in error. |
| Patti Chan | Mr. Dowdy, is that, would that be correct? |
| Ron Dowdy | The majority of the cash for the payments that Starts does is correct. Starts would pay the, for example, the insurance policy for the whole corporation. It would pay the workers comp for the, primarily the whole corporation. It would pay those type of bills and that cash would go to Starts Inc. |
| Patti Chan | Okay. Thank you. Turning back to Mr. Wheaton, are there any customer lists that the Debtor collects? |
| Robert Wheaton | No. |
| Patti Chan | Okay. |
| Robert Wheaton | Well, I – that, I'd like to correct that, the Debtor would have a list of a number of schools that had historically done field trips at the restaurant. I'm not sure that I have ever seen that list, but I believe it is available. Or it has been maintained because school field trips are a large percentage of the luncheon business of Casa Bonita. So, I have to assume its maintained because there are marketing documents sent out from time to those institutions. |
| Patti Chan | Okay. I'm going to open it up to parties to ask questions and I'm going to first have, direct it to Mr. Simpson and Mr. Simpson, if you could state on the record your appearance. |
| Christopher Simpson | Thank you Ms. Chan. This is Christopher Simpson, the Subchapter 5 Trustee appointed in this case. And I'll just start by restating that Mr. Dowdy and counsel have made themselves available, so from my perspective, this is going to make today much easier than it usually is. There is quite a bit of more work to be done but they have been very cooperative, so, my list of questions will be somewhat shorter, but I do have a few. Mr. Wheaton, could you just generally describe for us the status of the reopening of the restaurant? |
| Robert Wheaton | Good morning Chris. The – we are working to separate and distinct paths. One is what I'll call cleanup of a business that's been closed for over a year due to, what I would deem government fiat, and that's physical cleanup of the property. It involves going through a very large inventory of food and a large inventory of gift shop merchandise to determine what needs to be exposed of, what can't |

| | |
|---|---|
| | be used. It involves cleanup of the outside of the property, with the tenant is responsible for maintaining and that process is ongoing right now. There is a second element of the reopening that has to do with making sure that all of the restaurant equipment, the stoves, the grills, the fryers, are – the dish, it's actually a flight dish machine, is working and functional. And that process started late last week and is expected to last probably a couple of more weeks. Depending on when we can – it's very difficult right now to get service people to actually show up for their appointed schedule. But we are working that side as well. Once the two of them are completed, then we should be able to move into the health inspection stage and the reopening stage. |
| Christopher Simpson | Very good and when, when that occurs will you be able to offer at a full capacity? |
| Robert Wheaton | The current regulations do not allow for full capacity. It's a restricted capacity so the answer would be that's up to the State of Colorado. But right now, it would be – every state is a little bit different Chris and but, I – it would be defined closely to 50% right now capacity. The restaurant has 1200 seats so you would initially saw that means at 50% capacity, 600 seats but then there are some other distancing requirements that come into play and I'm not convinced that I have an accurate number yet. But I would say we should be able to open between 300 and 500 per capacity. |
| Christopher Simpson | Of course, this location is rather unique in the restaurant industry, that's a large space for 300 to 500. Can you operate profitably at that level? |
| Robert Wheaton | No |
| Christopher Simpson | So, in the initial stages of operation do you anticipate operating at a loss? |
| Robert Wheaton | We do |
| Christopher Simpson | Any insight from the State yet regarding how long that may be necessary? |
| Robert Wheaton | No |
| Christopher Simpson | Okay. |
| Robert Wheaton | But before we provide final proformas in this structuring, we'll have the best answer that we possibly can have on that. If I can add Chris, the nice thing about Casa Bonita is that Star Buffet has owned Summit for, it will be 25 years in September. That's about 60% of Casa Bonita's full wonderful tenure that it had. We have extraordinarily detailed financial statements going back a number of years and the nice thing about Casa Bonita is that we can almost tell to the day, exactly what the sales will be on a go forward basis because historically the performance has been so well managed and has been so consistent. So really the only question will be capacity and when we are going to be able to get to 70%, when we'll get to 80%. But once we, we know that, we're going to know |

| | |
|---|---|
| | exactly how much the business is going to generate in sales and cash flow. It's a remarkably consistent business. |
| Christopher Simpson | Thank you for that explanation and I will lead right into my next question which, feel free to refer to Mr. Dowdy on this one as well. But, I've seen some information regarding the net profit of the company in past or at this location in past years, do you understand what I mean when I say net profit? |
| Robert Wheaton | I do |
| Christopher Simpson | Okay. Can you give ballpark, either you or Mr. Dowdy, of the net profit for this location for 2019? |
| Robert Wheaton | I'm presumably looking at the same Schedule that you are looking at and it shows net profit of $1,152,738 if you add back depreciation it will be a little bit more than that. We tend to look at a pretax cash flow number versus an 18 number but both of those were provided to you and so that would be a reasonable proxy for that year. |
| Christopher Simpson | Thank you. Fast forwarding to when you are able to reach full capacity, there appears to be some changes happening in the economy that I don't know if you have the ability to model but, just as your basic anticipation, let's say for the first full year of operating at full capacity, do you anticipate that you would be able to reach these same net profit numbers? |
| Robert Wheaton | The range over the last five years, as you know from the Schedules that you were provided, is between – cash flow or net profit between $1.1 and $1.5 million. We consistently operated in that and I would be very comfortable and would expect that the proforma that you see will show a pretax, after tax cash flow number of $1.2 to $1.5. For the first full year of operation at 100% capacity. |
| Christopher Simpson | Thank you. And so, from that answer, it sounds like at least at this present time, increases in food costs, increases in labor are things that you believe you'll be able to manage and will not materially decrease your net profit in the coming years? |
| Robert Wheaton | Well Chris you are obviously up to speed on the challenges that restaurant industry has right now. They are, there – the two are more labor shortages than labor costs increases and right now food costs are a challenge for the restaurant industry. It had been fairly stable for a couple of years. But if you were to take a menu from Casa Bonita five years ago and you would look at it today, Casa Bonita has been able to consistently increase its menu charges along with a line of cost increases that we have experienced. And again, we – it's a bit unfortunate because you know, it's just a sign of inflation but, but, we have historically been able to increase our menu prices and I expect that we'll be able to do – I actually sent to the printer, well, that's an exaggeration, I provided it to our acting GM who is hopefully bringing the menu to the printer, last weekend, and it has eight, on average, an 8% increase from the menu that we had when |

| | |
|---|---|
| | we closed in March of 2020. The numbers have already been done. I don't know if the menus have been printed yet. |
| Christopher Simpson | Thank you. Thank you for that explanation. Sounds like you are in a good position to manage through the challenges ahead as far as costs. |
| Robert Wheaton | I'm sorry, historically Casa Bonita has been able to – it's very analogous to Disney – it's been able to move its costs up as the costs have increased. I still see the wonderful crowds that we have enjoyed for 25 years. |
| Christopher Simpson | Very good. As far as the business plan, I don't want to put words in your mouth, but for the sake of brevity, it sounds like the business plan is to get this location up, running, to come to some sort of agreement with the landlord and then continue operations as you have done historically. Is that a fair assessment? |
| Robert Wheaton | Yes |
| Christopher Simpson | Are there any other opportunities or alternatives that you are currently investigating? |
| Robert Wheaton | Would you be more specific in your question? I'm not sure how |
| Christopher Simpson | Has there been any – have you seen any indication in the market of anyone interested in purchasing this location from the Debtor? |
| Robert Wheaton | We've had multiple inquiries as to whether we would be interested in selling the business. As we have |
| Christopher Simpson | And what are your |
| Robert Wheaton | I'm sorry, as we have had for years. This |
| Christopher Simpson | And what are your current thoughts? |
| Robert Wheaton | The business is marketable but it has – it's been a consistently profitable investment for Star Buffet, Inc. for many years and we are going to remain, we are going to remain open but I think the investment will be far more valuable if the restaurant is open than selling it shuttered. |
| Christopher Simpson | Understood. I will switch to Mr. Dowdy, only because I think he might be in a better position to answer this next line of questioning. But if I'm wrong about that Mr. Wheaton, please jump in. Mr. Dowdy, during the course of this bankruptcy, is there any anticipation of any need to distribute funds to any affiliates? And that would include for overhead items. |
| Ron Dowdy | Ahh, no. |
| Christopher Simpson | Very good. Mr. Wheaton indicated that this location may need to operate at a loss for some period of time. Do you have an understanding of how that would be financed? |

| Ron Dowdy | The – in the short term it would be financed through cash on hand that Summit has. |
|---|---|
| Christopher Simpson | And not to put too fine a point on it but just want to make sure we have clarity on the answer as far as any distributions to affiliates – this would include no distributions for admin costs, reimbursement of insurance or reimbursement of workman's comp as you currently anticipate it. Would that be correct? |
| Ron Dowdy | That's what we currently anticipate. |
| Christopher Simpson | Okay, very good, thank you. As far as compensation for both you and Mr. Wheaton, in our early discussions, I believe I had anticipated, or you had anticipated that there would be some compensation from the Debtor entity, it now sounds like the current consideration is that there will be no compensation from the Debtor entity or, let's take it one at a time. Do you anticipate any compensation from this Debtor for Mr. Wheaton during the terms of this bankruptcy? |
| Ron Dowdy | Well, I thought your previous question was do I anticipate any of the – any overheads being, outside overhead being paid by the Debtor. And I said no, but to – but I expect that there will be direct – there is the possibility there is to be direct compensation from the Debtor to Mr. Wheaton and myself as we work full-time for Summit. |
| Christopher Simpson | Very good. Let's take that one party at a time. It was my understanding from Mr. – and Mr. Wheaton please feel free to jump in here – it was my understating from what you said before is historically you had received no compensation from this Debtor. Is that still correct? |
| Ron Dowdy | That's still correct yet |
| Christopher Simpson | Okay. So, there would be – to the extent that you're planning to compensate Mr. Wheaton, this would be a change? Than the historically practice |
| Ron Dowdy | Yes it is. Yeah, because historically Mr. Wheaton doesn't go and spend two consecutive months in Denver. So, it's, it is an historical change but it's also unprecedented circumstances. |
| Christopher Simpson | And do you anticipate that that arrangement would – you would seek approval from the Bankruptcy Court? |
| Ron Dowdy | Yeah |
| Christopher Simpson | Very good. Same question for you Mr. Dowdy, to the extent that your gearing away from past practices for direct compensation, do you anticipate getting Bankruptcy Court approval for that compensation? |
| Ron Dowdy | Yeah |

| | |
|---|---|
| Christopher Simpson | Thank you. And with that those are all the questions I have at this time Ms. Chan and I'd like to thank Mr. Dowdy, Ms. ▮▮▮▮ and Mr. Wheaton again for their availability they have given me these past several weeks. |
| Patti Chan | Thank you. Now I'm going to let Mr. Dawes speak and if you could please state your name and who you represent for the record. |
| Chris Dawes | Thank you. Yes, Chris Dawes, I represent BSV Lamont JCRS LLC, the Landlord at the Casa Bonita location. So gentlemen, I have a few questions I wanted to follow-up on. Mr. Dowdy, the compensation package that you and Mr. Wheaton envisioned on a go forward, could you describe what that compensation package is and what the economics would be? |
| Ron Dowdy | Ahh, I had to get it off of mute. I would expect that on a go forward basis we are talking probably a max of 2 months compensation for Mr. Wheaton and 2 to 4 weeks perhaps for myself. |
| Chris Dawes | And what would the economics look like? |
| Ron Dowdy | The economics of that would be, for 2 months, Mr. Wheaton salary would be approximately $40,000 and for 1 month, mine would probably be $7,000. |
| Chris Dawes | So Mr. Wheaton's would be $20,000 per month? Is that – do I understand that right? |
| Ron Dowdy | Approximately, yes |
| Chris Dawes | Okay. And do I understand that if I understood some of testimony earlier, Mr. Wheaton has spent the last 2 months in Denver on this project? |
| Ron Dowdy | He has not been in – he has been working on this project, we anticipate – I think I said, the next 2 months. |
| Chris Dawes | Got it. Got it. So, I heard that Summit family, the Debtor operates from an office in Arizona, is that correct? |
| Ron Dowdy | It has that – it has an address in Arizona |
| Chris Dawes | Okay, and what is located at that address in Arizona? |
| Ron Dowdy | Its, it's just a PO Box |
| Chris Dawes | Okay, so there is no physical office? |
| Ron Dowdy | No |
| Chris Dawes | Okay |
| Robert Wheaton | Well, that's not – if I may interrupt, I know you |

| | |
|---|---|
| Patti Chan | Yeah, that's |
| Robert Wheaton | I can't do that? |
| Patti Chan | Is that Mr. Wheaton? |
| Robert Wheaton | It is Mr. Wheaton. |
| Patti Chan | Okay, Mr. Wheaton, did you want to answer that question posed by Mr. Dawes? |
| Robert Wheaton | I did. I gave the address of 4716 East Valley Vista Lane as the address where I operate and I have consistently operated at that address to administer Casa Bonita's affairs and other affairs since the corporate office was shuttered, which was in Scottsdale, Arizona in March of last year. So, I am physically here and I'm directing the business from 4716 East Valley Vista Lane. |
| Chris Dawes | And what physically is at that location Sir? |
| Robert Wheaton | It is a home office |
| Chris Dawes | Is that where you personally reside? |
| Robert Wheaton | Yes |
| Chris Dawes | And when did the principal office address for Summit Family Restaurants change from Plant City, Florida? |
| Robert Wheaton | Ron Dowdy can correct me if I'm wrong, but I would say it was in the last 30 days as the business in Florida was shuddered and the assets were sold. |
| Chris Dawes | Alright, so there has been a change in the printable address from Florida to Arizona in the last thirty days, is that right? |
| Robert Wheaton | Yes |
| Chris Dawes | One of the things I noticed in the Schedules is that the Debtor has itemized the debt owed to the Landlord in the amount of $354,898, when is that through? |
| Robert Wheaton | Ron, do you want to |
| Ron Dowdy | I believe that is through April 6th |
| Chris Dawes | Okay. Now that does not account for any of the liquidated damages owed under the Lease, correct? |
| Sierra Minter | If I could chime in, this is Sierra Minter, Debtor's counsel, we are disputing the liquidated damages and I think that's a legal question that will be answered in later proceedings. |

| | |
|---|---|
| Chris Dawes | Well, I'm just trying to understand the number. So, the number does not include any liquidated damages, correct? |
| Robert Wheaton | The number doesn't include liquidated damages. |
| Chris Dawes | Alright, now that balance is indicated as disputed, what is the basis of the disputed characterization? |
| Patti Chan | I'm assuming that Mr. Wheaton is directed to answer, unless he needs Mr. Dowdy's help. |
| Robert Wheaton | I will defer to Mr. Dowdy |
| Ron Dowdy | The dispute is a legal matter that will be answered by our terms. |
| Chris Dawes | Okay. Well, what I'm trying to understand is why the Debtor checked disputed on the balance owed to the Landlord. What is the factual basis for the dispute? |
| Ron Dowdy | To the extent that that's going to call for attorney-client privilege communication, I would just recommend you speak with your counsel. |
| Chris Dawes | Yeah, and I don't want to know about attorney-client communications, what I'm looking to understand is what is the factual basis of the dispute between the Tenant and the Landlord on the balance owed under the Lease. And if the Debtor doesn't know, I will accept that. |
| Patti Chan | Again, |
| Ron Dowdy | Yeah, I'm going to still say the same answer that I had before |
| Chris Dawes | And what was that Sir? |
| Ron Dowdy | That, that we – that will – out attorneys will, will answer that |
| Chris Dawes | Okay, are you saying you don't know? |
| Ron Dowdy | No, I'm not saying that. I'm just |
| Chris Dawes | Okay. Well I get it but I'm, I'm here to ask the Debtor questions and I'm trying to understand the Debtors – why the Debtor has indicated that they dispute a balance or dispute a claim. Can you tell me that? |
| Robert Wheaton | I'm not in a position to tell you that |
| Chris Dawes | Okay |
| Robert Wheaton | And that this is Mr. Wheaton. |

| | |
|---|---|
| Chris Dawes | Alright. Now, Mr. Wheaton, is it correct that the Tenant has not paid rent in nearly 14 months? |
| Robert Wheaton | I don't believe that that is correct. I believe that rent was paid through April of 2020 and Ron, correct me if I'm wrong, was May paid as well? |
| Ron Dowdy | Ahh, yeah, the sub theory is for April 2021 and May of 2021 was paid. |
| Chris Dawes | Alright, I think we're – there is a little bit of miscommunication here, because Mr. Wheaton was talking about paying rent through April 2020. Is that correct? |
| Ron Dowdy | Well, we actually paid rent through May 31st of 2020. |
| Chris Dawes | Okay. And then, Mr. Dowdy, you started to say that sub rent in May of 2021 rent has been paid? Did I understand that right? |
| Ron Dowdy | Yeah |
| Chris Dawes | Okay. When was that paid? |
| Ron Dowdy | The check was issued last week and it was delivered to the Landlord on Saturday, what, 3 days ago. |
| Chris Dawes | And do you recollect the amount of that check? |
| Ron Dowdy | It was $57,000 and a few hundred dollars, I don't remember the exact |
| Chris Dawes | Okay. And that was delivered – how was that delivered? Just so my folks can track that down |
| Ron Dowdy | It was delivered by Express Mail through the United States Post Office |
| Chris Dawes | Okay. And, I only ask because as of yesterday they, I understood they had not received it. So, we'll check on that. We'll check on that. So, a couple of other things regarding the space. I understand that some of the sprinkler lines had frozen and there were some damage back in mid-February. Are you familiar with that? |
| Robert Wheaton | I am. And this is Robert Wheaton answering that question. |
| Chris Dawes | Okay. And Mr. Wheaton, there were certain emergency repairs undertaken for which the Landlord invoiced the Tenant, correct? |
| Robert Wheaton | That is correct. |
| Chris Dawes | Okay. And none of those have been paid, am I right? |
| Robert Wheaton | They have not been paid nor do I necessarily agree that, with the Tenant, ahh the Landlord's position with respect to those charges. |

| Chris Dawes | You've seen correspondence from the Landlord indicating some additional repairs will be necessary. Are you familiar with that correspondence? |
|---|---|
| Robert Wheaton | You'll have to be more specific. I am familiar with all correspondence that the Landlord has sent to me but I'm not sure what you are referring to now. |
| Chris Dawes | There is a letter that I believe was sent out in early March from John Deacon regarding the repairs and had forwarded along some invoices and had noted that there would be some additional repairs and that the Landlord expected Tenant would undertake. Does that help you? |
| Robert Wheaton | That does and I did receive that and I actually looked at the sprinkler configuration on Saturday in the gift shop area and I am – I have indicated that I was not in agreement with Landlords position as to the who was responsible for the expense and I have on my do to list to meet with, try to meet with the Landlord this week to determine what additional requirements they expect. |
| Chris Dawes | Okay. Had any further repairs been made to any of the plumbing or sprinkler lines this calendar year? |
| Robert Wheaton | The answer that my understanding is that the plumber is there today doing work. My understanding is that we had requested plumbers to do work on a couple of other occasions and I know at least one time, the plumbers did not show. I cannot tell you one way or another whether they did show for some other assignments but, we have a to do list and we are going to work through it this week. |
| Chris Dawes | And then, in terms of the – who is the Debtor brining on board in terms of plumbing, subcontractors? Do you know? |
| Robert Wheaton | Bell is the vendor's name. Bell Plumbing and Heating |
| Chris Dawes | Oaky |
| Robert Wheaton | Is that correct Ron? Is it Bell? |
| Ron Dowdy | I think its Bell Heating and Plumbing |
| Chris Dawes | Okay. There, let me switch gears a little bit and ask you about – there is a grease trap bill of about $21,000. Are you familiar with that grease trap bill? |
| Robert Wheaton | I am not. |
| Chris Dawes | Do you know if the Debtor has made any arrangements to bring the grease trap bill current? |
| Robert Wheaton | I have no idea of what you are talking about. |
| Chris Dawes | Okay. Alright. Have you had any interaction with City Lakewood Officials regarding the grease trap situation? |

| | |
|---|---|
| Robert Wheaton | No |
| Chris Dawes | Alright. And to your – that hasn't been brought to your attention by anybody at any time? |
| Robert Wheaton | Repeat the question |
| Chris Dawes | Yeah, has anyone raised with you, say in the last six months, any issue with respect to the grease trap and the bill that has accumulated with respect to service on that? |
| Robert Wheaton | Absolutely not, in the last six months. |
| Chris Dawes | How about |
| Robert Wheaton | or in the last year. Or in the last year. |
| Chris Dawes | Okay. Alright. What is – is that something that the Debtor paid directly for grease trap service? |
| Robert Wheaton | Yes |
| Chris Dawes | Alright. Let me switch gears again and ask you a little bit about the intellectual property that has been described in the Debtor's Schedules. As I understand it, there is a – its described as an oral agreement for intellectual property. Are you familiar with that? |
| Robert Wheaton | Yes |
| Chris Dawes | Okay. And what, what exactly is the intellectual property? |
| Robert Wheaton | Registered trademarks |
| Chris Dawes | Okay. And could you describe those? |
| Robert Wheaton | There are a number of trademarks but the specific one that I can describe is a mark, I don't have the numbers of the Federal trademarks. It's a mark very specifically multicolored, Casa Bonita mark. |
| Chris Dawes | And that, if I understand it, that mark is owned by Star Buffet, Inc.? |
| Robert Wheaton | There will be a correction in – an amendment to a document filed. The 202 document that will show that the actual owner is Casa Bonita Denver, Inc., which is a wholly owned subsidiary of Star Buffet, Inc. and it's the sole asset of that entity. |
| Chris Dawes | Alright. And that correction – and for how long has that been the case? |
| Robert Wheaton | I believe since 2011 |

| | |
|---|---|
| Chris Dawes | And who, who is filing this correction? |
| Robert Wheaton | Counsel for the Debtor. |
| Chris Dawes | Okay. Is that your bankruptcy counsel? |
| Robert Wheaton | That is the bankruptcy counsel. |
| Chris Dawes | Okay. Now, so the verbal intellectual property agreement is – who negotiated that? |
| Robert Wheaton | I did |
| Chris Dawes | Okay. And you negotiated that for who? |
| Robert Wheaton | I'm not sure I understand your question |
| Chris Dawes | Did you negotiate that for the Debtor? |
| Robert Wheaton | I negotiated that for the Shareholder. |
| Chris Dawes | Okay. Now you are confusing me. Let me, let me say, who are the parties to the verbal intellectual property agreement? |
| Robert Wheaton | It would be three parties. It would be Star Buffet, Inc. It would be Casa Bonita Denver, Inc. And it would be Summit Family Restaurants, Inc. |
| Chris Dawes | Okay. And Summit Family Restaurant, the Debtor, would be the Licensee? Is that right? |
| Robert Wheaton | It would be the Licensee, that's correct |
| Chris Dawes | And then the Licensor is who? |
| Robert Wheaton | The Licensor would be Casa Bonita Denver, Inc. and the owner of the License would be Star Buffet Inc. |
| Chris Dawes | Alright. So, is there an agreement between Star Buffet, Inc. and Casa Bonita Denver? |
| Robert Wheaton | No |
| Chris Dawes | Okay. So, how then does Casa Bonita Denver license the mark to the Debtor? |
| Robert Wheaton | Well, that element of the 202 was accurate, it's a verbal agreement between Casa Bonita Denver and Summit. Which is a general standard practice of Star Buffet, Inc. Star Buffet, Inc. is the holder of intellectual property of any of the subsidiaries and they license the use of that to operating subsidiaries. On an informal, verbal arrangement. |

| | |
|---|---|
| Chris Dawes | When was the verbal agreement reached? |
| Robert Wheaton | I think I indicated that it was effective and, so I would assume agreed to in 2011. |
| Chris Dawes | Okay. And are there any writings reflecting that? Letter of Intent? Term Sheet? Email confirmations? Anything? |
| Robert Wheaton | I will have to confirm that; one way or another. |
| Chris Dawes | Okay. So, for this (interrupted) |
| Robert Wheaton | I'm sorry. That was my (inaudible) |
| Chris Dawes | Yeah (talking over each other) |
| Robert Wheaton | My belief is, my belief is that that there will be some written kind of converse, confirmation of a directive from me to our IP counsel to effect that transaction. Right. |
| Chris Dawes | So, in terms of negotiating the oral agreement between the owner, licensor and licensee, who are the representatives who, who made that happen? |
| Robert Wheaton | It would be me. |
| Chris Dawes | Just you? |
| Robert Wheaton | Yes. |
| Chris Dawes | Okay. And what are the terms of the what you are describing today as a verbal license agreement between Casa Bonita Denver and the Debtor? What are the terms of that agreement? |
| Robert Wheaton | It would be a, good until terminated right to use the Casa Bonita name by Summit Family Restaurants. |
| Chris Dawes | So is there, does Debtor pay for utilization of this intellectual property? |
| Robert Wheaton | It does not and none of our IP _____ incur those costs and there is very specific accounting reason for that and that is that Star Buffet, Inc. owns subsidiaries that have significant intellectual property and that other subsidiaries that don't and so that we can compare financial performance of one subsidiary to another, on an equal or apples to apples basis, we do not charge for the use of intellectual property or we're not able to compare the performance of one where there are, there might be license payments for use and one where there isn't so we hold the intellectual property and the Star Buffet level and the subsidiary levels do not incur any costs for using the intellectual property owned by Star. |
| Chris Dawes | Okay. What are the (interrupted) |
| Robert Wheaton | There are others, other subsidiaries such as Casa Bonita Denver Inc. |

| | |
|---|---|
| Chris Dawes | And what is the term or duration of the verbal intellectual property agreement that Debtor is party to? |
| Robert Wheaton | I, I thought I indicated that it was good till cancelled. |
| Chris Dawes | And what governs the right of cancellation? |
| Robert Wheaton | It is significant on my part as to whether to cancel it or not. |
| Chris Dawes | Okay. It's entirely your discretion? |
| Robert Wheaton | I am the sole director and that is of, of Summit and I am one of a number of directors of Star Buffet Inc. and then may or may not be discussion at the director level of Star Buffet Inc. but it wouldn't be at the Summit. They need discussion at the Summit level other than mine. |
| Chris Dawes | In their right of termination, as you described it, is in favor of Casa Bonita Denver, is that right? |
| Robert Wheaton | That would be correct. |
| Chris Dawes | All right. Is there, there's not agreement between Star Buffet and Casa Bonita Denver that's in writing, correct? |
| Robert Wheaton | That's correct. |
| Chris Dawes | And there's no consideration paid by Casa Bonita Denver to Star Buffet? |
| Robert Wheaton | I apologize, to (inaudible) the answer is there is no consideration exchanged between those two parties. |
| Chris Dawes | All right. And, like with the Debtor, is it your position, you personally can terminate that arrangement between Star Buffet and Casa Bonita at any time? |
| Robert Wheaton | Based on business considerations at that point in time, I would make that decisions. |
| Chris Dawes | Okay. Are there other than Casa Bonita Denver and the Debtor, are there any other licensees using this intellectual property? |
| Robert Wheaton | None. |
| Chris Dawes | All right. The schedules also indicate that there is cash on hand of about $984,000 is that right? |
| Robert Wheaton | That is correct |
| Chris Dawes | All right. And I understand from Mr. Dowdy's testimony earlier that's the money that the Debtor intends to use to operate in the short term? |

| | | |
|---|---|---|
| 1 | Robert Wheaton | Yes. |
| 2 | Chris Dawes | Okay. Is that, are those monies PPP loan proceeds? |
| 3 | Robert Wheaton | Yes. |
| 4 | Chris Dawes | Okay. Entirely? |
| 5 | Robert Wheaton | Yes. Ahh (interrupted) |
| 6 | Patti Chan | Is that Mr. Dowdy? |
| 7 | Ron Dowdy | Yes. Yes, other than maybe pennies. |
| 8 | Chris Dawes | Okay. And are there limitations as to how the Debtor can expend those PPP monies? |
| 9 | | |
| 10 | Robert Wheaton | Yes. |
| 11 | Chris Dawes | Okay. And are there limits as to how much can be spent on something like for example, rent? |
| 12 | | |
| 13 | Robert Wheaton | Yes. |
| 14 | Chris Dawes | And what do you understand those limits to be? |
| 15 | Robert Wheaton | Well, there is a specific formula, I don't have the formula in front of me, I would |
| 16 | | defer to Ron who may have that handy, but I don't have that PPP document in front of me. I would like to defer Ron if he has it. |
| 17 | | |
| 18 | Chris Dawes | It would be fine by me. |
| 19 | Ron Dowdy | Uh, I don't have the document in front me either. But, but the basics of the PPP that, uh, you spend 60% on payroll and then that allows you to spend on other items…. |
| 20 | | |
| 21 | Chris Dawes | The other 40%? |
| 22 | Ron Dowdy | The basics of PPP |
| 23 | Chris Dawes | Is it Debtor's intent to assume the lease of my client? |
| 24 | Robert Wheaton | Yes |
| 25 | Chris Dawes | Okay. And how, what is Debtor's plan or proposal to cure the arrearages on the lease? |
| 26 | | |
| 27 | Patti Chan | We haven't filed a, this is the Debtor's attorney, I don't think those are a fairly appropriate questions for a 341. We're just figuring things out and we haven't filed a Plan yet or even really got passed the administrative hurdles. |
| 28 | | |

| | |
|---|---|
| Chris Dawes | Okay. But you do understand that the only so much as the cash on hand can be utilized to cure the lease, right? |
| Robert Wheaton | I do, I understand the rules, but, but that is the rules are fairly clear. I just don't have them in front of me. |
| Chris Dawes | Okay. All right. The, there's been some mention of employees, as I understand it, there's currently three employees that the Debtor has, is that right? |
| Robert Wheaton | Yes. |
| Chris Dawes | And who are those employees? |
| Robert Wheaton | Dawn Mastiff is the acting general manager and I would defer to Ron and the payroll detail if he has it in front of him for the other two. |
| Ron Dowdy | I do not have that detail. |
| Chris Dawes | Do you know the names of your other, you have three employees, one which is Dawn Mastiff, do you know the names of your other two employees? |
| Robert Wheaton | I do not. |
| Chris Dawes | Do you know their titles? |
| Robert Wheaton | I do not. |
| Chris Dawes | Do you know their hire dates? |
| Robert Wheaton | I do not. |
| Chris Dawes | Do you know their comp? |
| Robert Wheaton | I do not. |
| Chris Dawes | Do you know who hired them? |
| Robert Wheaton | My understanding is that it would have been Dawn who hired them. |
| Chris Dawes | Okay. I would ____ Mr. Dowdy's statement on that |
| Ron Dowdy | Yes, that's my understanding. |
| Chris Dawes | When did you hire them sir? |
| Ron Dowdy | I didn't hire them, Dawn. |
| Robert Wheaton | Dawn Mastiff hired them. |
| Chris Dawes | I see. So, when did you hire Dawn? |

| | |
|---|---|
| Ron Dowdy | Her hire date was April 27th |
| Chris Dawes | So two weeks ago? |
| Ron Dowdy | Yes. |
| Chris Dawes | Okay. And is she on the payroll now? |
| Ron Dowdy | Yeah. |
| Chris Dawes | Okay. And had she been with the Debtor before it shut down a year or so ago? |
| Ron Dowdy | Yes. |
| Chris Dawes | She's a return employee then? |
| Ron Dowdy | Correct, yes. |
| Chris Dawes | As I understand it, there were another 30 or 40 employees that you're lining up on a part time basis, is that right? |
| Robert Wheaton | I believe my statement was that I expected, my response to Patti was that, that 90% would be part time, I would guess, I'll know more later this week we'll be full time. |
| Chris Dawes | Okay. So the 30 to 40 people that are going to come on are they, what are the general, what are they going to be doing? |
| Robert Wheaton | They will initially be doing different maintenance related activities, umm, I expect that at least two will be maintaining the gift shop, inventory and I believe that a couple will be taking employment applications. |
| Chris Dawes | Okay. So these, so these are not operational folks, these are people that kind of do clean up and address getting the space up and running? Is that fair? |
| Robert Wheaton | No, that's not correct. These are, for the most part, former employees who have expressed an interest in coming back, some of them worked in the kitchen, some of them worked as servers, some of them worked in a management capacity, some of them worked in an entertainment capacity, some of them worked in the arcade, and they have agreed to come back and work, until get the restaurant open and I expect as I should that a number of them the paperwork will be done this week in terms of hiring them and scheduling them to work. |
| Chris Dawes | Okay. Is that something that, is Dawn doing all that? |
| Robert Wheaton | Uhhh, later this week I will be helping Dawn so some of that. |
| Chris Dawes | Okay. |

| | |
|---|---|
| Robert Wheaton | And other staff, there will be other staff that's been hired will help Dawn do that. |
| Chris Dawes | Got it. And are you, Mr. Wheaton, spending time in Colorado in the year 2021 in connection with these efforts? |
| Robert Wheaton | I haven't spent any meaningful time at all, as a matter of fact, I made my first trip to Denver last week, I spent, umm, I stand corrected I was there for one day two weeks ago and I was there for two days last week. |
| Chris Dawes | So who's quarterbacking the efforts to reopen the restaurant? |
| Robert Wheaton | I am. |
| Chris Dawes | Okay. All right. |
| Robert Wheaton | I'm going to have an open. |
| Chris Dawes | When is that? |
| Robert Wheaton | When the, umm the restaurant is cleaned and we get approval from the Health Department to reopen. |
| Chris Dawes | And do you have an estimated date for that? |
| Robert Wheaton | I do not. |
| Chris Dawes | Any, any estimate at all? |
| Robert Wheaton | I don't know what the Health Department is ehh going to require us to do. |
| Chris Dawes | Are you interfacing with the Health Department on that front? |
| Robert Wheaton | I have not to date interfaced with the Health Department. But I will be soon. |
| Chris Dawes | All right. Is the (interrupted) |
| Robert Wheaton | The Health Department, if I could just, we provided in 2020 and 2021 three proposals to reopen under certain circumstances that was done by the former general manager, Mike Mason, the Health Department rejected at least two of those three plans to reopen so I simply do not know what active stage the Health Department will require. I'm hopeful that it will, that they will be cooperative and that the requirements will be minimal. But I have no way of knowing until I meet with the Health Department and Dawn meets with the Health Department. And before I meet with the Health Department, I want everything to be right. So… |
| Chris Dawes | If I understand your testimony correct, then, no one from the Debtor has communicated with anyone from the Health Department in the last twelve months, is that fair? |

| | |
|---|---|
| Robert Wheaton | No, that is not what I said. I said, it's been twice in 2020 and once in 2000, or at least I thought I did, once in 2021, Mike Mason who is the former VP of operations for Casa Bonita met with the Health Department, provided a plan to reopen with the Health Department and that plan was, on at least two of the three occasions, rejected. |
| Chris Dawes | Okay. And what about the third? |
| Robert Wheaton | I don't know the outcome of the third. |
| Chris Dawes | Okay. All right. And so, when was that communication from Mike in 2021? Do you know when? |
| Robert Wheaton | I don't know the specific date, but I believe the last communication, I, I, I'm guessing I believe the last communication was March, early March or late February of 2021. |
| Chris Dawes | Okay. So, the Debtor would have some written proposals or plans they would have submitted to the Health Department? |
| Robert Wheaton | I'm sure, yes |
| Chris Dawes | Okay. Who would have those records? |
| Robert Wheaton | I will follow up with Mike Mason on my next trip to Denver. |
| Chris Dawes | Is Mike Mason in the employee of the Debtor currently? |
| Robert Wheaton | No. |
| Chris Dawes | All right. And the only employees now are Dawn and the two employees you were not able to identify, correct? |
| Robert Wheaton | That's correct. |
| Chris Dawes | All right. The, I know your schedules for the Debtor identifies Star Surplus Lines as the insurer for the property, is that right? |
| Robert Wheaton | If you'll allow me to go to that, can you refer to the page so I can get the answer? |
| Chris Dawes | Yes. If you take a look at page 5, part 11. |
| Robert Wheaton | I see page 5 but I, just allow me, I have, it's my page 7 but I'm there now. |
| Chris Dawes | Okay. Yeah, if you look on the right-hand corner, you'll see the reference to page 5 I think. |
| Robert Wheaton | Well, I'm looking at the, some bates, what I think are bate stamped docs at the bottom, but I see the page 5 reference that you are referring to |

| | |
|---|---|
| Chris Dawes | Okay, okay. So, Star Surplus is the property insurer? |
| Robert Wheaton | That's correct. |
| Chris Dawes | And the property insurance is paid in full through when? |
| Robert Wheaton | Ummm, December of this year. |
| Chris Dawes | Through December 2021? |
| Robert Wheaton | That's correct. |
| Chris Dawes | Okay. |
| Robert Wheaton | That same schedule shows Pinnacle is the workers' comp carrier, and then a primary and excess PO carrier (inaudible) insurer of Princeton. |
| Chris Dawes | Okay. Are all of the Debtor's employees in the State of Colorado? |
| Robert Wheaton | To the extent that I will be an employee, I am not a resident of the State of Colorado. |
| Chris Dawes | All right. You are not an employee of the Debtor, correct? |
| Robert Wheaton | No, I have never been an employee of the Debtor, I have been, my initial statement is I am the Debtor's CEO and sole director. |
| Chris Dawes | Are all of the Debtor's employees residents of the State of Colorado? |
| Robert Wheaton | To my knowledge. |
| Chris Dawes | Does the Debtor have any Creditors in the State of Arizona? |
| Robert Wheaton | The listing would suggest that the majority of the Creditors are Colorado Creditors. |
| Chris Dawes | Okay. And I agree and I went through it, I didn't see any Arizona Creditors but that's why I was asking the question, does the Debtor have any Creditors in Arizona? |
| Robert Wheaton | There are none listed on the, in the Schedule. |
| Chris Dawes | Okay. And the Schedules are true (beep interruption) to your personal knowledge, correct? |
| Robert Wheaton | They are true and complete and accurate to my knowledge. |
| Chris Dawes | All right. So, we can state that the Debtor does not have any creditors in Arizona, correct? |

| | |
|---|---|
| Robert Wheaton | Yes. |
| Chris Dawes | All right, thanks those are the questions I have for the moment, I appreciate your time this morning. |
| Patti Chan | Okay |
| Chris Dawes | You're welcome. |
| Patti Chan | And, I'm going to turn to Mr. Hawkins and again state your name and appearance for the record. |
| Bill R. Hawkins | Bill R. Hawkins I am counsel for save Casa Bonita LLC. I just have a couple of questions to follow up from the other questions that were asked. Do you have the breakeven customer occupancy level percentage number? Or you would actually be on a breaking positive basis? |
| Robert Wheaton | Umm, I, I would tell you that historically, umm, (sigh). You know what, no. You indicated that right now the state is allowing 50% occupancy and that's going to be a negative status, is that right? I don't, I believe the way I understand Colorado and every state is slightly different is that there are state guidelines and then there are local and in our case Jefferson County's Health Department guidelines. And at the end of the day it's going to be Jefferson County that dictates what they expect, the rules that they except us to follow. And since I have not talked to Jefferson County, I don't know what Jefferson County's expectations are. |
| Bill R. Hawkins | Okay. I was just trying to get a flavor for how much occupancy has to go up before you believe you're going to be operationally positive. Do you know what that level is? |
| Robert Wheaton | Well the reason I'm hesitant is that Casa Bonita is more than a restaurant. As I pointed out earlier it has a lot of different elements to it. It has an entertainment element, it has an arcade element, it has a retail element and then it has a food element. And I know historically what those breakdowns have been. If Casa Bonita is allowed to operate at only 50% capacity, then to keep the losses to a minimum it may involve a different mix initially of those what I'll call 5 different revenue components. And so, I'm hesitant to give any numbers until I have a better handle on what the capacity is going to be. And when that is set, that will dictate where, what my targets are for those various revenue components and then I'll be able to tell what the breakeven is going to be. So when we put our pro formas together to provide the creditors, we have the rules we'll have the revenue mix and I'll be able to tell within a very small error range what we're, what losses we would sustain until we reach full capacity seating. But I don't know that now. |
| Bill R. Hawkins | Are you aware that my client is interested in purchasing the restaurant? |
| Robert Wheaton | No. Well, I heard that last night. I'm not sure I know who your client is. |

| | |
|---|---|
| Bill R. Hawkins | In connection with my client's interest to purchase the restaurant, I believe he said that you had incredibly well detailed financial statements for a lot of years going back. In that regard, could we get the last 5 years detailed financial statement for operations? |
| Robert Wheaton | That request would have to be through counsel. |
| Bill R. Hawkins | Okay. I've made that request, so I'll follow up with that. Alright. That's all I Have |
| Patti Chan | Okay. And finally, Ms. Fishman? Do you have any questions? And again, please state your appearance for the record. |
| Jessie Fishman | Hi Jessie Fishman on behalf of Mr. Hernandez and I actually don't have questions. Thank you. |
| Patti Chan | Okay. I just have a few more. Mr. Wheaton, do you anticipate filing a plan of reorganization within the statutory timeframe or July 7, 2021? |
| Robert Wheaton | Yes. |
| Patti Chan | Thank you so much for providing all the documents we've requested. Did Ms. Corklin speak with Mr. Dowdy or you about the monthly operating reports that need to filed due the following the month on the 21st? |
| Robert Wheaton | My understanding is yes, but I defer to Mr. Dowdy. |
| Mr. Dowdy | The answer is yes. |
| Patti Chan | And are you going to be completing the reports, or will you be hiring an accountant to assist with that? |
| Robert Wheaton | I will complete the reports. |
| Patti Chan | Okay. So first to thank everyone for your time and patience. We went longer than normal since normally we would have other 341 meetings but that would have resulted in just a continued 341 so instead, we were able to complete the questions. So, at this time I have no further questions and this 341 meeting for the Debtor is concluded. Thank you. |